## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JERLIB INVESTORS, LLC, | ) | |
| a Florida limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-06203 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| COHN & COHN, an Illinois partnership, | ) | Mag. J. Sheila M. Finnegan |
| ERWIN COHN, CHARLES A. COHN, | ) | |
| LEE S. ROSE, JOHN KRCIL, BLACK | ) | |
| LION INVESTMENT PARTNERS, INC., | ) | |
| BROWN CAPITAL FUNDING | ) | |
| INTERNATIONAL, LLC, | ) | |
| CHRISTOPHER R. BROWN | ) | |
| and STEPHEN HAY, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO CHARLES COHN AND COHN & COHN'S LOCAL RULE 56.1(b)(3) STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiff, JERLIB INVESTORS, LLC ("JerLib"), by and through its attorneys, hereby responds to Defendants Cohn & Cohn and Charles Cohn's (collectively, "Defendants") Local Rule 56.1(b)(3) Statement of Additional Material Facts (ECF No. 248) as follows:

1.      Defendant Lee Rose ("Rose") is an individual and a citizen of Illinois. Dkt. 136, ¶ 7. Rose was a close friend of Erwin's for over 40 years, as well as a client, and served as an expert witness in C&C cases. Ex. B. Rose Dep. Tr. (3.26.2021) at 248:21-249:23; Exhibit C, Charles Dep. Tr. at 76:20-21, 81:9-14, 170:12-13. Rose testified that he is the President of Black Lion Investment Partners, Inc. Exhibit B, Rose Dep. Tr. (3.26.2021) at 298:2-11. Rose is not an attorney. *Id*. at 122:22-23.

**ANSWER: Admit.**

2.      Defendant Black Lion Investment Partners, Inc. ("Black Lion") is incorporated in and has its principal place of business in Wyoming. Dkt. 136, ¶ 9. Rose, Krcil, Hay, and Wooten were all involved with Black Lion in some capacity. Dkt. 136, ¶ 52; Exhibit B, Rose Dep. Tr. (3.26.2021) at 95:5-100:23, 154:12-19.

**ANSWER: Admit.**

3.      Defendant Stephan Hay ("Hay") is an individual and is a citizen of Georgia. Dkt. 136, ¶ 12. Brown testified that he has known Hay for twenty years and Hay assisted BCFI with paperwork. Ex. H, Brown Dep. Tr. at 8:17-11:17.  Brown also testified that Hay introduced him to Krcil, and that Brown learned that Black Lion was Krcil's company from Hay. Exhibit E, Brown Dep. Tr. at 83:24-84:3.

**ANSWER: Admit.**

9.      SynSel Energy, Inc. ("SynSel"), though not a party to this lawsuit is a relevant third-party. SynSel is a biofuel company that has been searching for investors since its inception in 2013. Exhibit G, SynSel 30(b)(6) Dep. Tr. at 11:2-24. Tim Tawoda is the President and Chief Executive Officer of Synsel. Id. at 7:15-17.

**ANSWER:  JerLib objects to the statement in Paragraph 9 that SynSel is a "relevant" third-party as such assertion is ambiguous and calls for opinion testimony. Subject to and without waiving the foregoing objection, JerLib affirmatively states that SynSel is not a "relevant" third-party to this suit as it was not a party to the Escrow Agreement at issue in this case or the claims asserted by JerLib against the Cohn Defendants.**

**JerLib admits the remaining statements contained in Paragraph 9.**

5.     Erwin, who currently is ninety-four (94) years old, began his law practice in Illinois in 1951. Erwin's son, Charles, joined the firm in 1983 as an associate. Plaintiff's Answer to Cohn & Cohn and Charles Cohn's Counterclaim ("Dkt. 139"), ¶¶ 20-22. In 1983, the partnership was Cohn & Flynn, but was dissolved in 1987. Charles continued to work as Erwin's associate in the firm, Erwin Cohn & Associates until 1991. Exhibit C, Charles Dep. Tr. at 6:9-7:13.

**ANSWER: Admit.**

6.     C&C, formed by Erwin and Charles (together, "Partners"), in 1991, was, and continues to do business as a personal-injury law firm in Chicago. Dkt. 136, ¶ 24; Exhibit C, Charles Dep. Tr. at 6:9-13. At C&C, Erwin and Charles have represented clients on personal injury, social security disability, worker's compensation, and securities arbitration matters for several decades. Exhibit C, Charles Dep. Tr. at 147:16-148:8.

**ANSWER: Admit.**

7.     C&C's Partnership Agreement states that C&C was formed for the "purpose of conducting the business of the practice of law, and such other business as may be agreed upon by the Partners." Exhibit D, Charles Dep. Tr. at Exhibit 76, ¶ 1. Though C&C's partnership agreement ("Partnership Agreement") allowed each of the Partners to bind C&C in making contracts and incurring obligations, the Partnership Agreement provides that "no [p]artner shall incur any obligations in the name or on the credit of the firm exceeding $10,000.00 without the consent of the other partner." Exhibit D, Charles Dep. Tr. at Exhibit 76, ¶ 12.

**ANSWER: Admit.**

8.     On or around May 12, 2008, Charles and Erwin opened a Chase Bank primary checking account #XXXXX3532 for C&C (the "Account"). Exhibit C, Charles Dep. Tr. at

206:920. The Account maintained a balance of $50.00, without change, until February 2019. Dkt. 139, ¶¶ 26-27. Rose admitted that he was aware that Erwin "was not using" the Account. Exhibit B, Rose Dep. Tr. (3.26.2021) at 66:8-14.

**ANSWER: Admit.**

9. For day-to-day operations, C&C used another bank account at BMO Harris Bank. Exhibit C, Charles Dep. Tr. at 29:11-31:6. C&C also maintains a separate client IOLTA account, in which Rose has not been involved. Exhibit C, Charles Dep. Tr. at 31:7-14.

**ANSWER: Admit.**

10. Erwin does not use, and has never regularly used, an email account for C&C business. Exhibit C, Charles Dep. Tr. at 94:21-24, 95:14-24. C&C has a general email account, cceclaw@aol.com, which is primarily monitored by C&C's legal assistant, Leticia Garcia ("Garcia"), who prints and relays relevant information for Charles and Erwin. Exhibit E, Garcia Dep. Tr. at 8:15-20, 44:9-23. Charles also reviews the C&C email account for information concerning his clients and cases. Exhibit C, Charles Dep. Tr. at 94:1-95:24, 178:17-22; Exhibit G, Garcia Dep. Tr. at 16:11-14. Charles does not review emails not related to his clients or cases because of the amount of junk mail received by the email address. Id. at 99:4-100:3 By 2019, the -3532 account had been dormant and unused for 11 years, so Charles did not regularly monitor it. Ex. C, Charles Dep. Tr. at 88:1–22. The C&C email account received no emails regarding the -3532 account until March 2019, when Rose altered the account to send email statements. *See supra*, SOF ¶ 45. At all relevant times, Rose knew Erwin did not know how to use an email account and that Erwin did not monitor the cceclaw@aol.com account. Exhibit B, Rose Dep. Tr. (3.26.2021) at 86:3-88:20.

**ANSWER:** JerLib denies the statements contained in Paragraph 10 to the extent they contradict Charles's deposition testimony that he monitors the cceclaw@aol.com email account on a daily basis. Ex. C, Charles Cohn. Dep. Tr. at 178:17-19.[1] JerLib further denies that Paragraph 10 accurately describes Rose's testimony concerning Erwin's use and monitoring of the cceclaw@aol.com account. Rose testified that Erwin had granted Rose access to the C&C firm email account (cceclaw@aol.com) because Erwin needed help deleting old emails. Ex. B, Rose Dep. Tr. at 86:5-88:20. The cited testimony in Paragraph 10 does not support the assertion that Rose testified that Erwin did not know how to use an email account or that Erwin did not monitor the cceclaw@aol.com account.

11.     Neither Charles nor Erwin sent a single email from cceclaw@aol.com or any other account concerning the GFA, Account, or Escrow Agreement. Exhibit N, Pl. Second Am. Ans. to Defs.' Interrogatories at No. 8.; Exhibit G, SynSel 30(b)(6) Dep. Tr. at 61:18-62-9.

**ANSWER: Admit.**

12.     JerLib, BCFI, and SynSel collaborated for a year and their collaboration resulted in JerLib and SynSel executing GFAs and multiple amendments, which would entitle JerLib to make incredible returns, including for depositing funds onto its own account. Dkt. 136, ¶¶ 15-16, 18-20; Dkt. 111-1; Exhibit H, Exhibit 3 (SynSel 30(b)(6) Dep. Tr.).

**ANSWER: JerLib objects to Defendants' characterization of "incredible" returns as such characterization is an opinion and not a statement of fact. JerLib admits the remainder of Paragraph 12.**

13.     SynSel failed to make full payments pursuant to the original GFA and each of its amendments. Exhibit F, Yaecker Dep. Tr. at 95:7-23.

---

[1]     Unless stated otherwise, citations to exhibits are in reference to the exhibits attached to Charles Cohn and Cohn & Cohn's Statement of Material Facts (ECF No. 226).

**ANSWER: Admit.**

14.     BCFI, likely via Hay, introduced Tim Tawoda ("Tawoda"), SynSel's majority owner, to Rose. Exhibit G, SynSel 30(b)(6) Dep. Tr. at 54:14-55:4. Rose was brought into the deal via Krcil (introduced to BCFI by Hay), and Rose in turn suggested the use of C&C as the escrow agent for the next GFA. Exhibit H, Brown Dep. Tr. at 83:24-84:3; Exhibit R, Rose Dep. Tr. (11.19.2019) at 21:1-15, 30:18-31:1.

**ANSWER: Admit.**

15.     No person or agent of Forstner or JerLib spoke to Erwin, Charles, or any agent of C&C before JerLib executed the March GFA, signed the Escrow Agreement, and deposited $3,000,000 in the Account. Exhibit M, Pl. Third Am. Ans. to Defs.' Interrogatories at No. 10. JerLib's due diligence into C&C, Erwin, Rose, and Charles consisted of an internet search, checking that the firm was in good standing with the ARDC, and that Rose had some sort of association with C&C." Exhibit K, Boggs Dep. Tr. at 31:13-32:5, 38:13-16, 40:23-41:24; Exhibit A, Forstner Dep. Tr. at 14:10-18, 26:6-27:20, 30:4-32:8; Exhibit G, SynSel 30(b)(6) Dep. Tr. at 64:19-69:15, 111:8-15, 51:7-16, 52:8-55:4; Exhibit F, Yaecker Dep. Tr. at 37:10-39:6, 52:18-53:6, 13-17, 59:19-64:21, 68:21-69:9, 72:8-24, 112:1-114:24, 118:11-119:6.

**ANSWER:  JerLib denies Paragraph 15.  Yaecker, an agent of JerLib, testified that he spoke with Rose prior to the execution of the Escrow Agreement. Exhibit F, Yaecker Dep. Tr. at 61:2-7.  Rose was held out as an agent of C&C by Erwin and held himself out as an agent of C&C.  Rose was at all relevant times an agent of C&C, by way of the fact that: (1) Erwin added Rose as an authorized signer on the C&C client trust account (#3532) (*see* Chase Business Account Add Signers Form, at JPMC/C&C000006)[2]; (2) Erwin directly**

---

[2]     Documents bates labeled "JPMC/C&C" were produced by Chase Bank pursuant to a protective order and were previously filed under seal in this case.  *See* ECF No. 32. Consequently, these documents

informed SynSel representatives that Rose handled the escrow services provided by C&C (*see* Ex. 9 to JerLib's Statement of Facts ("JerLib SOF"), ECF No. 231-9; Ex. 11 to JerLib SOF, ECF No. 231-11); (3) Erwin understood and agreed, on behalf of C&C, that Rose was an agent of C&C in charge of administering the client trust account (*see* Ex. B, Rose Dep. Tr. at 107:23-108:17); (4) Erwin agreed and granted permission for Rose to use the C&C client trust account (*see* Ex. B, Rose Dep. Tr. at 66:8-17); (5) Rose understood that Erwin was "acting under the authority of his firm" when he agreed to allow Rose to use the C&C client trust account (*id*. at 78:13-24); (6) Rose directly held himself out as an agent of C&C and testified that he considered himself an agent of C&C in charge of administering the client trust account (*id.* at 106:10-107:15); (7) Rose's involvement with C&C as its agent and manager of escrow services was communicated in writing to the C&C firm email account, without any dispute from Charles, Erwin, or C&C, despite all three having access to that account (*see* Ex. 26 to JerLib SOF, ECF No. 231-26); and (8) Rose was given access to the C&C firm email account (*see* Ex. C, Charles Cohn. Dep. Tr. at 96-97). Yaecker therefore did have a conversation with someone from C&C, as he has testified that he had communications with Rose prior to the execution of the Escrow Agreement. Exhibit F, Yaecker Dep. Tr. at 61:2-7.

In addition, SynSel representatives spoke with Erwin at the request of JerLib. Exhibit F, Yaecker Dep. Tr. at 115:18-24.

16. Yaecker testified that he originally questioned the propriety of having the Cohn & Cohn firm as an escrow agent because it is a personal injury law firm. Exhibit I, Yaecker Dep. Tr. at 113:12-18.

---

are not being included as exhibits to this Statement of Additional Material Facts. To the extent the Court wishes an additional copy of the statements, JerLib will provide them to the Court.

**ANSWER: Admit.**

17.     Boggs also questioned why C&C was "chosen out of say, 10,000 law firms in Chicago . . .why is Brown Capital so insistent on [working with C&C]." Exhibit K, Boggs Dep. Tr. at 31:16-32:5.

**ANSWER: Admit.**

18.     During his one call with Erwin, Tawoda did not ascertain whether Rose was an employee of C&C, "the parameters of Rose's relationship with Cohn & Cohn firm," or how many other such transactions Erwin had worked on. Exhibit B, SynSel 30(b)(6) Dep. Tr. at 67:8-18. Tawoda ascertained that Rose had a relationship with Erwin, not specifically whether the relationship was personal or professional. *Id*. at 66:16-67:7.

**ANSWER: JerLib denies Paragraph 18 to the extent it contradicts Tawoda's testimony that Erwin informed him that: Erwin's "got a 41-year, approximately, working history with Lee Rose," that "JerLib can work with [Rose] on all matters with regard to the escrow," and that Rose has "been the one they've [C&C] entrusted with the escrow, escrow account." Exhibit G, SynSel 30(b)(6) Dep. Tr. at 66:16-67:2.**

**JerLib admits the remaining statements contained in Paragraph 18**

19.     Tawoda testified that he relied primarily on Brown's vouching of C&C, specifically when asked if inter alia, the conversation with Erwin made him feel comfortable with the Escrow Agreement, Tawoda stated that "there was a reason greater than that. There was a dedicated email from Chris Brown . . . stating in writing, . . . we've got a ten-year history with Cohn & Cohn doing exactly this." Exhibit B, SynSel 30(b)(6) Dep. Tr. at 111:16-24.  Brown, however, admitted at his 2021 deposition that this statement was false, that he had never worked with C&C and that he had no knowledge of C&C ever doing work for Brown Capital. Ex. E,

Brown Dep. Tr. at 96:14–99:24. Tawoda testified that though he thought it was "rather unusual" that a personal injury firm was involved in escrow, they were assured by Chris Brown. *Id*. at 654:19-65:7. Tawoda also testified that SynSel was not a party to escrow agreement, and SynSel's purpose was to just get the agreement signed. *Id*. at 68:3-5, 87:12-16, 103:1-3.

**ANSWER: JerLib denies that Tawoda testified that he relied "primarily" on Brown's vouching of C&C and denies that Tawoda testified that "SynSel's purpose was to just get the agreement signed." Tawoda testified that he personally spoke with Erwin, who let him know, amongst other things, that Rose did escrow agreement services for C&C and that Erwin had a 40-year relationship with Rose. Exhibit G, SynSel 30(b)(6) Dep. Tr. at 106:10-109:18. Tawoda testified that he felt comfortable moving forward with the escrow agreement as a result of this conversation, as well as research Synsel had completed showing that no complaints had been filed against C&C with regard to monies being taken out of their client trust account and a representation made by Chris Brown that he had a ten-year history with C&C. *Id*. at 64:19-65-2; 111:3-112:4.**

**JerLib admits the remainder of Paragraph 19.**

20.     Forstner testified that: he did not know Erwin Cohn, had never spoken with Erwin or anyone who works for Erwin in his law firm, and did not do his own independent research on Erwin's professional background before signing the JerLib contract with C&C. Ex. A, Forstner Dep. Tr. at 30:4-18. Forstner "did not personally speak with anyone at Cohn & Cohn" at any point. Exhibit N, Pl. Second Am. Ans. to Defs.' Interrogatories at No. 9. Forstner testified that he "relied on the information from Scott Yaecker and also the attorney, Mr. Boggs, who did his own independent research on [C&C]" before entering the contract with C&C. Exhibit A, Forstner Dep. Tr. at 30:19-31:4.

**ANSWER: Admit.**

21.     Yaecker testified that he did not speak with Erwin, Charles, or anyone else at C&C in February or March, 2019. Ex. F, Yaecker Dep. Tr. at 62:20-:63:7. Yaecker testified that he determined Rose was incorrectly identified as a partner of C&C on a draft Escrow Agreement, but Yaecker does not recall if he ever spoke with Rose about his improper designation as a partner of the C&C law firm. Ex. F, Yaecker Dep. at 63:16-64:18. Yaecker also conducted no research or vetting of Rose, aside from determining that "he wasn't a partner in Cohn & Cohn." Id. at 64:1421.

**ANSWER:  JerLib denies Paragraph 21 to the extent it implies that Rose was not an agent of C&C in February or March 2019.  Rose was at all relevant times an agent of C&C, by way of the fact that: (1) Erwin added Rose as an authorized signer on the C&C client trust account (#3532) (*see* Chase Business Account Add Signers Form, at JPMC/C&C000006)[3]; (2) Erwin directly informed SynSel representatives that Rose handled the escrow services provided by C&C (*see* Ex. 9 to JerLib SOF, ECF No. 231-9; Ex. 11 to JerLib SOF, ECF No. 231-11); (3) Erwin understood and agreed, on behalf of C&C, that Rose was an agent of C&C in charge of administering the client trust account (*see* Ex. B, Rose Dep. Tr. at 107:23-108:17); (4) Erwin agreed and granted permission for Rose to use the C&C client trust account (*see* Ex. B, Rose Dep. Tr. at 66:8-17); (5) Rose understood that Erwin was "acting under the authority of his firm" when he agreed to allow Rose to use the C&C client trust account (*id.* at 78:13-24); (6) Rose directly held himself out as an agent of C&C and testified that he considered himself an agent of C&C in**

---

[3]     Documents bates labeled "JPMC/C&C" were produced by Chase Bank pursuant to a protective order and were previously filed under seal in this case.  *See* ECF No. 32. Consequently, these documents are not being included as exhibits to this Statement of Additional Material Facts.  To the extent the Court wishes an additional copy of the statements, JerLib will provide them to the Court.

charge of administering the client trust account (*id.* at 106:10-107:15); (7) Rose's involvement with C&C as its agent and manager of escrow services was communicated in writing to the C&C firm email account, without any dispute from Charles, Erwin, or C&C, despite all three having access to that account (*see* Ex. 26 to JerLib SOF, ECF No. 231-26); and (8) Rose was given access to the C&C firm email account (*see* Ex. C, Charles Cohn. Dep. Tr. at 96-97). Yaecker therefore did have a conversation with someone from C&C, as he has testified that he had communications with Rose prior to the execution of the Escrow Agreement. Exhibit F, Yaecker Dep. Tr. at 61:2-7.

JerLib admits the remaining statements contained in Paragraph 21.

22. Yaecker testified that in deciding to enter into the escrow agreement and good faith agreement he relied on Brown's representations "that Brown Capital worked with Cohn & Cohn for over a decade." Ex. I, Yaecker Dep. Tr. at 122:23-123:4. Yaecker testified that he also relied on representations of Tawoda in making his decision whether or not to advise JerLib to deposit $3 million into the Cohn & Cohn" Account. Ex. I, Yaecker Dep. Tr. at 124:7-12. Yaecker testified that his primary source of information concerning Cohn & Cohn was "[t]he ARDC, finding out that they were a firm in good standing." Ex. I, Yaecker Dep. Tr. at 114:6-21.

**ANSWER: JerLib denies that Yaecker testified that he relied on representations of Tawoda in making his decision whether or not to advise JerLib to deposit $3 million into the C&C Escrow Account. Rather, Yaecker testified that he relied on the representations made by Erwin to Tawoda, which representations were then conveyed to Yaecker. Ex. F, Yaecker Dep. Tr. at 124:7-16. Yaecker further testified that Tawoda had reached out to Erwin at the behest of JerLib. *Id*.**

**JerLib further denies Paragraph 22 to the extent it misconstrues the larger context of Yaecker's testimony, in which he described the various aspects of information concerning C&C that he, on behalf of JerLib, relied upon in depositing the $3 million into the C&C Escrow Account. Specifically, in agreeing to deposit the $3,000,000 into the C&C Escrow Account, JerLib relied on the false statements from Erwin to SynSel, which were subsequently conveyed to JerLib. Ex. F, Yaecker Dep. Tr. at 124:7-16; Ex. 9 to JerLib SOF, ECF No. 231-9; Ex. 11 to JerLib SOF, ECF No. 231-11. In addition, JerLib relied on the fact that at no point in time did anyone from C&C raise an objection or concern about its involvement with the Escrow Agreement, despite the fact that numerous emails were sent to the C&C email account directly addressing the Escrow Agreement. *See* Ex. 26 to JerLib SOF, ECF No. 231-26; Ex. 1 to JerLib SOF, Yaecker Aff., ECF No. 231-1 at ¶¶ 12-13. This included Buckta's March 6, 2019 email explaining the information Erwin provided SynSel regarding Rose's relationship with C&C and its escrow services. *Id*.**

23.    Boggs testified that his efforts to review Erwin's background were similar to Yaecker's and involved an "[i]nternet search, checking with the [ARDC]." Ex. K, Boggs Dep. Tr. at 40:23-41:19. Boggs testified that JerLib may have relied in part on Brown's representations regarding BCFI's relationship with C&C. Ex. K, Boggs Dep. Tr. at 43:6-18. Boggs did not speak with Erwin, Charles, or anyone else at C&C until he "encountered a problem with the return of the $3 million." Ex K., Boggs Dep. Tr. at 43:19-46:12.

**ANSWER: Admit.**

24.    Rose provided revisions and comments regarding the terms of the Escrow Agreement, including the parties' obligations. Exhibit D, Rose Dep. Tr. (3.26.2021) at 138:22-142:8. Yaecker never spoke to Charles or Erwin about the Escrow Agreement, but rather spoke

to Rose about "legalese or the verbalese in the escrow agreement." Exhibit I, Yaecker Dep. Tr. at 61:2-7; Exhibit M, Pl. Third Am. Ans. to Defs.' Interrogatories at Nos. 26, 32. Yaecker also confirmed that Rose "got involved in the communications, in the back and forth negotiations" regarding the Escrow Agreement. Exhibit I, Yaecker Dep. Tr. at 60:1-9. Further, Hay and Boggs were involved in the drafting of the Escrow Agreement. Exhibit I, Yaecker Dep. Tr. at 56:3:4, 88:1-4. SynSel orchestrated the exchange of documents and emails between the signing parties. Exhibit I, Yaecker Dep. Tr. at 110:21-111:2.

**ANSWER: Admit.**

25.     On March 2, 2019, without Charles's knowledge or consent, Rose accompanied Erwin to the Wilmette branch of Chase bank. Exhibit B, Rose Dep. Tr. (3.26.2021) at 236:9-15; Exhibit C, Charles Dep. Tr. at 103:11-15, 146:10-14. During the visit, Rose was added as a signatory to the Account, Charles was removed as a signatory to the Account, and the Account's paper statements and notifications (that were previously mailed to C&C's office) were redirected to electronic form sent to the general C&C email address, cceclaw@aol.com email address. Affidavit of Victor J. Pioli, Exhibit ("Dkt. 32"); Dkt. 136, ¶ 51; Affidavit of Victor J. Pioli ("Dkt. 30"), ¶ 9; Exhibit C, Charles Dep. Tr. at 94:1-95:24; 103:11-15; 146:10-14; Exhibit B, Rose Dep. Tr. (3.26.2021) at 236:9-15; Exhibit P, Bank Notification Addressed to Lee Rose. Prior to this change, C&C did not have a history of receiving emails from Chase on any account. Exhibit C, Charles Dep. Tr. at 100:10-24. Rose also opened another Chase Bank Account # 8928, which he enrolled in paperless statements. Exhibit B, Rose Dep. Tr. (3.26.2021) at 125:18-126:9, 224:5-225:4.

**ANSWER: JerLib denies Paragraph 25 to the extent it implies that Rose was added as a signatory to the Escrow Account without the explicit approval and knowledge of**

Erwin. Erwin explicitly added Rose as an authorized signer on the C&C Escrow Account. *See* Chase Business Account Add Signers Form, at JPMC/C&C000006. JerLib further denies Paragraph 44 to the extent it implies that Charles was removed as a signatory to the Escrow Account without the explicit approval and knowledge of Erwin. Erwin explicitly removed Charles as an authorized signer on the C&C Escrow Account. *See* Chase Business Account Remove Signers Form, at JPMC/C&C000007. JerLib further denies Paragraph 44 in that Chase Bank Account #8928 was in the name of Erwin, not Rose. Ex. B, Rose Dep. Tr. at 125:23-126:1. Because it was opened in Erwin's name, Erwin opened Chase Bank Account #8928. *Id*. at 225:1-4.

JerLib further denies that any of the banking activity with respect to the Escrow Account or Chase Bank Account *8928 was being completed without the knowledge of Charles. Notifications regarding changes to these accounts were being sent to the C&C firm email account (cceclaw@aol.com), which Charles had access to and monitored on a daily basis. *See* Ex. C, Charles Cohn Dep. Tr. at 178:17-19; JerLib SOF at ¶¶ 57-61.

26. Charles never authorized C&C's inclusion in or obligations under the Escrow Agreement. Exhibit C, Charles Dep. Tr. at 136:12-20.

**ANSWER:** JerLib objects to Paragraph 26 as it calls for a legal conclusion. Subject to and without waiving said objection, JerLib denies Paragraph 26 as Charles did, in fact, authorize C&C's inclusion in or obligations under the Escrow Agreement by entering into the C&C Partnership Agreement, pursuant to which Charles granted Erwin the authority to bind C&C and Charles to the Escrow Agreement. Exhibit D, C&C Partnership Agreement, ¶ 12. In addition, Charles authorized C&C's inclusion in or obligations under the Escrow Agreement by granting Erwin authority under various agency principals to

bind C&C and Charles to the Escrow Agreement. *See* JerLib's Memorandum of Law in Support of Motion for Summary Judgment, ECF No. 222, pp. 7-15.

27. Erwin believed, pursuant to Rose's instructions, and told Yaecker and Boggs, that he "could not release those funds as only Lee Rose could [and] only with authorization from Treasury Department." Exhibit L, Pl. Second Am. Ans. to Defs.' Interrogatories at No. 22; Group Exhibit O, Emails Between Rose and JerLib; Exhibit J, Rose Dep. Tr. (11.19.2019) at 141:23142:10. Rose confirmed as much in his first deposition when he stated "[n]obody can pay out any money . . . without approval of the Treasury Department." Exhibit J, Rose Dep. Tr. (11.19.2019) at 141:23-142:10. Accordingly, Erwin believed Rose's instruction that the Account is authorized to receive funds, but only Rose could distribute funds after receiving approval from the U.S. Department of Treasury. *Id.*

**ANSWER: JerLib denies Paragraph 27 as it contains no evidentiary support for what Erwin "believed" to be true concerning the release of JerLib's funds.**

28. No money was transferred to Charles or C&C, out of this Account. Dkts. 30, 32; Exhibit D, Rose Dep. Tr. (3.26.2021) at 224:5-226:21.

**ANSWER: Admit.**

29. Yaecker testified that in the summer of 2019, he called Rose and requested that he return the $3,000,000. Exhibit I, Yaecker Dep. Tr. at 66:7-69:22. Rose told Yaecker that the Treasury Department had to authorize the release of the funds. Exhibit I, Yaecker Dep. Tr. at 66:22-67:15.

**ANSWER: Admit.**

30. In late July or early August 2019, Charles received a telephone call from Boggs, counsel for JerLib, who demanded return of a $3,000,000 deposit from the Account. Dkt. 139, ¶¶

68-69. Specifically, Yaecker testified that he called "up Charles and basically said there seems to be something going on, that you better look into it." Exhibit I, Yaecker Dep. Tr. at 72:21-24. Charles thereafter learned about the events that transpired with Rose, and Rose's involvement with SynSel and JerLib. Exhibit C, Charles Dep. Tr. at 32:9-20, 35:5-17, 40:4-8, 45:19-46:4, 72:10-13, 79:3-11.

**ANSWER: Admit.**

31.     C&C's legal assistant, Garcia testified that she never had any conversations related to escrow agreements with either Charles or Erwin. Exhibit G, Garcia Dep. Tr. at 55:10-56:6. Even the other escrow agreements in this case became known to C&C only after litigation began. Exhibit C, Charles Dep. Tr. at 195:10-20.

**ANSWER: JerLib denies Paragraph 31 in that the other escrow agreements were emailed to C&C's general email account.  *See* Group Ex. 28 to JerLib SOF, ECF No. 231-28.  JerLib admits the remainder of Paragraph 31.**

32.     Pursuant to Section 11 of the Escrow Agreement:

Escrow Agent shall not incur any liability for (i) any act or failure to act made or omitted in good faith or (ii) … nor will the Escrow Agent be liable or responsible for any forgeries, fraud, impersonations, or determining the scope of any representative authority, provided that the Escrow Agent believed in good faith, that such forgeries, fraud or impersonation were genuine.

Exhibit P, Exhibit 2 (Forstner Dep. Tr.).

**ANSWER: Admit.**

Joseph R. Marconi (marconij@jbltd.com)          Respectfully submitted,
Victor J. Pioli (pioliv@jbltd.com)              JERLIB INVESTORS, LLC
Ramses Jalalpour (jalalpourr@jbltd.com)
JOHNSON & BELL, LTD.                             By:  _/s/ *Victor J. Pioli*_____
33 West Monroe Street                           One of Its Attorneys
Suite 2700
Chicago, Illinois 60603
312.372.0770 (T)

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on September 2, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*/s/ Victor J. Pioli*       
