**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JERLIB INVESTORS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-06203 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| COHN & COHN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In connection with what was represented to be a lucrative investment opportunity, Plaintiff JerLib Investors, LLC ("JerLib") deposited $3 million in an escrow account held by Defendant Cohn & Cohn, a law firm consisting of two partners, Defendants Charles Cohn ("Charles") and Erwin Cohn ("Erwin"). When the investment fell through, JerLib requested that Cohn & Cohn return its deposit. JerLib brought the present action after Cohn & Cohn failed to comply with JerLib's request. JerLib's Second Amended Complaint asserts claims against Cohn & Cohn, Charles, and Erwin for breach of contract, breach of fiduciary duty, conversion, and fraud. (Dkt. No. 111.) Now before the Court are JerLib's motion for partial summary judgment (Dkt. No. 221), Charles and Cohn & Cohn's (collectively, "Firm Defendants") motion for summary judgment as to all claims (Dkt. No. 224), and Erwin's motion for judgment on the pleadings and for partial summary judgment (Dkt. No. 228). For the reasons that follow, JerLib's motion is granted, and Firm Defendants' and Erwin's motions are granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

JerLib is a Florida-based company whose single member, Gerald Forstner, formed it in connection with an investment opportunity offered by SynSel Energy, Inc. ("SynSel"), a biofuel company. (Defs. Charles Cohn and Cohn & Cohn's Response to Pl.'s Statement of Material Facts in Supp. of Mot. for Summ. J. ("CCRPSF") ¶¶ 1, 5, Dkt. No. 248; Pl.'s Resp. to Defs. Charles Cohn and Cohn & Cohn's Statement of Material Facts in Supp. of Mot. for Summ. J. ("PRCCSF") ¶¶ 9, 21.) In particular, SynSel was looking to undertake a transaction in which it would receive financing to construct biofuel plants from Defendant Brown Capital Funding International, LLC ("BCFI"), a direct-lending company with a single member, Defendant Christopher Brown. (CCRPSF ¶ 5; PRCCSF ¶¶ 7, 18, 19.) BCFI proposed using a "good faith" account form of financing for SynSel's business, whereby SynSel, as the party seeking the loan, was required to make a good faith showing that it had access to capital representing 25% of its loan. (PRCCSF ¶¶ 18–20.)

A third-party company approached Forstner about providing financial support for SynSel's transaction with BCFI. (CCPRSF ¶ 5; PRCCSF ¶ 18.) Forstner had no previous relationship with either SynSel or BCFI, but he nonetheless proceeded to form JerLib for the purpose of doing business with SynSel. (PRCCSF ¶¶ 18, 20–21.) While JerLib had no employees, Forstner's accountant and business manager, Scott Yaecker, served as JerLib's agent in the dealings relevant here. (Id. ¶ 22.) In addition, David Boggs, a North Carolina attorney, served as JerLib's outside counsel. (Id.) After working with BCFI and SynSel, JerLib entered into its first Good Faith Agreement with SynSel on May 25, 2018. (CCRPSF ¶ 7; PRCCSF ¶¶ 23–24.) Under that agreement, JerLib was to deposit $3 million in a specially held account under its own name, which would allow BCFI to obtain $12 million in financing for SynSel.

(CCRPSF ¶ 7; PRCCSF ¶ 24.) In exchange, SynSel agreed to pay JerLib a return consisting of a $1 million transaction fee, paid after 90 days, and $240,000 in legal fees and contingencies, paid in four installments over a year. (PRCCSF ¶ 24.) JerLib subsequently deposited the $3 million as agreed, but BCFI was unable to obtain financing for SynSel and SynSel was unable to timely pay JerLib the promised return. (CCRPSF ¶ 8; PRCCSF ¶¶ 25–27.) As a result, the Good Faith Agreement was amended to extend SynSel's time to pay JerLib while also increasing the amount of JerLib's return. (PRCCSF ¶ 26.) When SynSel again failed to pay JerLib, the process repeated. (*Id.*) Altogether, the original Good Faith Agreement was amended six times and the amount due to JerLib was increased to $1,550,000, but SynSel remained unable meet its payment obligations. (CCRPSF ¶ 8; PRCCSF ¶¶ 26–27.)

Despite SynSel's failure to obtain financing from BCFI and pay JerLib pursuant to the initial Good Faith Agreement, it nonetheless sought to enter into a new Good Faith Agreement with JerLib. (CCRPSF ¶ 9; PRCCSF ¶ 28.) To that end, Defendant Lee Rose was brought into the deal. (PRCCSF ¶ 28.) Rose was a principal in Defendant Black Lion Investment Partners, Inc. ("Black Lion"), along with Defendant John Krcil and Edward Wooten. (CCRPSF ¶ 46; PRCCSF ¶¶ 3–6.) Rose suggested that JerLib and SynSel enter a new Good Faith Agreement in which the $3 million would be deposited in a cash escrow account, and he recommended using Cohn & Cohn as the escrow agent. (CCRPSF ¶¶ 11–12; PRCCSF ¶ 28.) Cohn & Cohn was an Illinois personal-injury law firm organized as a general partnership under Illinois law. (PRCCSF ¶¶ 2, 13–14; Pl.'s Statement of Material Facts, Ex. 3, Partnership Agreement, Dkt. No. 231-3.) The firm's two partners were Erwin, and his son, Charles, and they both represented clients in personal injury, Social Security Disability, worker's compensation, and securities arbitration

matters. (PRCCSF ¶¶ 2, 12–14.) Rose was a long-time friend of the 94-year-old Erwin and had previously served as an expert witness for Cohn & Cohn. (*Id.* ¶ 3.)

On February 21, 2019, BCFI provided SynSel with an initial draft of an escrow agreement between JerLib and Cohn & Cohn, which listed Cohn & Cohn as the escrow agent and identified Rose as the Cohn & Cohn partner representing the firm. (CCRPSF ¶ 15; PRCCSF ¶ 30.) After JerLib received a copy of the draft escrow agreement, both Yaecker and Boggs questioned why a small personal-injury law firm that had no previous relationship with JerLib or Forstner was chosen to serve as the escrow agent. (CCRPSF ¶¶ 13, 16; PRCCSF ¶¶ 31–33.) In a February 27, 2019 email, Yaecker wrote to BCFI's Brown explaining that he had asked "Tim Tawoda [CEO of SynSel] how Cohn & Cohn was selected to act as the escrow agent, how they had been vetted, and what prior experience [Tawoda] had with them. Tim said he hadn't been involved in the selection" and directed Yaecker to refer those questions to Brown. (CCRPSF ¶ 16.) In response, Brown stated that he selected Cohn & Cohn as escrow agent because the firm had "proven themselves to serve our needs for well over a decade." (CCRPSF ¶ 17; PRCCSF ¶ 33.) Yet Brown later admitted that neither he nor BCFI had previously worked with Cohn & Cohn. (*Id.*)

To investigate the chosen escrow agent further, JerLib asked Tawoda to reach out directly to Cohn & Cohn. (CCRPSF ¶ 18.) On March 6, 2019, Tawoda sent an email to Yaecker in which he stated that he had personally spoken with Erwin and that Erwin "verified that [Rose] is the escrow agent—NOT a partner at Cohn & Cohn" and that "Rose and Erwin have known each other for 40 years and [Rose] does a lot of these with Cohn & Cohn." (*Id.* ¶ 20.) Tawoda later testified that the conversation described in the email was consistent with a five-minute phone call he had with Erwin. (CCRPSF ¶ 21; PRCCSF ¶ 34.) That same day, another agent of SynSel,

Brian Buckta, emailed Yaecker to inform him that Tawoda "was able to verify [Rose's] 41-year association with Cohn & Cohn by speaking directly with Erwin." (CCRPSF ¶ 22.) Buckta further explained that "Lee Rose is a financial specialist who manages Escrow services for Cohn & Cohn, working under the full authority of the firm" and that "BCFI erroneously listed Lee as a Partner when they completed the template, as they assumed he was an attorney due to his role and tenure with the firm." (*Id.*) Though disputed, Buckta later testified that his email was consistent with a discussion he had with Erwin by phone. (*Id.* ¶ 24.)

After SynSel's representatives spoke with Erwin, the draft Good Faith Agreement was revised to remove Rose as the signatory for Cohn & Cohn and replace him with Erwin. (CCRPSF ¶ 25; PRCCSF ¶ 36.) At no point was either Erwin or Charles involved in drafting or revising the Good Faith Agreement, and instead, Rose claimed to work on behalf of Cohn & Cohn during the process. (PRCCSF ¶¶ 37–38, 41–43.) Moreover, SynSel was the primary conduit for the exchange of documents and communications between JerLib and Rose. (*Id.* ¶ 43.)

On March 2, 2019, Rose accompanied Erwin to a Chase Bank branch and had himself added as a signatory to an existing but little-used Cohn & Cohn checking account ending 3532 ("Escrow Account"). (CCRPSF ¶¶ 37–39; PRCCSF ¶¶ 15, 44; Defs. Charles Cohn and Cohn & Cohn's Resp. to Pl.'s Statement of Additional Facts ("CCRPSAF") ¶¶ 7–8, Dkt. No. 267.) At the same time, Rose removed Charles as a signatory to the Escrow Account and changed the delivery format of the account's statements and notifications to have the documents sent electronically to the general Cohn & Cohn email address, cceclaw@aol.com, whereas they were previously sent in paper form to Cohn & Cohn's office. (PRCCSF ¶ 44.) Erwin did not regularly monitor the cceclaw@aol.com account, and Rose was aware that Erwin had difficulties using that email account. (*Id.* ¶ 17.) During the visit, a new Chase Bank account ending 8928 was

opened under Erwin's name ("8928 Account"), with Rose given signatory access. (CCRPSF ¶¶ 58–59; PRCCSF ¶ 44.) As with the Escrow Account, statements and notifications regarding the 8928 Account would be sent in electronic form to Cohn & Cohn's email account. (*Id.*)

Several days later, SynSel and JerLib executed a new Good Faith Agreement with an effective date of March 13, 2019 ("March 2019 GFA"), under which JerLib would deposit the $3 million it previously held in its own bank account into the Escrow Account with Cohn & Cohn serving as the escrow agent. (CCRPSF ¶¶ 26, 44; PRCCSF ¶¶ 45–46.) In exchange for its deposit, SynSel promised to pay JerLib over the course of 14 months an amount equal to the unpaid $1,550,000 from the first Good Faith Agreement along with additional fees and interest. (PRCCSF ¶ 47.) JerLib contemporaneously executed an escrow agreement with Cohn & Cohn ("Escrow Agreement"), which was attached to the March 2019 GFA. (CCRPSF ¶ 27; PRCCSF ¶ 49.) The Escrow Agreement listed Cohn & Cohn as the escrow agent and Erwin signed the agreement on behalf of Cohn & Cohn.[1] (CCRPSF ¶ 31.) Under the Escrow Agreement, JerLib agreed to deposit $3 million into the Escrow Account, where that sum would be held separately from any other funds and for JerLib's exclusive benefit. (*Id.* ¶¶ 32–34.) As the escrow agent, Cohn & Cohn could act solely upon instructions from JerLib and could not move or transfer the funds without JerLib's express written consent and instruction. (*Id.* ¶¶ 33–35.) Finally, the Escrow Agreement provided that, after 75 days, JerLib would have an absolute right to the return of the $3 million upon written notice to Cohn & Cohn. (*Id.* ¶ 33.)

On March 18, 2019, JerLib deposited $3 million into the Escrow Account. (CCRPSF ¶ 36; PRCCSF ¶ 53.) Prior to making the deposit, none of JerLib's agents (*i.e.*, Forstner,

---

[1] Rose presented the Escrow Agreement to Erwin and asked him to sign it. (CCRPSF ¶ 28.) Neither Erwin nor Firm Defendants dispute that Erwin signed the Escrow Agreement. (*Id.* ¶¶ 29–30.)

Yaecker, and Boggs) had any direct communications with Erwin or Charles. (PRCCSF ¶ 54.)
That same day, $175,000 of JerLib's funds were transferred out of the Escrow Account and into
the 8928 Account, then later from the 8928 Account to Rose. (CCRPSF ¶¶ 47, 60; PRCCSF
¶ 56; CCRPSAF ¶ 15.) Four days later, Rose made a cash withdrawal of $20,000 from the
Escrow Account, converted it into a cashier's check, and paid that cashier's check to Erwin as a
"fee for handling paperwork." (PRCCSF ¶ 56; CCRPSAF ¶ 14.) Erwin signed the cashier's
check and deposited the $20,000 in his personal bank account. (*Id.*) Within 22 days of the
deposit, JerLib's remaining funds were transferred out of the Escrow Account and directed to
Rose, Black Lion, or one of Black Lion's other principals. (CCRPSF ¶¶ 47–48; PRCCSF ¶ 56.)
Meanwhile, Rose had used the Escrow Account to deposit funds obtained pursuant to similar
escrow agreements with other investors.[2] (CCRPSF ¶¶ 39, 54–57; CCRPSAF ¶ 36.)

Ultimately, BCFI was unable to obtain the promised financing for SynSel, which left
SynSel unable perform its obligations to JerLib pursuant to the March 2019 GFA. (CCRPSF
¶ 40.) Consequently, JerLib attempted to exercise its right to the immediate return of its $3
million deposit. (CCRPSF ¶ 42.) JerLib's first attempt came by way of a July 12, 2019 letter to
Erwin that went unanswered. (*Id.*) JerLib followed up on its request twice in August 2019 but
received no response. (*Id.* ¶ 43.) When Yaecker reached out to Rose seeking the return of
JerLib's funds, Rose told Yaecker that "the Treasury Department had to authorize the release of
the funds." (PRCCSF ¶ 58.) In late July or early August 2019, JerLib's counsel, Boggs, was able
to contact Charles regarding JerLib's request for the return of its $3 million and advised him that
"there seems to be something going on" that Charles needed to look into. (*Id.* ¶ 59.) Charles

---

[2] Like the Escrow Agreement, those other escrow agreements listed Cohn & Cohn as the escrow agent.
But unlike here, Rose signed them purportedly on Cohn & Cohn's behalf. (CCRPSF ¶ 54; Pl.'s Statement
of Material Facts, Ex. 27, Dkt. No. 231-26.)

claims that it was only after Boggs's call that he first learned about the situation with Rose and Erwin. (*Id.*)

Having still not obtained the return of its funds, JerLib initiated the present lawsuit on September 17, 2019. (Dkt. No. 1.) Erwin appeared at multiple in-person hearings before this Court. (CCRPSF ¶ 63.) During a hearing on September 20, 2019, Erwin acknowledged that he was the escrow agent for the Escrow Account but claimed that he could not return JerLib's funds "without the approval of the Treasury Department." (*Id.* ¶ 64.) Erwin later explained to the Court at subsequent hearings that government authorities would only allow him to return JerLib's $3 million if Forstner personally appeared to verify his identity and collect the funds. (*Id.* ¶¶ 65–66.) Those statements were inaccurate, but Charles, Erwin, and Cohn & Cohn all contend that Erwin did not make them with an intent to mislead, as Erwin himself had been deceived by his longtime friend Rose. (*Id.* ¶¶ 63–67.) Similarly, Rose gave testimony in connection with the present action during which he stated that JerLib would receive its $3 million when Forstner showed up in Court to claim it. (PRCCSF ¶ 61.) Yet Rose incongruously insisted that he was free to do "whatever he wanted" with JerLib's $3 million and did not need to repay it, characterizing the money as a "perfect $3 million gift." (CCRPSF ¶ 49; PRCCSF ¶ 61.)

On July 30, 2021, the United States Securities and Exchange Commission filed a complaint against Rose, Black Lion, Krcil, and Wooten, alleging that they defrauded three investors out of $3,340,000, in a scheme resembling the allegations here. (PRCCSF ¶ 63.) Default judgment was entered as to Rose, Black Lion, Krcil, and Wooten in that action on November 2, 2021. (*Id.*) In addition, JerLib obtained a default judgment against Wooten in North Carolina state court for a sum that included $2,760,000 in compensatory damages and $5,520,000 in punitive damages. (*Id.* ¶ 65.)

JerLib's ten-count Second Amended Complaint in this case alleges the following claims against Erwin, Charles, and Cohn & Cohn: requests for injunctive relief, declaratory judgment, and an accounting, each relating to the return of JerLib's $3 million deposit (Counts I–III); breach of contract (Count IV); breach of fiduciary duty (Count V); conversion (Count VI); fraud (Count VII); consumer fraud (Count VIII); civil conspiracy (Count IX); and, in the alternative to Count VI's conversion claim, unjust enrichment (Count X). (Second Am. Compl., Dkt. No. 111.) Further, Rose is named as a Defendant with respect to all Counts except for Count IV. Krcil and Black Lion are included as Defendants for purposes of Counts VI through X. And BCFI, its owner, Brown, and another BCFI agent, Stephen Hay, are named as Defendants in Counts VII through X. The Court has since entered default judgment as to liability with respect to Krcil, Black Lion, BCFI, Brown, and Hay, and entered default as to Rose.[3] (Dkt. No. 205.) Thus, only Erwin, Charles, and Cohn & Cohn are actively litigating JerLib's claims.

Now before the Court are motions for summary judgment brought by JerLib, Firm Defendants, and Erwin. JerLib requests that summary judgment be entered against Firm Defendants and Erwin as to its claims for breach of contract, breach of fiduciary duty, and conversion (Counts IV–VI). Firm Defendants seek summary judgment as to all Counts against them. And Erwin seeks summary judgment in his favor as to the claims for conversion, fraud,

---

[3] Firm Defendants have asserted a counterclaim against JerLib, crossclaims against Rose, and third-party claims against Black Lion, Krcil, BCFI, Brown, Hay, and Wooten. (Dkt. No. 110.) Similarly, Erwin has asserted crossclaims against Rose and third-party claims as to Black Lion, Krcil, BCFI, Brown, Hay, and Wooten. (Dkt. No. 120.) Charles, Cohn & Cohn, and Erwin moved for default judgment as to their crossclaims and third-party claims (Dkt. Nos. 155, 173, 201), but this Court denied those motions without prejudice. (Dkt. No. 205.)

consumer fraud, and civil conspiracy (Counts VI–IX),[4] and with respect to certain damages issues.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, JerLib and Firm Defendants move for summary judgment as to the claims for breach of contract, breach of fiduciary duty, and conversion, with Erwin also moving for summary judgment as to conversion. In the case of cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

Broadly, Firm Defendants contend they are entitled to summary judgment as to all Counts because Erwin was not authorized to execute the Escrow Agreement on behalf of Cohn & Cohn. Firm Defendants also argue that summary judgment should be entered in their favor because Erwin acted in good faith and therefore the Escrow Agreement protects them from liability. At minimum, Firm Defendants assert that both contentions are sufficient to defeat JerLib's motion for summary judgment. Thus, the Court will begin with those two issues since they are applicable to all claims. The Court will then turn to the parties' various individual

---

[4] While Erwin characterizes his motion as to Counts VI through IX as one for either judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or partial summary judgment, his arguments regarding those counts often refer to matters outside the pleadings, and for that reason, JerLib's opposition treated the entire motion as one for summary judgment. The Court agrees that Erwin's motion is best evaluated as arising solely under Federal Rule of Civil Procedure 56.

contentions regarding the claims asserted at Counts IV through X.[5] To conclude, the Court will address any remaining contentions as to damages.

## I.      Firm Defendants' Liability for Erwin's Acts

According to Firm Defendants, all JerLib's claims fail because Erwin acted outside the ordinary course of Cohn & Cohn's business as a personal-injury law firm by executing the Escrow Agreement. At minimum, Firm Defendants assert that there are genuine issues of fact regarding Erwin's ability to execute the Escrow Agreement on Cohn & Cohn's behalf that defeat JerLib's motion for summary judgment.

Cohn & Cohn is a general partnership, and under Illinois law, partners "are agents of the partnership and of one another for purposes of the businesses." *Ioerger v. Halverson Constr. Co.*, 902 N.E.2d 645, 648 (Ill. 2008). Thus, Illinois's Uniform Partnership Act ("UPA") provides that "[a] partnership is liable for loss or injury caused to a person . . . as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with the authority of the partnership." 805 ILCS 206/305(a). The UPA further states that "[a]n act of a partner which is not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners." 805 ILCS 206/301(2). Firm Defendants claim that Erwin acted outside the scope of Cohn & Cohn's business as a personal-injury law firm when he executed the Escrow Agreement to assist parties with which the firm had no previous relationship in obtaining financing for a biofuel plant construction project.

The Court begins by addressing certain preliminary issues that may impact or dispose of multiple claims. The Court agrees that Firm Defendants have a strong argument that the Escrow

---

[5] Neither Firm Defendants nor Erwin make any arguments specific to Counts I through III.

Agreement was outside Cohn & Cohn's ordinary course of business given that Erwin was not acting as an attorney with respect to the Escrow Agreement, nor was there any history of an attorney-client relationship between the firm and either JerLib or SynSel. Nonetheless, section 305(a) of the UPA also makes the partnership liable where a partner acts "with the authority of the partnership." 805 ILCS 206/305(a). Similarly, section 301's rules as to a single partner's ability to bind the partnership is "[s]ubject to the effect of a statement of partnership authority." 805 ILCS 206/301.

> Relevant here, section 12 of Cohn & Cohn's partnership agreement provides that:
>
> Each partner shall have equal voice in the management of the Partnership and shall have authority to bind the Partnership in making contracts and incurring obligations in the name and on the credit of the firm. However, no Partner shall incur any obligations in the name or on the credit of the firm exceeding $10,000.00 without the consent of the other partner.

(Partnership Agreement § 12; *see also* CCRPSF ¶ 14; PRCCSF ¶ 14.) By its express terms, the partnership agreement gives a single partner the ability to execute any contract so long as he does not incur an obligation greater than $10,000. Firm Defendants do not contend that Cohn & Cohn incurred an obligation exceeding $10,000 with respect to the Escrow Agreement, and they could not, since Cohn & Cohn's job as escrow agent was simply to "ensure the security of the escrowed funds" but otherwise it had no interest in them. (Pl.'s Statement of Material Facts, Ex. 14, Escrow Agreement § 12, Dkt. No. 231-14.)

Yet Firm Defendants claim that the otherwise plain language of section 12 of Cohn & Cohn's partnership agreement must be read in conjunction with section 1 of the agreement. There, the partnership agreement states that Cohn & Cohn was formed as "a Partnership for the purpose of conducting the business of the practice of law, and such other business as may be agreed upon by the Partners." (Partnership Agreement § 1; *see also* PRCCSF ¶ 14.) Essentially,

Firm Defendants argue that section 1 modifies section 12 so as to add another, unenumerated exception to a single partner's ability to execute a contract on behalf of the firm—not only must the contract incur no obligation of greater than $10,000, but it also must relate to the practice of law. The Court rejects such an interpretation, however, as it conflicts with the plain language of section 12. *See, e.g.*, *Guarantee Tr. Life Ins. Co. v. Platinum Supplemental Ins., Inc.*, 68 N.E.3d 481, 489 (Ill. App. Ct. 2016) ("The contractual language must be given its plain and ordinary meaning."). Had Cohn & Cohn intended to limit a single partner's ability to bind the firm as Firm Defendants now propose, it could have expressly done so in section 12, just as it did with respect to obligations in excess of $10,000. *See, e.g.*, *Gallagher v. Lenart*, 854 N.E.2d 800, 807 (Ill. App. Ct. 2006) ("A presumption exists against provisions that easily could have been included in the contract but were not.").

While Firm Defendants correctly observe that "[a] contract must be construed as a whole, viewing each provision in light of the other provisions," *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011), the Court disagrees that section 1 impliedly modifies section 12. Section 1 simply states Cohn & Cohn was formed to conduct a particular type of business—the practice of law. But it does not necessarily follow that the fundamental nature of a law firm's business can be changed by a small number of transactions not directly related to the practice of law. That being the case, the Court declines to modify section 12 "in a way that is contrary to the plain and obvious meaning of the language used." *Id.*; *see also Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021) ("A court will not rewrite a contract to suit one of the parties." (quoting *Wright v. Chi. Title Ins. Co.*, 554 N.E.2d 511, 514 (Ill. App. Ct. 1990))).

Section 12's clear and unambiguous language gave Erwin the right to bind Cohn & Cohn to the Escrow Agreement, even though that contract may not have been related to the practice of

law. Consequently, Firm Defendants can neither obtain summary judgment as to JerLib's claims against them nor defeat JerLib's motion for summary judgment by arguing that the Escrow Agreement was outside the ordinary course of Cohn & Cohn's business.

## II. Good Faith

Next, Firm Defendants note that there is an applicable exculpatory clause in the Escrow Agreement that absolves Cohn & Cohn from liability for acts or omissions made in good faith. They argue that the exculpatory clause applies here because Erwin honestly believed his longtime friend Rose's representations regarding the Escrow Agreement, only to learn that Rose had taken advantage of his trust.

Section 11 of the Escrow Agreement provides, in relevant part, as follows:

> In performing any duties under this Agreement, the Escrow Agent shall not be liable to any party for damages, losses, or expenses except that Escrow Agent shall be liable to Client for all damages, losses and expenses that may be incurred or suffered by Client or otherwise due Client on account of breach or failure of any of Escrow Agent's duties and obligations to Client under this Agreement. The Escrow Agent shall not incur any liability for (i) any act or failure to act made or omitted in good faith or (ii) any action taken or omitted in reliance on any instrument, including any written statement or affidavit provided for this Agreement that the Escrow Agent shall, in good faith believe to be genuine, nor will the Escrow Agent be liable or responsible for any forgeries, fraud, impersonations, or determining the scope of any representative authority, provided that the Escrow Agent believed in good faith, that such forgeries, fraud or impersonations were genuine.

(Escrow Agreement § 11; *see also* PRCCSF ¶ 49.) By limiting Cohn & Cohn's liability in certain circumstances, section 11 acts as an exculpatory clause. *See Hawkins v. Cap. Fitness, Inc.*, 29 N.E.3d 442, 446–47 (Ill. App. Ct. 2015). Although disfavored, exculpatory clauses are generally enforceable in Illinois. *Johnson v. Salvation Army*, 957 N.E.2d 485, 491 (Ill. App. Ct. 2011). Nonetheless, "courts closely scrutinize them and they are strictly construed against the party seeking to rely on them." *Hawkins*, 29 N.E.3d at 447. Here, JerLib does not challenge section

11's enforceability and instead dismisses as "laughable" Cohn & Cohn's assertion that it acted in good faith.

It is entirely plausible, however, that the nonagenarian Erwin was an innocent victim of his longtime friend's deception. Indeed, Rose was the person who got Cohn & Cohn involved in JerLib's transaction with SynSel in the first place. Rose was the sole intermediary between Cohn & Cohn and JerLib, handling all negotiations as to the Escrow Agreement and presenting it to Erwin for his signature. Indeed, the extent of Erwin's involvement was one or two brief phone calls he had with representatives of SynSel in which he vouched for his friend, Rose. Moreover, Rose was with Erwin at the Chase Bank branch on the day he was added as a signatory to the Escrow Account[6] and the 8928 Account was opened. And nearly all of JerLib's deposited funds were diverted to Rose or his associates, which Rose brazenly described as a $3 million gift. Meanwhile, the $20,000 that went to Erwin was provided in a form that disguised its provenance. That Rose had statements and notifications regarding the Escrow Account and 8928 Account sent to an email address that Erwin did not regularly use also suggests that Rose sought to conceal his misconduct from Erwin. Finally, a district court entered judgment against Rose in connection with his participation in similar fraudulent schemes. Thus, there is ample evidence to support Firm Defendants' contention that Erwin was taken advantage of by Rose.

Yet the evidence suggesting that Rose was solely responsible for the alleged misconduct does not create even a question of fact as to the applicability of section 11. As an initial matter, section 11 expressly states that Cohn & Cohn remained liable for any breaches of its duties under the Escrow Agreement. And the claims here relate to Cohn & Cohn's failure to safeguard

---

[6] Notably, Erwin opened the Escrow Account back in 2008 as a favor to Rose, after Rose claimed he needed the account to deposit some money that, ultimately, never materialized. (CCRPSAF ¶¶ 7–8.) Rose testified that he was aware that Erwin was not using the account (PRCCSF ¶ 15.)

JerLib's funds. Further, while the Escrow Agreement shields Cohn & Cohn from liability for "frauds" that it "believed in good faith" to be "genuine," that language is best construed as relating to frauds perpetrated by third parties—*i.e.*, a third party making a fraudulent claim to the funds. But here, while there is certainly strong evidence that Rose's conduct was fraudulent, the evidence also establishes that he was not a third party. Instead, Erwin allowed Rose to become a signatory to the Escrow Account, which at all times was registered as a Cohn & Cohn business account.[7] By doing so, Erwin expressly certified that Rose was "authorized to act for and on behalf of the Business in any matter involving any of the Business' depository accounts at the Bank." (Pioli Aff., Ex. B at JPMC/C&C000001, Chase Bank Business Depository Resolution, Dkt. No. 32; *id.* at JPMC/C&C000006, Chase Bank Business Account Add Signers Form; *see also* CCRPSF ¶¶ 37 & n.1, 45.) Consequently, Rose acted as Cohn & Cohn's agent in moving JerLib's money out of the Escrow Account. *E.g.*, *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. App. Ct. 1999) ("An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act.").

Especially since section 11 must be strictly construed against Cohn & Cohn (the party seeking its protection), the Court cannot conclude that it protects Cohn & Cohn from liability for the acts of someone expressly granted authority to act on its behalf—*i.e.*, that Cohn & Cohn is shielded from responsibility for its own fraud. *See, e.g.*, *Zimmerman v. Northfield Real Est., Inc.*, 510 N.E.2d 409, 415 (Ill. App. Ct. 1986) ("Defendants argue that the contract's exculpatory clause . . . protects them from liability for fraud. An exculpatory clause cannot protect persons

---

[7] Although Firm Defendants employ passive voice to describe how Rose was added as a signatory to the Escrow Account (*see* PRCCSF ¶ 44 ("Rose was added as a signatory to the Account . . . .")), at least at the summary judgment stage, they do not contend that Rose gained signatory access without Erwin's knowing authorization.

from the results of their willful and wanton misconduct."); *see also Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1211 (7th Cir. 1993) ("[A] principal who arms his agent to deceive . . . ought to be answerable for the consequences of that deceit.").

In short, by signing the Escrow Agreement, Erwin obligated Cohn & Cohn to safeguard the $3 million JerLib deposited into the Escrow Account. Further, Erwin authorized Rose to act on behalf of the firm with respect to the Escrow Account, thus making Rose's fraud Cohn & Cohn's fraud. For that reason, Firm Defendants cannot now use section 11's exculpatory clause to claim that Cohn & Cohn acted in good faith such that it cannot be liable for Rose's misconduct.

## III.    Breach of Contract

Turning next to the individual claims, JerLib first contends that there is no genuine dispute of fact that Cohn & Cohn breached the Escrow Agreement. In Illinois, a breach of contract claim requires a plaintiff to prove: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). Neither Firm Defendants nor Erwin challenges the Escrow Agreement's validity or enforceability—they admit Erwin signed it and they do not claim that he did so unknowingly or involuntarily. They also do not deny that JerLib performed its obligations under the agreement.

JerLib argues that Cohn & Cohn breached at least three of its obligations as escrow agent. In particular, JerLib contends that Cohn & Cohn breached its obligation to deposit JerLib's $3 million "in a separate designated trust account of [Cohn & Cohn] for [JerLib's] exclusive benefit" by allowing its funds to be commingled with other parties' funds. (Escrow Agreement § 12; CCRPSF ¶¶ 33, 39.) Cohn & Cohn also failed to honor JerLib's absolute right to the return

of its funds after 75 days by, to this day, failing to return JerLib's $3 million. And Cohn & Cohn allowed JerLib's funds to be transferred out of the Escrow Account without first receiving JerLib's express written approval. There is no genuine dispute that each of these breaches occurred.

Both Firm Defendants and Erwin nonetheless argue that they cannot be held liable for breaching the Escrow Agreement because they never took any action with respect to the funds. Rather, it was Rose who was responsible for commingling and transferring JerLib's money in violation of the Escrow Agreement. Moreover, Firm Defendants and Erwin claim that JerLib's damages were not caused by them but by Rose's intervening criminal acts. In response, JerLib argues that because Rose was vested with authority to act on Cohn & Cohn's behalf when he was added as signatory to the Escrow Account, Firm Defendants and Erwin cannot now disavow Rose as a third party and intervening cause of JerLib's damages. As discussed above, the Court agrees that Rose's acts taken within the authority granted to him as signatory of the Escrow Account are properly treated as Cohn & Cohn's acts. Because Firm Defendants and Erwin raise no other arguments in opposition to the breach of contract claim, JerLib is entitled to summary judgment on Count IV.

## IV. Breach of Fiduciary Duty

JerLib asserts that Cohn & Cohn was a fiduciary to the escrowed funds and therefore owed a fiduciary duty to JerLib that it breached by allowing Rose to abscond with the $3 million. A breach of fiduciary duty claim requires that the plaintiff establish (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately caused by that breach. *Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 829 N.E.2d 818, 829 (Ill. App. Ct. 2005).

As an escrow agent, Cohn & Cohn owed a fiduciary duty to JerLib that required Cohn & Cohn "to act only in accordance with the escrow instructions." *231 W. Scott, LLC v. Lakeside*

18

*Bank*, 80 N.E.3d 753, 760 (Ill. App. Ct. 2017) (internal quotation marks omitted). Cohn & Cohn breached that duty by allowing JerLib's funds to be transferred out of the Escrow Account without JerLib's written consent and by failing to return the money upon JerLib's demand. And, as a result, JerLib has been damaged because it remains without the $3 million it deposited into the Escrow Account.

Erwin makes a brief, underdeveloped argument that JerLib's breach of fiduciary duty claim runs afoul of the Illinois rule that prohibits breach of contract claims from being converted into tort claims. That argument fails because Illinois does not treat a breach of fiduciary duty claim as a tort. *Kinzer v. City of Chicago*, 539 N.E.2d 1216, 1220 (Ill. 1989). Otherwise, both Firm Defendants and Erwin rely on the same Rose-as-intervening-cause argument that they asserted in opposition to the breach of contract claim. That argument is equally unavailing to defeat the breach of fiduciary duty claim. Consequently, JerLib is granted summary judgment as to Count V.

## V.    Conversion

The last claim on which JerLib seeks summary judgment is its conversion claim. "The essence of an action for conversion is the wrongful deprivation of property from the person entitled to possession." *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985) (internal quotation marks omitted). *Id.* A conversion claim must involve "an identifiable object of property of which the plaintiff was wrongfully deprived," which can include money, so long as the money is "capable of being described as a specific chattel." *Id.* To prevail on a conversion claim, a plaintiff "must show a tortious conversion of the chattel, a right to property in it, and a right to immediate possession which is absolute." The plaintiff must also show that it made a demand for the return of the property. *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008).

Here, JerLib has shown that it was deprived of a specific sum of money that was deposited into the Escrow Account, it had a right to that money, and it had a right to immediate possession of that money upon demand. In response, Firm Defendants and Erwin claim that it was Rose who converted the funds not them. As the Court has discussed above, Rose was authorized by Erwin to make the transfers on behalf of Cohn & Cohn, such that Rose's conversion was effectively Cohn & Cohn's conversion. *See, e.g.*, *Phipps v. Cohn*, 487 N.E.2d 428, 430 (Ill. App. Ct. 1985) ("A principal is liable for acts committed within the scope of authority by an agent . . . .").[8] As a result, summary judgment is granted in JerLib's favor as to Count VI.

## VI.     Fraud and Consumer Fraud

Firm Defendants and Erwin both seek summary judgment as to JerLib's common law fraud and consumer fraud claims. The two fraud claims are predicated on Erwin's statements to SynSel vouching for Rose as Cohn & Cohn's escrow specialist. According to JerLib, it relied on those statements to its detriment in deciding to proceed with the Escrow Agreement.

As an initial matter, the Court must address Firm Defendants' contention that the statements Erwin made to SynSel's agents, Tawoda and Buckta, are inadmissible hearsay. Erwin's statements to Tawoda and Buckta are properly regarded as non-hearsay statements under Federal Rule of Evidence 801(d)(2), since they are Erwin's own statements and offered by JerLib against him as an opposing party. Moreover, there is no hearsay issue based on the fact that the statements are recounted in emails because both Tawoda and Buckta testified that the

---

[8] Erwin contends that JerLib's damages with respect to the conversion claim should be limited to the sum remaining in the Escrow Account at the time JerLib demanded the return of its funds. The Court is aware of no authority suggesting that a plaintiff's conversion damages should be limited in such a way and Erwin cites none. *See, e.g.*, *United States v. Morales*, 572 F. Supp. 3d 502, 508 (N.D. Ill. 2021) ("[U]nderdeveloped and merely perfunctory arguments . . . are waived.").

emails accurately reflected their own direct conversations with Erwin. (CCRPSF ¶¶ 21, 24); *see, e.g.*, *United States v. Hunter*, 932 F.3d 610, 621 (7th Cir. 2019) ("[The witness's] testimony centered on her personal knowledge of what she heard [the defendant say], and those things are admissible as non-hearsay statements by a party opponent."). Erwin's statements are therefore properly considered in connection with summary judgment.

Turning to the substantive claims, in Illinois, a common law fraud claim requires a plaintiff to prove:

> (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 198 (Ill. 1992). Meanwhile, a consumer fraud claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, requires a plaintiff to establish the following elements: "(1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Firm Defendants and Erwin contend that they are entitled to summary judgment on both fraud claims because the evidence shows that Erwin made the allegedly false statements to SynSel, not JerLib, and because JerLib's fraud claims rest on the same factual foundation as its breach of contract claims.

It is undisputed that Erwin did not make the challenged statements directly to JerLib; his alleged misrepresentations were made only to representatives of SynSel. Nonetheless, for purposes of the fraud claims, it is not necessary that Erwin made the statements directly to JerLib. *E.g.*, *People ex rel. Peters v. Murphy-Knight*, 618 N.E.2d 459, 466 (Ill. App. Ct. 1993)

("[T]he fact that the representations were not made directly to the plaintiff in the first instance does not preclude an action for fraud . . . ."). "[F]alse representations need not be made directly to the party claiming to have relied on them, but may instead be indirect, 'where a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving him.'" *Amerigas Propane, LP v. BP Am., Inc.*, 691 F. Supp. 2d 844, 853 (N.D. Ill. 2010) (quoting *St. Joseph Hosp. v. Corbetta Constr. Co.*, 316 N.E.2d 51, 72 (Ill. App. Ct. 2010)). Viewing the evidence in the light most favorable to JerLib, a jury could reasonably conclude that Erwin made statements to SynSel about Rose intending or knowing that SynSel would convey his statements to JerLib, the other party to the contract Rose was seeking to execute on Cohn & Cohn's behalf and that Erwin ultimately signed.

Next, Firm Defendants and Erwin argue that JerLib's fraud claims are improper reformulations of its breach of contract claim. The Illinois Supreme Court has held that "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005). However, Firm Defendants and Erwin are incorrect that JerLib alleges only that the Escrow Agreement is the misrepresentation at issue in the fraud claims. As already discussed, the fraud claims arise out of Erwin's statements regarding Rose's escrow work for Cohn & Cohn. Thus, neither Firm Defendants nor Erwin have demonstrated any grounds for summary judgment on the fraud and consumer fraud claims. Accordingly, the Court denies their motions for summary judgment as to Counts VII and VIII.

### VII. Civil Conspiracy

JerLib claims that Firm Defendants and Erwin conspired with Rose and the other Defendants named in this action to defraud JerLib of its $3 million. "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted

22

action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). A civil conspiracy claim "requires proof that a defendant knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (internal quotation marks omitted). To be liable as a coconspirator, a defendant must "understand[] the general objectives of the conspiratorial scheme, accept[] them, and agree[], either explicitly or implicitly to do its part to further those objectives." *Adcock*, 645 N.E.2d at 894. However, "[a]ccidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy." *McClure*, 720 N.E.2d at 258.

Rarely is a conspiracy susceptible to direct proof. *Id.* "Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id.* (internal quotation marks omitted). Where a plaintiff seeks to show a conspiracy only by circumstantial evidence, "that evidence must be clear and convincing." *Id.* Here, Firm Defendants and Erwin contend that JerLib's civil conspiracy claim fails because it lacks clear and convincing evidence that proves a conspiratorial agreement.

Although JerLib argues that there is direct proof of the conspiracy, the Court disagrees. The supposed direct proof consists of Rose's testimony that Erwin agreed to allow Rose to use the Escrow Account and that he vaguely recalled discussing with Charles at some indeterminate "time in the past" having himself added as a signatory to the Escrow Account. (CCRPSAF ¶ 13; Pl.'s Statement of Material Facts, Ex. 24, Rose Dep. Tr. 74:8–21.) None of this evidence demonstrates that Erwin or Charles ***knowingly*** agreed to join the conspiracy. And "a defendant

who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Id.* (internal quotation marks omitted).

Because all JerLib's evidence of the purported civil conspiracy is circumstantial, it is subject to the clear and convincing evidence standard. Yet Illinois courts have recognized that "no reasonable trier of fact could find, by clear and convincing evidence, that the defendants entered into a conspiratorial agreement if a nonconspiratorial explanation could reasonably be postulated." *Gillenwater v. Honeywell Int'l, Inc.*, 996 N.E.2d 1179, 1202 (Ill. App. Ct. 2013). The Court has discussed above how the evidence plausibly suggests that Erwin was taken advantage of by his friend Rose and had no idea that his involvement with respect to the Escrow Agreement and the Escrow Account was in furtherance of Rose's misconduct.

There is even less evidence as to Charles's involvement in a conspiracy. Indeed, nothing in the record shows that Charles was actively involved in any discussions regarding the Escrow Agreement or Escrow Account prior to JerLib contacting him to request the return of its $3 million. At best, JerLib's evidence shows that Charles regularly monitored the email account that received emails regarding JerLib's dealings with Rose and the electronic statements for the Escrow Account and the 8928 Account. (CCRPSF ¶¶ 50–53, 55–57.) There is no evidence that the Cohn & Cohn account ever responded to any of those emails, and Charles claims he only reviewed emails regarding his own clients and cases. (PRCCSF ¶ 17.) Even if Charles saw the relevant emails, "[m]ere knowledge of the fraudulent or illegal actions of another is also not enough to show a conspiracy." *McClure*, 720 N.E.2d at 258; *see also Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 950 (N.D. Ill. 2014) ("[M]erely failing to prevent the unlawful conduct of one party or assisting an unlawful actor does not necessarily constitute a conspiracy." (internal

quotation marks omitted)). Finally, none of JerLib's $3 million was transferred to either Charles or Cohn & Cohn. (PRCCSF ¶ 57.)

On the present record, the Court concludes that the facts concerning Erwin's and Charles's respective roles in Rose's misconduct "are as consistent with innocent conduct as they are with guilty conduct," and therefore "the evidence is neither clear nor convincing." *Lozman v. Putnam*, 884 N.E.2d 756, 774 (Ill. App. Ct. 2008). For that reason, JerLib's civil conspiracy claim cannot survive summary judgment. *Id.* ("If a party relies solely on circumstantial evidence to prove a conspiracy claim, the heightened 'clear and convincing' standard is implicated by the summary judgment motion."). Summary judgment is granted in favor of Firm Defendants and Erwin as to Count IX.

### VIII. Unjust Enrichment

As to Firm Defendants and Erwin, JerLib's unjust enrichment claim is pleaded in the alternative to the breach of contract claim. That is because "a party may not seek a quasi-contractual remedy such as unjust enrichment where an actual contract governs their relationship." *Gagnon v. Schickel*, 983 N.E.2d 1044, 1053 (Ill. App. Ct. 2012). Since the Court has granted JerLib summary judgment as to the breach of contract claim, its unjust enrichment claim is not viable. Therefore, the Court grants Firm Defendants and Erwin summary judgment as to Count X.

### IX. Punitive Damages

Finally, Firm Defendants and Erwin seek summary judgment as to punitive damages. They assert that JerLib cannot seek punitive damages because section 12 of the Escrow Agreement makes clear that the escrow agent shall not "be liable for special, punitive, indirect, or consequential loss or damage of any kind whatsoever" except in the case of the agent's "gross negligence or willful misconduct." (Escrow Agreement § 12; PRCCSF ¶ 51.) The Court declines

to rule as a matter of law that section 12 bars any of JerLib's damages claims. Rather, the Court believes that a reasonable jury could conclude that Erwin was grossly negligent in failing to exercise any oversight over Rose, despite allowing him to represent himself as Cohn & Cohn's escrow specialist and granting him signatory access to a Cohn & Cohn bank account.

## CONCLUSION

For the foregoing reasons, JerLib's motion for summary judgment (Dkt. No. 221) is granted, and Firm Defendants' and Erwin's motions for summary judgment (Dkt. Nos. 224, 228) are granted in part and denied in part. Summary judgment is entered in favor of JerLib with respect to Counts IV, V, and VI of the Second Amended Complaint. Summary judgment is entered in favor of Firm Defendants and Erwin as to Counts IX and X.

ENTERED:

Dated:  March 31, 2023

_____
Andrea R. Wood
United States District Judge

26