# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| Cohn & Cohn, | ) | |
| | ) | Bankruptcy No. 24-05705 |
| Debtor. | ) | |
| | ) | Honorable Janet S. Baer |
| | ) | |

## JERLIB INVESTORS, LLC MOTION TO LIFT AUTOMATIC STAY
## TO RESUME DISTRICT COURT PROCEEDINGS

JerLib Investors, LLC ("JerLib"), a creditor herein, moves this Honorable court to modify the automatic stay under 11 U.S.C. § 362(d), to allow JerLib to resume certain district court proceedings against the law firm of Cohn & Cohn ("Debtor"). In support thereof, JerLib states as follows:

### INTRODUCTION

1.     In 2019 JerLib filed suit in the U.S District Court for the Northern District of Illinois against Debtor, a Chicago-based law firm, and its two partners: father and son Erwin Cohn ("Erwin") and Charles Cohn ("Charles").   The litigation arises out of Debtor, Erwin, and Charles's conversion of $3 million in funds that were placed into Debtor's escrow account by JerLib.

2.     After nearly five years of litigation and on the day before trial was set to begin, Debtor filed a petition for bankruptcy protection under Chapter 7 of the Bankruptcy code.  Debtor's bankruptcy petition has effectively placed the district court litigation in limbo.

3.     In light of Debtor's bankruptcy filing, JerLib recently chose to voluntarily dismiss the two pending claims that were set for trial against Debtor, Erwin, and Charles. The only remaining claims in the litigation (breach of contract, breach of fiduciary duty, and conversion) have already

been resolved by a summary judgment ruling in JerLib's favor. The only step left in the litigation, therefore, is the entry of final judgment on those counts.

4.      Under *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991) and its progeny, the automatic stay should be lifted so that JerLib can proceed with its claims in district court and obtain a judgment against Debtor. Because Debtor cannot obtain a discharge in this Chapter 7 proceeding, a finding that Debtor's debt to JerLib is non-dischargeable is unnecessary.

## JURISDICTION

5.      This Court has jurisdiction over the above-captioned case and this motion pursuant to 28 U.S.C. §§ 157 and 1334. This Case is referred to this Court pursuant to Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

6.      Venue of the Case and of this motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(G).

## BACKGROUND

7.      On September 17, 2019, JerLib filed suit in the case captioned *JerLib Investors, LLC v. Cohn & Cohn, et al*, Case No. 1:19-cv-06203, U.S. District Court for the Northern District of Illinois (the "JerLib Litigation") against a number of individuals and entities, including Debtor, Erwin, and Charles (collectively, the "Cohn Defendants"). The JerLib Litigation revolves around JerLib's deposit of $3 million in an account owned by Debtor, the funds of which were to remain in said account untouched and returned to JerLib upon demand. The funds, unfortunately, were removed from Debtor's account without JerLib's consent and were never returned to JerLib despite repeated demands.

8.     On February 18, 2021, JerLib filed its operative ten-count Second Amended Complaint.  *See* JerLib Second Amended Complaint, **Exhibit 1**.  JerLib has moved to voluntarily dismiss the first three counts as moot.  *See* Motion for Voluntary Dismissal, **Exhibit 2**.  On March 31, 2023, the district court entered an order granting summary judgment in JerLib's favor and against all three Cohn Defendants as to Counts IV (breach of contract), V (breach of fiduciary duty), and VI (conversion).  The district court also entered summary judgment in the Cohn Defendants' favor as to Counts IX (civil conspiracy) and X (unjust enrichment).  *See* 3/31/2023 MSJ Order, **Exhibit 3**.

9.     After the court's summary judgment ruling, the only counts of JerLib's Second Amended Complaint left for adjudication were Counts VII (fraud) and VIII (consumer fraud).  A jury trial on the two remaining fraud claims was set for April 19, 2024.  *See* 4/9/2024 Order Setting Trial, **Exhibit 4**.  On April 18, 2024, the day before trial was scheduled to commence, Debtor filed this bankruptcy proceeding under Chapter 7 of the Bankruptcy Code.  [ECF No. 1].  Debtor is a partnership, not an individual, and therefore cannot obtain a discharge in this Chapter 7 proceeding. *See* 11 U.S.C. § 727(a)(1).

10.     On April 19, 2024, JerLib filed a motion in the JerLib Litigation pursuant to FRCP 54(b) seeking entry of final judgment against Erwin and Charles on the three counts which the district court has entered summary judgment in JerLib's favor.  On August 8, 2024, the district court entered an order denying JerLib's Rule 54(b) motion on two grounds.  *See* 8/8/2024 Order Denying Rule 54(b) Motion, **Exhibit 5**.  First, the court held that the automatic stay arising from this bankruptcy proceeding precludes the district court from entering final judgment against Debtor on the three summary judgment counts, which means that those three counts cannot be fully adjudicated as required by Rule 54(b).  *Id*. at 3 ("First, the automatic bankruptcy stay precludes

3

this Court from entering a final judgment as to Cohn & Cohn. That means any Rule 54(b) judgment would fail to fully adjudicate the breach of contract, breach of fiduciary duty, and conversion claims for which JerLib was awarded summary judgment because each of those claims is also asserted against Cohn & Cohn.").

11.    Second, the court ruled that JerLib's yet-to-be adjudicated fraud counts are based upon the same conduct that gave rise to JerLib's three summary judgment counts, making a Rule 54(b) judgment inappropriate. *Id*. ("The Seventh Circuit has 'insisted that Rule 54(b) be employed only when the subjects of the partial judgment do not overlap with those remaining in the district court.'") (quoting *Lottie v. W. Am. Ins. Co.,* 408 F.3d 935, 938–39 (7th Cir. 2005)).

12.    In light of the district court's ruling, JerLib has since orally moved to voluntarily dismiss two remaining fraud counts.  *See* 8/9/2024 Minute Entry, **Exhibit 6**.  Thus, the only remaining counts in the JerLib Litigation against the Cohn Defendants will be the three counts for which the district court has already granted summary judgment in JerLib's favor.    The only remaining step in the litigation is the entry of final judgment in JerLib's favor on those three counts.

## **ARGUMENT**

13.    The automatic stay can be modified "for cause." 11 U.S.C. § 362(d)(1).  "[C]ause to modify the stay to permit a lawsuit to proceed 'is determined on a case-by-case basis.'" *In re Comdisco, Inc*., 271 B.R. 273, 276 (Bankr. N.D. Ill. 2002) (citing *In re Fernstrom Storage & Van Co*., 938 F.2d 731, 735 (7th Cir. 1991).

14.    The Seventh Circuit has applied "a three-factor test for determining whether 'cause' exists, asking whether:

> a) Any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit,

b) the hardship to the [non-bankrupt party] by maintenance of the stay considerably

outweighs the hardship of the debtor, and

c) the creditor has a probability of prevailing on the merits."

*Fernstrom Storage*, 938 F.2d at 735.

15.    Here, all three factors weigh strongly in favor of granting JerLib's request to lift the

stay.

### A.  The Estate and Debtor Will Not Suffer Any Prejudice by Continuation of the JerLib Litigation

16.    First, no great prejudice to Debtor or its estate will result from allowing the JerLib

Litigation to proceed.  Because Debtor, a partnership, filed its petition under Chapter 7, it cannot

receive a discharge of its debts in these proceedings.  Therefore, the JerLib Litigation will move

forward one way or another.  In addition, the JerLib Litigation has all but concluded, with the only

remaining action left is for the district court to enter final judgment on the three counts it has

already resolved in JerLib's favor.  Any supposed concern about litigation costs for the Debtor or

its estate is unfounded.

### B.  The Balance of Hardships Favors Modification of the Stay

17.    Maintaining the stay will impose a substantial hardship on JerLib.  JerLib has invested

nearly five years of effort and expense into bringing the JerLib Litigation to a conclusion.  *See*

*Fernstrom*, 938 F.2d at 736–37 (7th Cir. 1991) ("A decision continuing the application of the stay

… would cause it great prejudice by forcing [plaintiff], in effect, to write off the expenses it

incurred in litigating its case … to the eve of trial.").

18.     The Debtor elected to file for bankruptcy relief literally on the eve of trial for the sole purpose of impeding JerLib's efforts to recover its $3 million in damages.[1]  Debtor's bankruptcy filing has thus far had its intended effect by precluding a final judgment not only against Debtor but also against non-debtors, Erwin and Charles.   Any further delays will not only extend the time JerLib must wait to be compensated for its injuries but will also increase the likelihood that JerLib's inevitable judgment will ultimately become uncollectible.

**C.  JerLib has Established a Certainty, not a Mere Probability, of Prevailing on the Merits**

19.     Finally, JerLib not only has a likelihood of prevailing on the merits in the JerLib Litigation, it has the certainty of doing so since the district court has already granted summary judgment in JerLib's favor on the only three remaining counts pending against Debtor.    And because that judgment debt cannot be discharged in this bankruptcy proceeding, lifting the stay now, rather than later, is appropriate.

**D.  Waiver of Rule 4001 Stay**

20.     An "order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001. Courts routinely waive the 14-day stay of execution on stay relief motions, particularly when good cause is shown.  In this case, JerLib wishes to promptly resume the JerLib Litigation and accordingly requests waiver of the 14-day stay.

---

[1]     Debtor's bankruptcy disclosures reveal $3,231,000 in liabilities.  [ECF No. 1 at 7].  JerLib's $3 million claim against Debtor represents over 90% of Debtor's disclosed liabilities.  [*Id*. at 15].

**Wherefore**, JerLib respectfully requests that the Court enter an order, substantially in the form submitted herewith, modifying the automatic stay to allow JerLib to exercise its rights and remedies in the JerLib Litigation, and for such other relief as this Court deems appropriate.

Dated: September 4, 2024                    Respectfully submitted,

                                            JERLIB INVESTORS, LLC

                                            By:   /s/   *Ramses Jalalpour*
                                                     One of Its Attorneys

Victor J. Pioli (pioliv@jbltd.com)
Ramses Jalalpour (jalalpourr@jbltd.com)
JOHNSON & BELL, LTD.
33 West Monroe St., Ste. 2700
Chicago, Illinois 60603
312.372.0770 (T)

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JERLIB INVESTORS, LLC, | ) | |
| a Florida limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-06203 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| COHN & COHN, an Illinois partnership, | ) | Mag. J. Sheila M. Finnegan |
| ERWIN COHN, CHARLES A. COHN, | ) | |
| LEE S. ROSE, JOHN KRCIL, BLACK | ) | |
| LION INVESTMENT PARTNERS, INC., | ) | |
| BROWN CAPITAL FUNDING | ) | |
| INTERNATIONAL, LLC, | ) | |
| CHRISTOPHER R. BROWN | ) | |
| and STEPHEN HAY, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, JERLIB INVESTORS, LLC ("JerLib"), by and through its attorney, Victor J. Pioli of JOHNSON & BELL, LTD., and for its Second Amended Complaint for Injunctive and Other Relief against Defendants, COHN & COHN ("C&C"), ERWIN COHN ("Erwin"), CHARLES COHN ("Charles"), LEE S. ROSE ("Rose"), JOHN KRCIL ("Krcil"), BLACK LION INVESTMENT PARTNERS, INC. ("Black Lion"), BROWN CAPITAL FUNDING INTERNATIONAL, LLC ("BCFI"), CHRISTOPHER R. BROWN ("Brown"), and STEPHEN HAY ("Hay"), states as follows:

### INTRODUCTION

1.    This is a lawsuit brought by JerLib to recover $3,000,000 that it dutifully deposited into an escrow account at Chase Bank and over which C&C acted as escrow agent. Pursuant to the clear and unequivocal terms of the escrow agreement at issue, JerLib is entitled

to the return of its $3,000,000.   Yet, Defendants have inexplicably refused to return JerLib's $3,000,000 despite repeated requests to do so.   In fact, Defendants have virtually refused to even acknowledge JerLib's repeated demands for the return of their $3,000,000.   Defendants have not returned a single dollar to JerLib.  Instead of keeping Jerlib's $3,000,000 in a segregated account for JerLib's safekeeping as they were required to do, Defendants have disbursed nearly the entirety of JerLib's funds – including hundreds of thousands of dollars each to Defendants in this case.

2.      As has become clear, JerLib has fallen victim to a massive fraud.  Defendants' actions are entirely without justification and are most certainly illegal and criminal.   Their scheme must be stopped before other members of the public fall prey to their deceit.

### PARTIES

3.      Plaintiff, JERLIB INVESTORS, LLC ("JerLib") is a limited liability company duly organized and existing under the laws of the state of Florida, with its principal place of business located at 1433 SW 57th Ter., Cape Coral, FL 33914.   JerLib's sole member and manager is Gerald C. Forstner, Jr. who is an individual and citizen of the state of Florida.

4.      Defendant, COHN & COHN ("C&C") is a partnership duly organized and existing under the laws of the state of Illinois, with its principal place of business located at 77 West Washington Street, Suite 1422.  Cohn & Cohn has two partners: Erwin Cohn and Charles A. Cohn.

5.      Defendant, ERWIN COHN ("Erwin"), is an individual and a citizen of the state of Illinois.  At all times relevant, Erwin has acted within  the scope his status as a partner in C&C.

6.      Defendant, CHARLES A. COHN ("Charles"), is an individual and a citizen of the state of Illinois.  At all times relevant, Charles has acted within  the scope his status as a partner in C&C.

7.      Defendant, LEE S. ROSE ("Rose"), is an individual and a citizen of the state of Illinois.  At all times relevant, Rose acted within the authority granted to him as an agent and representative of C&C.

8.      Defendant, JOHN KRCIL ("Krcil"), is an individual and a citizen of the state of Minnesota.

9.      Defendant, BLACK LION INVESTMENT PARTNERS, INC. ("Black Lion"), is a corporation duly organized and existing under the laws of the state of Wyoming, with its principal place of business located at 1712 Pioneer Ave., Suite 500, Cheyenne, Wyoming 82001.

10.     Defendant, BROWN CAPITAL FUNDING INTERNATIONAL, LLC ("BCFI"), is a limited liability company duly organized and existing under the laws of the state of Georgia with its principal place of business located in Atlanta, Georgia.  Christopher R. Brown is its sole member.

11.     Defendant, CHRISTOPHER R. BROWN ("Brown"), is an individual and a citizen of the state of Georgia.

12.     Defendant, STEPHEN HAY ("Hay"), is an individual and a citizen of the state of Georgia.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists among the parties and the amount in controversy exceeds the sum of $75,000.  Specifically, Plaintiff is a citizen of the state of Florida while Defendants C&C, Erwin, Charles,

and Rose are all citizens of the state of Illinois; Defendant Krcil is a citizen of Minnesota; Defendant Black Lion is a citizen of Wyoming; and Defendants BCFI, Brown, and Hay are citizens of Georgia.

14.    Venue over the matter in controversy properly lies in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) (1) and (2) because all Defendants reside in the Northern District of Illinois and a substantial part of the events giving rise to this cause of action occurred in the Northern District of Illinois and the property that is the subject of this dispute is located in the Northern District of Illinois.

**ALLEGATIONS COMMON TO ALL COUNTS**

***The Good Faith Agreements***

15.    In September 2017 and again in January 2018, JerLib was approached by US Land Financial, Inc. to provide financial support for a transaction whereby BCFI would arrange financing for SynSel Energy, Inc. ("SynSel") to build biofuels plants in the United States. Preliminary negotiations among the parties involved a loan from JerLib to fund a European standby letter of credit with Barclay's Bank and/or HSBC or a loan directly from JerLib to Synsel.  However, these transactions never materialized.

16.    Thereafter, BCFI proposed that JerLib enter into a Good Faith Agreement which would require JerLib to deposit the sum of Three Million Dollars ($3,000,000.00) into an a specially held account held by JerLib or an escrow account held by a lawyer designated by BCFI.  This would then allow BCFI to arrange financing for Synsel in an amount of Twelve Million Dollars ($12,000,000.00) as BCFI required 25% of the loan amount it would procure for Synsel to be held pursuant to a Good Faith Agreement.

17.     To induce JerLib to enter into a Good Faith Agreement, BCFI made numerous representations regarding its expertise and how the Good Faith Agreement would operate.  Many of these representations are contained directly on BCFI's website and included the following: (1) that BCFI was a private equity firm founded 50 years ago; (2) that BCFI had arranged hundreds of millions of dollars in funding on hundreds of transactions; (3) the funds deposited pursuant to a Good Faith Agreement are "not at risk at any point"; and (4) BCFI had lawyers who were able to serve as escrow agents for deposited funds.

18.     Finally, on or about May 25, 2018, JerLib entered into an original Good Faith Agreement with SynSel Energy, Inc. ("SynSel") which was later amended five (5) times to extend certain deadlines for payment obligations owed by SynSel to JerLib.  To obtain the payments due from SynSel, JerLib was required to maintain funds of $3,000,000 in its own Chase Bank account.

19.     BCFI did not obtain financing for Synsel as it promised to do.  As a result, Synsel was not able to meet its payment obligations to JerLib as required under the original Good Faith Agreement.

20.     Consequently, on or about March 11, 2019, JerLib and SynSel entered into a new Good Faith Agreement (the "GFA").  A true and correct copy of the GFA is attached hereto as Ex. A.

21.     The GFA attached the original May 25, 2018 Good Faith Agreement and set new deadlines for SynSel's payment obligations. *See* GFA, Ex. A, at ¶ 3 (c)-(e).

22.     Unlike the original Good Faith Agreement which merely required JerLib to maintain $3,000,000 in its own Chase Bank account, the new GFA required the formation of a

$3,000,000 cash escrow account pursuant to an Escrow Agreement (the "Escrow Agreement"). *See* GFA, Ex. A, at ¶¶ 1, 2, and Ex. 2.

23.     The GFA specifies that "Cohn & Cohn Attorneys at Law of Chicago, Illinois will serve as Escrow Agent" and further requires the Escrow Agent to establish an account at "Chase Bank, Chicago, Illinois" for the purpose of holding the $3,000,000 of escrowed funds to be deposited by Jer-Lib. *See* GFA, Ex. A, at ¶ 2 (a)-(b).

24.     JerLib had no prior affiliation, relationship, or even knowledge of Cohn & Cohn ("C&C").  In fact, JerLib specifically raised concerns regarding using a Chicago personal injury law firm as escrow agent.

25.     C&C was made known to JerLib entirely by BCFI – specifically, Brown and Hay required using C&C as escrow agent and vouched for them.  For example, on February 22, 2019, Brown signed a letter (which was authored by Hay) to JerLib wherein he announced that BCFI had "aligned with the Law Office of Cohn & Cohn to provide escrow services for our good faith deposits."  On February 27, 2019, Brown and Hay sent an email to JerLib in response to JerLib's concerns about Cohn & Cohn stating that "We prefer this firm for they have proven themselves to serve our needs for well over a decade."

26.     At the inception of negotiations, Hay inserted Rose as the representative of C&C who would be C&C's representative on the transaction.  JerLib raised a concern since Rose was not an attorney and requested that an attorney and partner in the firm be listed as the signatory on the Escrow Agreement.  Synsel, at the insistence of JerLib, contacted C&C and spoke to Erwin. Erwin verified Rose's 41-year association with C&C and confirmed that he was a financial specialist who manages escrow services for C&C and worked under the full authority of C&C

thereby confirming Rose's earlier representations.  Erwin also consented to be the signatory on the Escrow Agreement.

***The Escrow Agreement And Its Terms***

27.     To further induce JerLib to enter into the Escrow Agreement, BCFI, C&C, Rose, and Erwin made additional representations to JerLib which were later included as terms of the Escrow Agreement.  These included *inter alia*: (1) JerLib had an absolute right to the return of its $3,000,000 upon written notice to Defendants after 75 days of execution of the Escrow Agreement; (2) JerLib's funds would be deposited into a separate segregated account for the exclusive benefit of JerLib; (3) Defendants would act solely upon instructions from JerLib with respect to the escrowed funds; (4) JerLib's funds would not be moved or transferred without JerLib's express written consent and instruction; and (5) provide JerLib with periodic statements accounting for its funds .

28.     In reliance upon the representations set forth in ¶¶ 17 and 27 *supra*, JerLib agreed to enter into the GFA and Escrow Agreement.  A true and correct copy of the Escrow Agreement is attached hereto as Ex. B.

29.     The Escrow Agreement is signed by Erwin on behalf of C&C.

30.     The Escrow Agreement has an "Effective Date" of March 13, 2019 and was executed on the same date.  *See* Escrow Agreement, Ex. B hereto, at p. 1.

31.     The Escrow Agreement designates C&C as "Escrow Agent" and requires JerLib to deposit "the sum of Three Million US Dollars ($3,000,000 USD) (the "Escrow Funds") into the Escrow Agent's designated non-interest bearing Escrow account in a bank acceptable to [JerLib]."  *See* Escrow Agreement, Ex. B, at p. 1, ¶ 2.

32.     The Escrow Account was an account held by C&C at JPMorgan Chase Bank, N.A. ("Chase Bank") in Chicago, Illinois – Account No. #####3532 (the "Escrow Account"). *See* Escrow Agreement, Ex. B, at p. 8.

33.     Under the Escrow Agreement, C&C was charged to "provide all general services required in carrying out the duties of Escrow Agent including safekeeping and the receipt into escrow of funds in the amount of Three Million US Dollars ($3,000,000 USD) from [JerLib]." *See* Escrow Agreement, Ex. B, at p. 1.

34.     The Escrow Agreement provides the following with respect to C&C's duties under the Escrow Agreement:

> **General Rights and duties of Escrow Agent:** The Escrow Agent agrees to ensure the security of the escrowed funds and the Escrow Agent agrees to perform its duties hereunder with the same degree of care as that of a prudent fiduciary. The Escrow Agent does not have an interest in the Escrow Funds and has possession thereof only as Escrow Agent in accordance with the terms of this Agreement.  Any funds received into escrow shall be deposited in a separate designated trust account of Escrow Agent for the exclusive benefit of Client, unless otherwise instructed in writing by the Client.

*See* Escrow Agreement, Ex. B, at ¶ 12.

35.     The Escrow Agreement further provides that "The Parties expressly agree that the Escrow Agent is acting and shall act at all times solely on the executed instructions from the Client and no other party."  *See* Escrow Agreement, Ex. B, at ¶ 3.

36.     The Escrow Agreement also states as follows with respect to JerLib's entitlement to have its $3,000,000 returned:

> After 75 days from the Effective Date herein, *Client will have the absolute right to remove its funds from the Escrow Account at any time with written notice to Escrow Agent. Escrow Agent agrees to transfer the full balance of the Escrow Account funds paid into the escrow account to Client in readily available funds within five (5) business days*, in accordance with instructions to be provided by Client in such written notice.

*See* Escrow Agreement, Ex. B, at ¶ 1-A (emphasis added).

37.     JerLib complied with all of its obligations under the Escrow Agreement, including

*inter alia* depositing $3,000,000 into the Escrow Account.

***Jerlib's Repeated Demands For the Return Of Its Money In The Escrow Account Go Unanswered and Unheeded***

38.     BCFI never obtained any financing for Synsel.  As it turned out, BCFI, Brown,

and Hay were complete frauds.  BCFI is not a firm founded 50 years ago that has provided

hundreds of millions of dollars in financing.  In fact, it has been revealed BCFI cannot identify a

single borrower or produce documentation for a single transaction for which it provided

financing.

39.     As a result of BCFI's failure, SynSel failed to live up to its payment obligations to

JerLib under the GFA.

40.     Regardless, pursuant to the terms of the Escrow Agreement, after 75 days from

the Effective Date of the Escrow Agreement (*i.e.*, after May 27, 2019), JerLib possessed the

absolute right to have its $3,000,000 in escrowed funds being held in the Escrow Account

returned at any time upon written notice to C&C.

41.     On July 12, 2019, JerLib wrote to Erwin and C&C advising that JerLib was

"exercising its right to immediately remove all its funds from the Escrow Account totaling Three

Million Dollars ($3,000,000), plus any interest earned or accrued on such account."  *See*

7/12/2019 Letter from G. Forstner to Erwin Cohn, Ex C.

42.     JerLib's July 12, 2019 correspondence to Erwin and C&C went unacknowledged

and unanswered.

43.     On August 5, 2019, JerLib's counsel again wrote to Erwin, Charles, and C&C and

once again advised that JerLib was exercised its rights under the Escrow Agreement to have its

$3,000,000 returned from the Escrow Account. *See* 8/5/2019 Letter from D. Boggs to Erwin and Charles Cohn, Ex D.

44.     JerLib's August 5, 2019 correspondence to Erwin, Charles, and C&C went unacknowledged and unanswered.

45.      On August 13, 2019, JerLib's counsel wrote to Chase Bank advising that JerLib had exercised its rights under the Escrow Agreement to have its $3,000,000 returned and requested confirmation that Chase still possessed the funds. *See* 8/13/2019 Letter from D. Boggs to Chase, Ex. E.

46.     JerLib's August 13, 2019 correspondence to Chase Bank was not answered.

47.     On August 29, 2019, JerLib's Illinois counsel wrote to Erwin, Charles, and C&C advising that JerLib demanded the return of its $3,000,000 and that Erwin, Charles, and C&C's inexplicable refusal to return those funds violated their obligations under the Rules of Professional Conduct. *See* 8/29/2019 Letter from V. Pioli to Erwin Cohn, Ex. F.

48.     JerLib's August 29, 2019 correspondence to Erwin, Charles, and C&C went unacknowledged and unanswered.

***Defendants' Began Stealing JerLib's Funds As Soon As They Were Deposited Into The Escrow Account***

49.     The reason for Defendants' failures to respond JerLib's repeated demands for the return of its money from the Escrow Account is simple – JerLib's $3,000,000 was looted and there was no money to return.

50.     Subsequent investigation by JerLib into the Escrow Account has revealed that the Escrow Account was not set up as a "separate designated trust account…for the exclusive benefit of [JerLib]" as Defendants had represented.  Rather, the Escrow Account was a preexisting account maintained by Cohn & Cohn.

51.     Rose was added as a signatory on the Escrow Account on March 2, 2019.  It has been revealed that Cohn & Cohn and Erwin received their direction with regard to the Escrow Account from Rose and Rose has at all times acted as an agent for Erwin and Cohn & Cohn (and vice versa) with regard to the Escrow Agreement and the Escrow Account.

52.     Unbeknownst to JerLib, Rose was a principal in Black Lion along with Krcil and Edward Wooten.[1]  Rose, in turn, was taking his direction for the handling of the Escrow Account from Krcil, Wooten, and Black Lion.  Krcil purportedly wrote to JerLib on September 18, 2019 claiming that Black Lion had JerLib's money and was waiting to give it back.  This statement was obviously false as JerLib's money had long disappeared and was not entirely in Black Lion's possession.  Regardless, JerLib demanded the return of its funds from Krcil and Black Lion and its demands went unanswered.

53.     Beginning on March 18, 2019 (*i.e.*, the date JerLib deposited $3,000,000 into the Escrow Account), Rose, Erwin, and C&C began transferring funds out of the Escrow Account.  This includes at least $175,000 to Rose personally, at least $195,000 to Erwin personally, at least $1,555,000 to Edward Wooten, and at least $250,000 to Black Lion.

54.     Upon information and belief, Defendants have engaged other parties to enter into agreements similar to the Escrow Agreement and have filtered the funds from those other parties through the Escrow Account for their own benefit.

55.     There is currently less than $50,000 remaining in the Escrow Account.

---

[1]     Edward Wooten is not named in this lawsuit, but is a conspirator with Defendants in their fraudulent scheme.  JerLib has obtained a judgment against Wooten in another jurisdiction for his actions related to the transactions involved in this lawsuit.

## COUNT I – INJUNCTIVE RELIEF
### (C&C, ERWIN, CHARLES AND ROSE)

56.     Jerlib re-alleges and incorporates by reference paragraphs 1 through 55 as though fully set forth herein.

57.     The Escrow Agreement is a valid and enforceable contract under Illinois law.

58.     Pursuant to the terms the Escrow Agreement, JerLib is entitled to the immediate return of the $3,000,000 of Escrow Funds deposited in the Escrow Account or transferred or disbursed therefrom.  JerLib has properly tendered written demands in accordance with ¶ 1-A of the Escrow Agreement for the return of the balance of the Escrow Account.  JerLib's demands have inexplicably gone unanswered.

59.     Consequently, JerLib seeks injunctive relief providing that no funds from the Escrow Account be paid out, withdrawn, or otherwise transferred from the Escrow Account. JerLib also seeks a mandatory injunction directing that the remaining Escrow Funds contained in the Escrow Account be paid to JerLib.

60.     JerLib does not have an adequate remedy at law.  The lawsuit concerns the disposition of a specific fund – *i.e.*, the Escrow Account containing the Escrow Funds.  If the Escrow Account is dissipated and/or diminished, JerLib will be left without any remedy at all.

61.     JerLib has established, based on the allegations and exhibits attached hereto, that it is likely to succeed on the merits of its claims.

62.     JerLib will be irreparably harmed should this Court fail to enter the injunctive relief sought by JerLib.  Specifically, JerLib will forever lose its rights to the Escrow Funds being held in the Escrow Account solely for its benefit should Defendants be allowed to dissipate or otherwise dispose of the Escrow Funds expected to be returned to JerLib.

63.    An injunction can be narrowly drawn so that is solely for the purposes sought herein.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, respectfully requests that this Court enter judgment on this Count I in its favor and against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, and LEE ROSE, for the following:

(i)    A preliminary and permanent injunction against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, and LEE ROSE, to prevent Defendants from dissipating, transferring, withdrawing, or otherwise disposing of the funds in the Escrow Account;

(ii)    A mandatory injunction against Defendant, Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, and LEE ROSE, requiring that the funds in the Escrow Account be transferred to JerLib in accordance with the terms of the Escrow Agreement and JerLib's demands and instructions; and

(iii)    For such other relief as the Court deems just and proper.

## COUNT II – DECLARATORY JUDGMENT
### (C&C, ERWIN, CHARLES AND ROSE)

64.    JerLib re-alleges and incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

65.    Based upon the facts set forth above, ¶¶ 15 to 55 *supra*, there exists an actual controversy between JerLib and Defendants regarding JerLib's entitlement to the return of its $3,000,000 under the terms of the Escrow Agreement.

66.    As a result, JerLib seek a declaration that JerLib has complied with its obligations under the Escrow Agreement; JerLib has the right to the immediate return of its $3,000,000 in funds that JerLib placed in the Escrow Account; and C&C, Erwin, Charles, and Rose have no basis in fact or in law for refusing to return JerLib's funds..

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, respectfully requests that this Honorable Court enter a declaratory judgment that:

    (i)    JerLib has complied with its obligations under the Escrow Agreement;

    (ii)    JerLib has the right to the immediate return of its $3,000,000 in funds that it placed in the Escrow Account or such other place where such funds were transmitted or are held;

    (iii)    C&C, Erwin, Charles, and Rose have no basis for refusing to to return JerLib's funds wherever held or deposited;

    (iv)    There is no basis for anyone holding all or part of the Escrow Funds to refuse to release or return JerLib's funds; and

    (v)    For such other relief as the Court deems just and proper.

## COUNT III – ACCOUNTING
### (C&C, ERWIN, CHARLES AND ROSE)

67.    JerLib re-alleges and incorporates by reference paragraphs 1 through 66 as though fully set forth herein.

68.    As set forth *supra*, JerLib does not possess an adequate remedy at law.

69.    Further, by virtue of their status as Escrow Agent and pursuant to the terms of the Escrow Agreement, C&C, Erwin, Charles, and Rose (as the principal who Erwin and C&C worked for and took direction from) owed fiduciary duties to JerLib as the party who deposited the funds into the Escrow Account and for whose benefit the funds were being held in the Escrow Account.

70.    C&C, Erwin, Charles, and Rose have breached the fiduciary duties they owe to JerLib by *inter alia* refusing to return the $3,000,000 held in the Escrow Account back to JerLib as they have been directed to do.

71.     As a result, JerLib is entitled to an accounting of the amounts remaining in the Escrow Account and return of all remaining funds and to an accounting of the transfer of the Escrow Funds from the Escrow Account.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, respectfully requests that this Court enter judgment on this Count III in its favor and against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, and LEE ROSE, jointly and severally, for the following:

    (i)    Directing Erwin, Charles, C&C and Rose to provide an accounting of all funds in or transferred from the Escrow Account;

    (ii)    A judgment against Erwin, Charles C&C, and Rose in the amount the funds remaining in the Escrow Account plus whatever amounts have been withdrawn from the Escrow Account; and

    (iii)    For such other relief as the Court deems just and proper.

### COUNT IV – BREACH OF CONTRACT
### (COHN & COHN, ERWIN, AND CHARLES)

72.     JerLib re-alleges and incorporates by reference paragraphs 1 through 71 as though fully set forth herein.

73.     The Escrow Agreement is a valid and enforceable contract under Illinois law.

74.     C&C, Erwin, and Charles have breached their obligations under the Escrow Agreement by *inter alia*: (1) failing to act solely on the executed instructions from JerLib as required under ¶ 3 of the Escrow Agreement; (2) failing to transfer the full balance of the Escrow Account to JerLib as instructed to do so in accordance with ¶ 1-A of the Escrow Agreement; and (3) allowing the Escrow Funds to be transferred and/or withdrawn.

75.     JerLib has performed all of its obligations under the Escrow Agreement, including depositing $3,000,000 into the Escrow Account and providing written notice pursuant to ¶ 1-A of the Escrow Agreement.

76.      As a consequence of C&C, Erwin, and Charles' unlawful breaches of the Escrow Agreement, JerLib has suffered damages in an amount exceeding $3,000,000 because it has been deprived of the Escrow Funds which belong to JerLib and the use of said funds.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, respectfully requests that this Court enter judgment on this Count IV in its favor and against Defendants, COHN & COHN, ERWIN COHN, and CHARLES COHN, for the following:

(i)      For compensatory damages in an amount to be proven at trial, which JerLib believes will exceed $3,000,000; and

(ii)      For such other relief as the Court deems just and proper.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (C&C, ERWIN, CHARLES AND ROSE)

77.      JerLib re-alleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

78.      By virtue of their status as Escrow Agent and pursuant to the terms of the Escrow Agreement, C&C, Erwin, Charles, and Rose (as the agent who Erwin and C&C worked for and took direction from) owed fiduciary duties to JerLib as the party who deposited the funds into the Escrow Account and for whose benefit the funds are being held in the Escrow Account.

79.      Further, Jer-Lib reposed trust and confidence in C&C, Erwin, Charles, and Rose that they would fulfill their duties to safeguard the Escrow Funds and comply with their obligations to return the Escrow Funds.

80.      C&C, Erwin, Charles, and Rose breached their fiduciary duties owed to JerLib by *inter alia*: (1) failing to transfer the full balance of the Escrow Account to JerLib when provided written demand to do so; (2) failing to communicate and respond to JerLib's various demands; (3) failing to provide an accounting of the funds in the Escrow Account; (4) failing to direct

Chase to deliver the balance of the Escrow Account to JerLib; and (5) wrongfully transferring and disposing of the funds in the Escrow Account.

81.     As a direct and proximate result of C&C, Erwin, Charles, and Rose's multiple breaches of their fiduciary duties, JerLib has sustained damages.  These damages include the loss of the $3,000,000 JerLib deposited into the Escrow Account and loss of use of those funds.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, prays for the entry of judgment on this Count V in its favor and against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, and LEE S. ROSE, for the following:

(i)     For compensatory damages in an amount to be proven at trial, which JerLib believes will exceed $3,000,000;

(ii)    For punitive damages; and

(iii)   For such other relief as the Court deems just and proper.

### COUNT VI – CONVERSION
### (C&C, ERWIN, CHARLES, ROSE, KRCIL, BLACK LION)

82.     JerLib re-alleges and incorporates by reference paragraphs 1 through 81 as though fully set forth herein.

83.     JerLib owns and is entitled to the funds being held in the Escrow Account and the escrowed funds disbursed therefrom.

84.     Per the terms of the Escrow Agreement, the Escrow Account is an individual and segregated account that solely holds the Escrow Funds.  The Escrow Funds are separately known and identifiable sums.

85.     JerLib is entitled to the Escrow Funds pursuant to the terms of the Escrow Agreement by whomever held and wherever held.

Cases 2:14-15:05-06:003224 ocument #01-91471 Filed 02/06/21 Page 24 of 57 221 Page 1 of 58 of 68 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05 of 13:05
1    Page 19 of 79

86.     As set forth in ¶¶ 38 to 48, 52 *supra*, JerLib has made repeated demands upon C&C, Erwin, Charles, Rose, Krcil and Black Lion to return the Escrow Funds.

87.     C&C, Erwin, Charles, Rose, Krcil and Black Lion have inexplicably and wrongfully refused to comply with JerLib's demands.  Indeed, they have not even acknowledged JerLib's demands at all.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, prays for the entry of judgment on this Count VI in its favor and against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, LEE S. ROSE, JOHN KRCIL, and BLACK LION INVESTMENT PARTNERS, INC., for the following:

(i)     For compensatory damages in an amount to be proven at trial, which JerLib believes will exceed $3,000,000;

(ii)     For punitive damages; and

(iii)     For such other relief as the Court deems just and proper

### COUNT VII – FRAUD
### (ALL DEFENDANTS)

88.     JerLib re-alleges and incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

89.     Defendants' actions set forth *supra* were an elaborate scheme to defraud JerLib of its $3,000,000 that it deposited into the Escrow Account and steal those funds for their own use and purposes.

90.     In order to induce JerLib to enter into the Escrow Agreement and deposit $3,000,000 into the Escrow Account, C&C, Erwin, Charles and Rose represented to JerLib *inter alia*: (1) JerLib had an absolute right to the return of its $3,000,000 upon written notice to Defendants after 75 days of execution of the Escrow Agreement; (2) JerLib's funds would be

deposited into a separate segregated account for the exclusive benefit of JerLib; (3) Defendants would act solely upon instructions from JerLib with respect to the Escrowed Funds; and (4) JerLib's funds would not be moved or transferred without JerLib's express written consent and instruction.

91.    To induce JerLib to enter into the GFA and the Escrow Agreement, BCFI, Brown, and Hay made numerous representations to JerLib including inter alia: (1) that BCFI was a private equity firm founded 50 years ago; (2) that BCFI had arranged hundreds of millions of dollars in funding on hundreds of transactions; (3) the funds deposited pursuant to a Good Faith Agreement are "not at risk at any point"; (4) BCFI had lawyers who were able to serve as escrow agents for deposited funds; and (5) that Cohn & Cohn had worked with and proven themselves to BCFI for over a decade.

92.    JerLib did, in fact, rely upon Defendants' representations when it entered into the Escrow Agreement and deposited $3,000,000 into the Escrow Account.

93.    Each of the representations made by Defendants in ¶¶ 90 - 91 *supra* was utterly false at the time and place made to JerLib and JerLib has suffered harm from its reliance upon Defendants' representations.  Specifically, JerLib has lost the $3,000,000 that Defendants have stolen from JerLib.

94.    In addition, Krcil and Black Lion made the additional representation that Black Lion was holding JerLib's $3,000,000.00 and was ready to return the same to JerLib.  This statement was false and was known to be false when.  It was made to induce JerLib to refrain from acting from foreclosing its interests.  JerLib did, in fact, refrain from foreclosing its interests in reliance upon the statement to its detriment.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, prays for the entry of judgment on this Count VII in its favor and against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, LEE S. ROSE, JOHN KRCIL, BLACK LION INVESTMENT PARTNERS, INC., BROWN CAPITAL FUNDING INTERNATIONAL, LLC, CHRISTOPHER R. BROWN, and STEPHEN HAY for the following:

    (i)    For compensatory damages in an amount to be proven at trial, which JerLib believes will exceed $3,000,000;

    (ii)    For punitive damages; and

    (iii)    For such other relief as the Court deems just and proper

## COUNT VIII – CONSUMER FRAUD
### (ALL DEFENDANTS)

95.    JerLib re-alleges and incorporates by reference paragraphs 1 through 94 as though fully set forth herein.

96.    C&C, Erwin, Charles, Rose, BCFI, Brown, Hay, Krcil, and Black Lion promoted, advertised, and offered for sale to the general public their products and services and made the representations set forth in ¶¶ 90 - 91 *supra*.

97.    The representations set forth in ¶¶ 90 - 91 *supra* are false.

98.    In the course of promoting, advertising, and sale of their products and services, C&C, Erwin, Charles, Rose, BCFI, Brown, Hay, Krcil, and Black Lion purposely and intentionally made the misrepresentations set forth in ¶¶ 90 - 91 *supra*.

99.    C&C, Erwin, Charles, Rose, BCFI, Brown, Hay, Krcil, and Black Lion made the misrepresentations set forth in ¶¶ 90 - 91 *supra* in order to induce prospective clients and investors to retain them and use their services.

100.    At all times relevant to this complaint, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. was in full force and effect.

101.    The Consumer Fraud Act, 815 ILCS 505/2, provides in relevant part as follows:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

102.    C&C, Erwin, Charles, Rose, BCFI, Brown, Hay, Krcil, and Black Lion violated the Consumer Fraud Act by virtue of their misrepresentations set forth in ¶¶ 90 - 91 *supra*.

103.    As a direct and proximate result of the foregoing, JerLib has been damaged in the amount it deposited into the Escrow Account and lost (*i.e*., $3,000,000.00).

104.    As a result of the foregoing, JerLib is further entitled to recover punitive damages from C&C, Erwin, Charles, Rose, BCFI, Brown, Hay, Krcil, and Black Lion for their intentional and unlawful conduct in making the misrepresentations set forth in ¶¶ 90 - 91 *supra* in an amount which will serve to punish C&C, Erwin, Charles, Rose, BCFI, Brown, Hay, Krcil, and Black Lion and which will serve to deter C&C, Erwin, Charles, Rose, BCFI, Brown, Hay, Krcil, and Black Lion, and other similarly situated persons and/or entities, from committing similar unlawful acts in the future.

105.    JerLib is further entitled to recover its attorneys' fees pursuant to Section 10(a)(c) of the Consumer Fraud Act.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC., respectfully requests that this Honorable Court enter judgment on this Count VIII in its favor and against Defendants, COHN

& COHN, ERWIN COHN, CHARLES COHN, LEE S. ROSE, JOHN KRCIL, BLACK LION

INVESTMENT PARTNERS, INC., BROWN CAPITAL FUNDING INTERNATIONAL, LLC,

CHRISTOPHER R. BROWN, and STEPHEN HAY, for the following:

> (i)     For compensatory damages in an amount to be proven at trial, which JerLib believes will materially exceed $50,000;

> (ii)    For punitive damages;

> (iii)   For attorney's fees; and

> (iv)    For such other relief as the Court deems just and proper

### COUNT IX – CIVIL CONSPIRACY
### (ALL DEFENDANTS)

106.    JerLib re-alleges and incorporates by reference paragraphs 1 through 105 as though fully set forth herein.

107.    Defendants have engaged in a scheme and conspiracy to defraud JerLib and enrich themselves by luring JerLib to deposit $3,000,000 into the Escrow Account and then stealing those funds.

108.    Each Defendant agreed to perpetrate the scheme as well as the objective and methods to perpetrate the scheme and to benefit therefrom and deprive JerLib of its monies.

109.    Erwin and Charles are partners and functioned through their partnership entity Cohn & Cohn.  Rose was added as a signatory to the C&C trust account at Chase Bank by Erwin and Charles and Rose, along with Erwin, Charles and C&C, had responsibilities and duties relative to the Escrow Account and Escrow Agreement.  In turn, Rose functioned as a partner with Krcil and Wooten through Black Lion from whom Rose took his direction relative to the Escrow Account.  BCFI, Brown, and Hay partnered with C&C though Rose and represented to

JerLib that they worked with C&C for over a decade on transactions similar to the GFA and the Escrow Agreement.

110.    Each Defendant took actions in furtherance of the scheme.  Erwin, Charles, and C&C added Rose as a signatory on the Escrow Account which allowed him to withdraw JerLib's funds from their client trust account.  Rose withdrew and transferred funds from the account and transferred some of JerLib's funds into his own account and to the accounts of others not entitled to said funds, including Krcil and Black Lion.  Krcil and Black Lion attempted to stonewall JerLib with the September 18, 2019 letter.  Krcil and Black Lion also served as a means to dispose and hide JerLib's funds.  BCFI, Brown and Hay took actions in furtherance of the scheme, including inter alia the making the misrepresentations set forth in ¶¶ __ - __ *supra* in order to induce JerLib to enter into the GFA and deposit $3,000,000.00 into the Escrow Account.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, prays for the entry of judgment on this Count IX in its favor and against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, LEE S. ROSE, JOHN KRCIL, BLACK LION INVESTMENT PARTNERS, INC., BROWN CAPITAL FUNDING INTERNATIONAL, LLC, CHRISTOPHER R. BROWN, and STEPHEN HAY, jointly and severally, as follows:

> (i)    For compensatory damages in an amount to be proven at trial, which JerLib believes will exceed $3,000,000;
>
> (ii)    For punitive damages; and
>
> (iii)    For such other relief as the Court deems just and proper

### COUNT X - UNJUST ENRICHMENT
### (ALL DEFENDANTS)
### (ALTERNATIVE TO COUNT IV AS TO COHN & COHN, ERWIN, AND CHARLES)

111.    JerLib re-alleges and incorporates by reference paragraphs 1 through 71 and 77 through 110 as though fully set forth herein.

112.     As a consequence of the foregoing, JerLib has suffered financial loss in the amount of at least $3,000,000.00.

113.     As a result of the willful, intentional, and malicious acts of Defendants, JerLib is entitled to restitution and punitive damages.

WHEREFORE, Plaintiff, JERLIB INVESTORS, LLC, prays for the entry of judgment on this Count X in its favor and against Defendants, COHN & COHN, ERWIN COHN, CHARLES COHN, LEE S. ROSE, JOHN KRCIL, BLACK LION INVESTMENT PARTNERS, INC., BROWN CAPITAL FUNDING INTERNATIONAL, LLC, CHRISTOPHER R. BROWN, and STEPHEN HAY, jointly and severally, as follows:

(iv)     For compensatory damages in an amount to be proven at trial, which JerLib believes will exceed $3,000,000;

(v)      For punitive damages; and

(vi)     For such other relief as the Court deems just and proper

***TRIAL BY JURY DEMANDED***

Respectfully submitted,

JERLIB INVESTORS, LLC

By: __/s/ *Victor J. Pioli*_____
           One of Its Attorneys

Joseph R. Marconi
Victor J. Pioli
JOHNSON & BELL, LTD.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
312.372.0770 (T)

*Attorneys for Plaintiff,*
  *Jerlib Investors, LLC*

24

### CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*/s/ Tula Kotsiovos*

# EXHIBIT A

# GFA Agreement



This document represents a binding agreement (the "Agreement") between SynSel Energy, Inc., with its principal office located at 455 Fullerton Ave., Elmhurst, IL 60126, USA ("SynSel") and JerLib Investors, LLC, 1433 SW 57th Ter., Cape Coral FL 33914 ("JerLib"), herein jointly referred to as "Parties" and, separately, as "Party", effective the on the later of the dates on the signature page of this Agreement ("Effective Date").

**WHEREAS** SynSel represents to JerLib that a Good Faith Account (GFA) is the financial equivalent of a traditional (USA) Certificate of Deposit (CD) in that, the GFA is a protected and secured account that returns a fixed annual income. The GFA funds are not collateralized or used as security or otherwise to the detriment of the GFA Owner in any way. The GFA insulates the GFA Owner from any perceived or real risk of loss or forfeiture; and

**WHEREAS** JerLib has previously been formed as special purpose entity for the purpose of holding funds in the original principal amount of USD $3,000,000.

**NOW THEREFORE** the parties wish to establish a GFA on the terms below.

<u>TERMS</u>

1. **GFA Amount.** USD $3,000,000 in the form of a cash escrow account in the name of JerLib Investors, LLC under terms satisfactory to JerLib, pursuant to the Escrow Agreement attached hereto as Exhibit 2.

2. **GFA Administration.** Neither SynSel nor any other party will have, directly or indirectly, any authority or power or right by contract or law or otherwise to withdraw GFA funds, put a lien or charging order on the GFA, use the GFA as collateral or leverage for a loan or any other purpose, or have access to or use the GFA funds in any way, directly or indirectly. The funds will be and remain the sole and exclusive property of JerLib at all times for all purposes.

    a. Cohn & Cohn Attorneys at Law of Chicago, Illinois will serve as Escrow Agent for the GFA per the Escrow Agreement attached as Exhibit 2.

    b. The GFA will be held in an escrow account established by the Escrow Agent at Chase Bank, Chicago, Illinois (the "Escrow Account"), as specified in the Escrow Agreement attached as Exhibit 2.

    c. The sole and irrevocable signatory of the GFA will be Gerald C. Forstner, Jr or his authorized agent, if any.

3. **SynSel Payments to JerLib:**

    a. All payments including fees and Interest will be paid directly to JerLib in immediately available funds.

# GFA Agreement



b.  SynSel may, without discount, premium or penalty, at any time and from time to time, prepay all or any portion of the outstanding payments and interest due under this Agreement. Such prepayment(s) will not reduce the full amounts that would be payable when and as due under Sections 3.c., 3.d. and 3.e.

c.  SynSel shall make 14 consecutive monthly payments without notice or demand even if the GFA is terminated early by Client in accordance with the Agreement equal to 7% (seven percent) interest based on the initial USD $3,000,000 deposit into Escrow Account.  The first payment occurring at the end of 75 days from the Effective Date. Payment shall be made within one Business Day, as directed by Gerald C. Forstner, Jr. or his authorized agent, if any.

d.  JerLib has unpaid fees due and owing from SynSel pursuant to the prior GFA. Reimbursement for these unpaid fees will be made by SynSel to JerLib on the following schedule from the Effective Date hereof, provided there is no early withdrawal of the Escrow Account by Client in breach of the GFA:

   i.   USD $60,000 on or before the 180th day

   ii.  USD $60,000 on or before the 270th day

   iii. USD $60,000 on or before the end of 1 year

   Each payment shall be due and payable without notice or demand.

e.  A debt of USD $1,550,000.00 owed to JerLib by SynSel is currently outstanding per Exhibit 1 of this Agreement. SynSel will pay JerLib USD $100,000 per month for 13 consecutive Months, with the first payment occurring at the end of 75 days from the Effective Date, and a final payment of USD $250,000 in month 14.  Each payment shall be due and payable by the 15th of each month, without notice or demand.  A grace period of 5 days for payment shall be allowed.

f.  Upon default in any payment when and as due and payable in any of the Sections 3.c., 3.d, or 3.e., the balance due under each of those sections shall be accelerated such that the full amount thereof shall be immediately due and payable without notice or demand.

g.  In consideration of the forbearance and revised payment terms under 3.d, 3.e, within 75 days of the Effective Date:

   i.   SynSel shall transfer and convey in customary manner, which shall include drag-along rights, to JerLib an unencumbered or undiluted 1% highest priority, voting equity share consisting of common stock in SynSel Ontonagon, Inc.

   ii.  When all of SynSel's obligations under this Agreement have been fully-satisfied by SynSel, SynSel shall have the irrevocable option to purchase the 1% highest priority, voting equity share consisting of common stock of SynSel Ontonagon, Inc. from JerLib at a price of $0.01 per share for a period of up to 90 days from the fulfilment of SynSel's obligations under this Agreement, paid in full at closing of such stock sale transactions.

# GFA Agreement



h. That in the event that a bankruptcy proceeding is initiated by or against SynSel within 91 days of JerLib's receipt of any monies, JerLib shall be under no obligation to consider the payment as accepted and the obligation satisfied unless and until such time as it is conclusively determined that JerLib has no exposure of any causes of action arising under Chapter 5 of the Bankruptcy Code, including but not limited to 11 U.S.C. §§ 547 and 548.

i. SynSel's obligation to make the payments required by Sections 3.c., 3.d., 3.e., 3.f., 3.j., 6, and 7 hereof shall not be delayed or reduced if the funds in the Escrow Account are withdrawn prior to such 14-month period term due to SynSel's default in accordance with terms of this GFA Agreement, or in the event of a Material Breach of the Escrow Agreement by the Escrow Agent, in accordance with the terms of the Escrow Agreement.

j. JerLib shall be entitled to recover its attorney's fees and costs for enforcement of this Agreement.

4. **Term.** The term of this Agreement shall be 14 months from the Effective Date unless sooner terminated in accordance with this Agreement. The term of this Agreement may be extended upon the mutual written agreement of SynSel and JerLib with specified interest rates and additional fees applying to any such extension.

5. **Taxes.** Any corporate or personal taxes on income received by JerLib are the responsibility of JerLib.

6. **Fees & Expenses.** Except as otherwise provided herein, SynSel and JerLib will each bear its own fees and expenses. If JerLib must pursue collection of any amount due hereunder, it shall be entitled to reasonable attorney fees and costs.

7. **Liability.** Each party shall be individually responsible for making required filing, including tax returns, with the respective government entities in which it is or may be respectively domiciled and/or obligated to pay any taxes, impounds or levies which may be assessed. Each Party hereby agrees to indemnify and hold the other harmless from any and all unpaid or assessed liabilities, damages, claims, judgments and causes arising out of and related to such taxation or obligations. This obligation shall survive termination of the GFA. Each party otherwise shall have no further responsibility or liability to the other or to any third party, other than as set forth in this Agreement.

8. **Force Majeure.** The parties shall not be liable to the other for any failure to perform its obligations here under if such failure is due to fires, floods, strikes, work stoppages, accidents, wars, acts of God or any cause beyond the control of the party failing to perform. However, in the event of a Force Majeure as defined in this Agreement, SynSel shall not be relieved of its obligation to pay the debts or obligations owed to JerLib by SynSel described in Sections 3.c., 3.d., 3.e., 3.f., 3.i., 6 and 7 of this Agreement.

# GFA Agreement



9. **Severability, Construction, Enforceability.** If any of the terms or conditions of this Agreement are held by any court of competent jurisdiction to be unenforceable or invalid, such unenforceability or invalidity shall not render unenforceable or invalid the entire Agreement. Instead, this Agreement shall be construed as if it did not contain the particular provision or provisions held to be unenforceable or invalid, the rights and obligations of the parties shall be construed and enforced accordingly, and this Agreement shall thereupon remain in full force and effect.

10. **Default.** In the event that SynSel defaults on any of its obligations herein or there is a failure of material representation herein, such default will cause all and every payments due by SynSel to JerLib under this Agreement to become immediately due and payable without notice or demand, and JerLib shall be entitled to immediately withdraw all funds from the Escrow Account and terminate this GFA without penalty or liability or other cost or expense. Such termination will not affect the rights and remedies of JerLib hereunder or as otherwise allowed.

11. **Miscellaneous.**

    a. **Computation of Interest.** All computations of interest, if any, shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on the principal on the day on which the GFA is funded, and shall not accrue on the day on which it is released.

    b. **Business Day Convention.** Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension will be taken into account in calculating the amount of interest payable under this Agreement.

    c. **Compliance with Other Instruments.** SynSel is not and for the duration of this GFA shall not be in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract or agreement to which it is a party or by which it is bound or of any judgment, decree, order or writ. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated by this Agreement will not result in any such violation or be in conflict with, or constitute, with or without the passage of time or giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of SynSel or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to SynSel, its business or operations or any of its assets or properties.

    d. **Compliance with Laws.** To its knowledge, SynSel is not and for the duration of this GFA shall not be in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties.

# GFA Agreement



    e.   **USA Patriot Act, Anti-Money Laundering, Know-Your-Customer, Anti-Terrorist OFAC and Other Regulations.**

        i.   Neither SynSel nor, to the knowledge of SynSel, any of its Affiliates or any of their respective officers, directors, brokers or agents (i) has violated or shall violate any Anti-Terrorism Laws or (ii) has engaged or shall engage in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

       ii.   Neither SynSel nor, to the knowledge of SynSel, any of its Affiliates or any of their respective officers, directors, brokers or agents is a Person that is or shall be, or is or shall be owned or controlled by Persons that are the subject/target of any Sanctions, or located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including currently, Cuba, Iran, North Korea, Sudan and Syria.

      iii.   Neither SynSel nor, to the knowledge of the SynSel, any of its Affiliates or any of their respective officers, directors, brokers or agents acting or benefiting in any capacity in connection with this Agreement conducts or shall conduct any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any Person, or in any country or territory, that is or shall be the subject/target of any Sanctions, deals in, or otherwise engages or shall engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law, or engages or shall engage in or conspires or shall conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

      iv.   At the request of SynSel and at SynSel's expense in all events, the GFA holder, Chase Bank may be engaged to certify that the GFA funds are legitimate and do not violate US or international Anti-Money-Laundering, Anti-Terrorist, or Know-Your-Customer regulations. Any payment made by SynSel hereunder shall be subject to the same laws and regulations set forth in this subsection (e).

    f.   **Termination:** This Agreement may be terminated prior to the 14-month period by JerLib without notice or demand to SynSel or SynSel's right to cure, without impairment of JerLib's rights or remedies, upon any of the following:

        i.   Material Breach of this Agreement;

       ii.   Failure of a Material Representation or Condition in this Agreement;

      iii.   Cessation of Business by SynSel;

      iv.   Bankruptcy, insolvency of, or assignment for benefit of creditors by SynSel;

      v.   Material Breach of the Escrow Agreement by the Escrow Agent.

# GFA Agreement



g. **Binding Agreement.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

h. **Governing Law.** All disputes, controversies or differences which may arise between the parties, out of or in relation to or in connection with this Agreement, or the breach thereof, shall be governed by the laws of the State of Ohio without giving effect to conflicts of laws principles. Exclusive venue and forum for proceeding shall be the federal or state courts located in or encompassing Berea, Ohio.

i. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures to this Agreement transmitted by facsimile or by electronic transmission shall be valid and effective to bind the party so signing.

j. **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

k. **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to SynSel or JerLib Investors, LLC at the addresses listed on the signature page.

l. **Modification; Waiver.** Any modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective only upon the written consent of all Parties to the Agreement.

m. **Entire Agreement.** This Agreement and the Exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

**Signature Page to Follow**

# GFA Agreement



12. **Signatures**.

The signatures below validate a binding Agreement per the terms listed above between SynSel and JerLib Investors, LLC

SynSel Energy, Inc.

By: _____

**Tim Tawoda for SynSel Energy, Inc.**
Title:
SynSel Energy, Inc.
455 Fullerton Ave., Elmhurst, IL 60126
ttawoda@synsel.com / bbuckta@synsel.com

<u>March 11, 2019</u>
**Date**

JerLib Investors, LLC

By: *Please See Scanned Copy on Following Page*

**Gerald C. Forstner, Jr. for JerLib Investors, LLC**
Manager
1433 SW 57th Ter., Cape Coral FL 33914
jerry@alpacafarm.com / scott@ssmini.com

_____
**Date**

# GFA Agreement 

12. Signatures.

The signatures below validate a binding Agreement per the terms listed above between SynSel and JerLib Investors, LLC

SynSel Energy, Inc.

By: _____            _____

**Tim Tawoda for SynSel Energy, Inc.**           **Date**
Title:
SynSel Energy, Inc.
455 Fullerton Ave., Elmhurst, IL 60126
ttawoda@synsel.com / bbuckta@synsel.com

JerLib Investors, LLC

By: _____            3-6-19

**Gerald C. Forstner, Jr. for JerLib Investors, LLC**    **Date**
Manager
1433 SW 57th Ter., Cape Coral FL 33914
jerry@alpacafarm.com / scott@ssmini.com

SCANNED COPY

# GFA Agreement



## EXHIBIT 1

### Amendment to GFA Agreement

This document represents an amendment to the GFA Agreement dated May 25, 2018 and attached as Exhibit A, between SynSel Energy, Inc., with its principal office located at 455 Fullerton Ave., Elmhurst, IL 60126, USA ("SynSel") and JerLib Investors, LLC, 1483 SW 57th Ter., Cape Coral FL 33914 ("JerLib"), herein jointly referred to as "Parties" and, separately, as "Party".

Pursuant to Section 5.b. of the GFA Agreement, the terms of the GFA Agreement may be extended upon the mutual written agreement of SynSel and JerLib, with specified interest rates and additional fees applying to any such extension.

Section 4.a. of the GFA Agreement specifies a payment of $1,000,000 to JerLib due 90 days from May 25, 2018. An amendment was made on August 26, 2018 that extended the payment date to September 7, 2018, with an additional $100,000 due at that time (attached as Exhibit B). An additional amendment was made on September 7, 2018 that extended the payment date to September 21, 2018, with an additional $100,000 due at that time (attached as Exhibit C). An additional amendment was made on September 21, 2018 that extended the term of the $1,000,000 payment to September 28, 2018, with an additional $50,000 (Fifty Thousand Dollars) due at that time (attached as Exhibit D). An Additional amendment was made on September 28, 2018 that extended the term of the $1,000,000 payment to October 28, 2018, with an additional $200,000 (Two Hundred Thousand Dollars) due at that time (attached as Exhibit E)

The authorized signatures of the Parties below shall further extend the term of the $1,000,000 payment to November 12, 2018, with an additional $100,000 (One Hundred Thousand Dollars) due for the 14-day extension, bringing the total due on or before November 12, 2018 to $1,550,000 (One Million and Five Hundred and Fifty Thousand Dollars). All subsequent payments shall be made according to the schedule in the GFA Agreement.

_____
Tim Tawoda for SynSel Energy, Inc.

October 29, 2018
Date

_____
Gerald C. Forstner, Jr. for JerLib Investors, LLC

OCT 29 2018
Date

Page 1 of 1

# GFA Agreement



---

**Exhibit A**

## GFA Agreement



This document represents a binding agreement (the "Agreement") between SynSel Energy, Inc., with its principal office located at 455 Fullerton Ave., Elmhurst, IL 60126, USA ("SynSel") and JerLib Investors, LLC, 1433 SW 57th Ter., Cape Coral FL 33914, herein jointly referred to as "Parties" and, separately, as "Party", effective the ꝺ⁵ᵗ day of May, 2018 ("Effective Date").

**WHEREAS** SynSel represents that a Good Faith Account (GFA) is much like a traditional (USA) Certificate of Deposit (CD), the GFA is a protected and secured account that returns a fixed annual income. The GFA funds are not collateralized or used as security or otherwise to the detriment of the GFA Owner in any way. The GFA insulates the GFA Owner from any perceived or real risk of loss or forfeiture; and

**WHEREAS** JerLib Investors, LLC has previously been formed as special purpose entity for the purpose of holding funds in the original principal amount of USD $3 Million.

**JerLib Investors, LLC** wishes to establish a GFA on the terms below.

**TERMS**

1. **GFA Amount.** $3,000,000 USD in the form of a cash bank account in the name of JerLib Investors, LLC.

2. **GFA Administration.** Neither SynSel nor any other party, including Chase Bank, will have any authority or power by contract or law to withdraw GFA funds, put a lien or charging order on the GFA, use the GFA as collateral or leverage for a loan or any other purpose, or have access to or use the GFA funds in any way directly or indirectly. The funds will be and remain the sole property of JerLib Investors, LLC at all times for all purposes.

   a. The SOLE and IRREVOCABLE signatory of the account will be Gerald C. Forstner, Jr or his authorized agent, if any.

   b. Christopher R. Brown of BCFI and/or his assigned agent shall be granted the required permissions to electronically monitor the account solely for purposes of verification of funds.

3. **GFA Bank.** The GFA will be held in the current Chase Bank Account held by JerLib Investors, LLC in Berea, Ohio.

4. **Return to JerLib Investors, LLC:**

   a. A Transaction Fee of USD $1,000,000 will be due and payable by SynSel to JerLib Investors, LLC at the end of 90 days from the Effective Date. Payment shall be made within when one Business Day after the expiration of said 90 day period in immediately available funds, as directed by Gerald C. Forstner, Jr. or his authorized agent, if any.

   b. Legal Fees and Contingencies
      I.   JerLib Investors, LLC has incurred some legal fees and expenses working with SynSel to date.
      II.  In addition, JerLib Investors, LLC has requested and is entitled to One-Month Libor + 2%

---

# GFA Agreement



---

## GFA Agreement



on the $3,000,000 that has been in a Chase Bank account since March 27, 2018. The current One-Month Libor rate is 1.94% (May 22, 2018). SynSel shall add 2% to this rate, for a combined total of 3.94% interest cost on the USD $3Million from March 27, 2018 – May 22, 2019. This comes to a 14- month total of approximately $138,000.

III.     The combined total of Legal Fees and Contingencies listed above is $198,000. SynSel will increase this amount by 20% to cover any potential market fluctuations throughout the 12-month period and shall be due in any event. The amounts will be paid by SynSel to JerLib Investors, LLC on the following schedule from the Effective Date hereof in readily available funds:

       1.   $60,000 at the Effective Date

       2.   $60,000 at the 180th day

       3.   $60,000 at the 270th day

       4.   $60,000 at the end of 1 year

IV.     The Transaction Fee, combined total of Legal Fees, Contingences, and Interest do not become part of GFA, but are paid directly to JerLib Investors, LLC.

V.      SynSel represents and warrants that it has currently and will maintain the capacity to pay the Return to JerLib when and as due, being the payments set forth herein.

5.   **Maturity.** For JerLib Investors, LLC to gain the full benefits of this Agreement, GFA funds of USD $3 Million must remain intact in the current JerLib Investors, LLC Chase Bank Account in Ohio for 12 months after the Effective Date of this Agreement.

    a.   With 10 Business-Days notice to SynSel, JerLib Investors, LLC may terminate this Agreement after 90 days. Any future payment installments identified in 4(iii) otherwise due from SynSel would be forfeited in the event of an accelerated Maturity Date. All payment then due shall be paid.

    b.   The terms of this Agreement may be extended upon the mutual written agreement of SynSel and JerLib Investors, LLC, with specified interest rates and additional fees applying to any such extension.

6.   **Taxes.** Any corporate or personal taxes on income received are the responsibility of JerLib Investors, LLC.

7.   **Fees & Expenses.** Except as otherwise provided herein, SynSel and JerLib Investors, LLC will each bear its own fees and expenses. If JerLib Investors, LLC has to pursue collection of any amount due hereunder, it shall be entitled to reasonable attorney fees and costs.

8.   **Liability.** The parties shall be individually responsible for making required filing, including tax returns, with the respective government entities in which they are or may be respectively domiciled and/or obligated to pay any taxes, impounds or levies which may be assessed for any of them respectively. The parties hereby agree to indemnify and hold each other harmless from any and all liabilities, damages, claims, judgments and causes arising out of and related to such taxation or obligations, payments and responsibilities or

# GFA Agreement



---

## GFA Agreement



equivalent which result in a reduction of the amounts to be received as fees. The parties otherwise shall have no further responsibility or liability to each other or to any third party, other than as set forth in this Agreement except for breach of this Agreement.

9. **Force Majeure.** The parties shall not be liable to the other for any failure to perform its obligations here under if such failure is due to fires, floods, strikes, work stoppages, accidents, wars, acts of God or any cause beyond the control of the party failing to perform.

10. **Severability.** If any of the terms or conditions of this Agreement are held by any court of competent jurisdiction to be unenforceable or invalid, such unenforceability or invalidity shall not render unenforceable or invalid the entire Agreement. Instead, this Agreement shall be construed as if it did not contain the particular provision or provisions held to be unenforceable or invalid, the rights and obligations of the parties shall be construed and enforced accordingly, and this Agreement shall thereupon remain in full force and effect

11. **Miscellaneous.**

    a. **Computation of Interest.** All computations of interest, if any, shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on the principal on the day on which the GFA is funded, and shall not accrue on the day on which it is released.

    b. **Business Day Convention.** Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension will be taken into account in calculating the amount of interest payable under this Agreement.

    c. **Compliance with Other Instruments.** SynSel is not in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violations that would not individually or in the aggregate have a material adverse effect on SynSel. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated by this Agreement will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of SynSel or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to SynSel, its business or operations or any of its assets or properties.

    d. **Compliance with Laws.** To its knowledge, SynSel is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation would materially and adversely affect the business, assets, liabilities, financial condition or operations of SynSel.

# GFA Agreement





## GFA Agreement

e.  **USA Patriot Act, Anti-Money Laundering, Know-Your-Customer, Anti-Terrorist OFAC and Other Regulations.**

  i.  Neither SynSel nor, to the knowledge of SynSel, any of its Affiliates or any of their respective officers, directors, brokers or agents (i) has violated any Anti-Terrorism Laws or (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

  ii.  Neither SynSel nor, to the knowledge of SynSel, any of its Affiliates or any of their respective officers, directors, brokers or agents is a Person that is, or is owned or controlled by Persons that are the subject/target of any Sanctions, or located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including currently, Cuba, Iran, North Korea, Sudan and Syria.

  iii.  Neither SynSel nor, to the knowledge of the SynSel, any of its Affiliates or any of their respective officers, directors, brokers or agents acting or benefiting in any capacity in connection with this Agreement conducts any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any Person, or in any country or territory, that is the subject/target of any Sanctions, deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law, or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

  iv.  At the request of SynSel, the GFA holder, Chase Bank may be engaged to certify that the GFA funds are legitimate and do not violate US or international Anti-Money-Laundering, Anti-Terrorist, or Know-Your- Customer regulations. Any payment made by SynSel hereunder shall be subject to the same laws and regulations set forth in this subsection (e).

f.  **Binding Agreement.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

g.  **Governing Law.** All disputes, controversies or differences which may arise between the parties, out of or in relation to or in connection with this Agreement, or the breach thereof, shall be governed by the laws of the State of Ohio giving effect to conflicts of laws principles. Exclusive venue and forum for proceeding shall be the federal or state courts located in or encompassing Berea, Ohio.

h.  **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

i.  **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

# GFA Agreement



## GFA Agreement



j. **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to SynSel or JerLib Investors, LLC at the addresses listed on the signature page.

k. **Modification; Waiver.** No modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective only upon the written consent of SynSel and JerLib Investors, LLC.

l. **Entire Agreement.** This Agreement and the Exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

**12. Signatures.**

The signatures below validate a binding Agreement per the terms listed above between SynSel and JerLib Investors, LLC

May 25, 2018

---

**Tim Tawoda for SynSel Energy, Inc.**

SynSel Energy, Inc.
ttawoda@synsel.com / bbuckta@synsel.com
455 Fullerton Ave., Elmhurst, IL 60126

---

**Gerald C. Forstner, Jr. for JerLib Investors, LLC**

JerLib Investors, LLC
Attn: Gerald C. Forstner, Jr.
jerry@alpacafarm.com /
scott@ssmini.com
1433 SW 57th Ter., Cape Coral FL 33914

5-25-2018

**Date**

# GFA Agreement



**Exhibit B**

## Amendment to GFA Agreement



This document represents an amendment to the GFA Agreement dated May 25, 2018 and attached as Exhibit A, between SynSel Energy, Inc., with its principal office located at 455 Fullerton Ave., Elmhurst, IL 60126, USA ("SynSel") and JerLib Investors, LLC, 1433 SW 57th Ter., Cape Coral FL 33914, herein jointly referred to as "Parties" and, separately, as "Party".

Pursuant to Section 5.b. of the GFA Agreement, the terms of the GFA Agreement may be extended upon the mutual written agreement of SynSel and JerLib Investors, LLC, with specified interest rates and additional fees applying to any such extension.

Section 4.a. of the GFA Agreement specifies a payment of $1,000,000 to JerLib Investors, LLC due 90 days from May 25, 2018. The authorized signatures of the Parties below shall extend the term of the $1,000,000 payment to September 7, 2018, with an additional $100,000 (One Hundred Thousand Dollars) due for the 14-day extension, bringing the total due on September 7, 2018 to $1,100,000 (One Million and One Hundred Thousand Dollars). All subsequent payments shall be made according to the schedule in the GFA Agreement.

_____
Tim Tawoda for SynSel Energy, Inc.

August 26, 2018
**Date**

_____
Gerald C. Forstner, Jr. for JerLib Investors, LLC

8-26-18
**Date**

# GFA Agreement



**Exhibit C**

## Amendment to GFA Agreement



This document represents an amendment to the GFA Agreement dated May 25, 2018 and attached as Exhibit A, between SynSel Energy, Inc., with its principal office located at 455 Fullerton Ave., Elmhurst, IL 60126, USA ("SynSel") and JerLib Investors, LLC, 1433 SW 57th Ter., Cape Coral FL 33914, herein jointly referred to as "Parties" and, separately, as "Party".

Pursuant to Section 5.b. of the GFA Agreement, the terms of the GFA Agreement may be extended upon the mutual written agreement of SynSel and JerLib Investors, LLC, with specified interest rates and additional fees applying to any such extension.

Section 4.a. of the GFA Agreement specifies a payment of $1,000,000 to JerLib Investors, LLC due 90 days from May 25, 2018. An amendment was made on August 26, 2018 that extended the payment date to September 7, 2018, with an additional $100,000 due at that time (attached as Exhibit B). The authorized signatures of the Parties below shall further extend the term of the $1,000,000 payment to September 21, 2018, with an additional $100,000 (One Hundred Thousand Dollars) due for the 14-day extension, bringing the total due on September 21, 2018 to $1,200,000 (One Million and Two Hundred Thousand Dollars). All subsequent payments shall be made according to the schedule in the GFA Agreement.

_____
**Tim Tawoda for SynSel Energy, Inc.**

September 7, 2018
**Date**

_____
**Gerald C. Forstner, Jr. for JerLib Investors, LLC**

9-10-18
**Date**

# GFA Agreement



**Exhibit D**

## Amendment to GFA Agreement 

This document represents an amendment to the GFA Agreement dated May 25, 2018 and attached as Exhibit A, between SynSel Energy, Inc., with its principal office located at 455 Fullerton Ave., Elmhurst, IL 60126, USA ("SynSel") and JerLib Investors, LLC, 1433 SW 57th Ter., Cape Coral FL 33914, herein jointly referred to as "Parties" and, separately, as "Party".

Pursuant to Section 5.b. of the GFA Agreement, the terms of the GFA Agreement may be extended upon the mutual written agreement of SynSel and JerLib Investors, LLC, with specified interest rates and additional fees applying to any such extension.

Section 4.a. of the GFA Agreement specifies a payment of $1,000,000 to JerLib Investors, LLC due 90 days from May 25, 2018. An amendment was made on August 26, 2018 that extended the payment date to September 7, 2018, with an additional $100,000 due at that time (attached as Exhibit B). An additional amendment was made on September 7, 2018 that extended the payment date to September 21, 2018, with an additional $100,000 due at that time (attached as Exhibit C). The authorized signatures of the Parties below shall further extend the term of the $1,000,000 payment to September 28, 2018, with an additional $50,000 (Fifty Thousand Dollars) due for the 7-day extension, bringing the total due on September 28, 2018 to $1,250,000 (One Million and Two Hundred and Fifty Thousand Dollars). All subsequent payments shall be made according to the schedule in the GFA Agreement.

_____

**Tim Tawoda for SynSel Energy, Inc.**

September 21, 2018
**Date**

_____

**Gerald C. Forstner, Jr. for JerLib Investors, LLC**

9-21-2018
**Date**

# GFA Agreement



Exhibit E



## Amendment to GFA Agreement

This document represents an amendment to the GFA Agreement dated May 25, 2018 and attached as Exhibit A, between SynSel Energy, Inc., with its principal office located at 455 Fullerton Ave., Elmhurst, IL 60126, USA ("SynSel") and JerLib Investors, LLC, 1433 SW 57th Ter., Cape Coral FL 33914 ("JerLib"), herein jointly referred to as "Parties" and, separately, as "Party".

Pursuant to Section 5.b of the GFA Agreement, the terms of the GFA Agreement may be extended upon the mutual written agreement of SynSel and JerLib, with specified interest rates and additional fees applying to any such extension.

Section 4.a. of the GFA Agreement specifies a payment of $1,000,000 to JerLib due 90 days from May 25, 2018. An amendment was made on August 26, 2018 that extended the payment date to September 7, 2018, with an additional $100,000 due at that time (attached as Exhibit B). An additional amendment was made on September 7, 2018 that extended the payment date to September 21, 2018, with an additional $100,000 due at that time (attached as Exhibit C). An additional amendment was made on September 21, 2018 that extended the term of the $1,000,000 payment to September 28, 2018, with an additional $50,000 (Fifty Thousand Dollars) due at that time (attached as Exhibit D).

Unless SynSel submits a payment of $1,250,000 to JerLib by 12PM Central Time on Tuesday, October 2, the authorized signatures of the Parties below shall further extend the term of the $1,000,000 payment to October 28, 2018, with an additional $200,000 (Two Hundred Thousand Dollars) due for the 30-day extension, bringing the total due on or before October 28, 2018 to $1,450,000 (One Million and Four Hundred and Fifty Thousand Dollars). All subsequent payments shall be made according to the schedule in the GFA Agreement.


_____
Tim Tawoda for SynSel Energy, Inc.

September 28, 2018
Date


_____
Gerald C. Forzner, Jr. for JerLib Investors, LLC

Oat 1st 2018
Date

# GFA Agreement



## EXHIBIT 2

### ESCROW AGREEMENT AND
### ESCROW INSTRUCTIONS

Date of Deposit: 9 March 2019 (hereinafter referred to as the "Effective Date")

Escrow Agent: COHN& COHN is an Illinois Attorney's office.

Escrow Number: JLB-20190221

This Agreement (hereinafter referred to as this "Agreement") is made and entered as of the above-cited date for the engagement of services from The Law Office of Cohn & Cohn as Escrow Agent having its primary place of business located at 77 W. Washington St., Suite 1422, Chicago, Illinois 60602 (hereinafter referred to as the "Escrow Agent"); and GERALD FORSTNER . . a Florida limited liability company having its primary registered office located at 1433 SW 57th Terrace, Cape Coral, Florida 33941. represented by Gerald C. Forstner Jr. in his representative/provider capacity only with no personal liability or obligation ascribed to Gerald C. Forstner, Jr. hereunder, (hereinafter referred to as the "Client"). The Escrow Agent and Client are also hereinafter collectively referred to as the "Parties.

In executing this Agreement, the Parties by their respective authorized signatory represent that the Agreement is understood and agreed to according to the provisions set forth herein.

**Scope of Services and Authority:** The Escrow Agent shall provide all general services required in carrying out the duties of Escrow Agent including safekeeping and the receipt into escrow of funds in the amount of Three Million US Dollars ($3,000,000.00 USD) from Client.

1.    **Term:** The Client in this Agreement specifically instructs the Escrow Agent to comply with the terms and timelines specified herein. This Agreement shall commence on the Effective Date and will remain active for fourteen (14) consecutive months thereafter except as provided in Section 2.A below (the "Term") after which the escrow will terminate and close as set forth in Section 6 below.

   A.    Client will have the absolute right to remove its funds from the Escrow Account at any time with written notice to Escrow Agent. Escrow Agent agrees to transfer the full balance of the Escrow Account funds paid into the escrow account to Client in readily available funds within five business days, in accordance with instructions to be provided by Client in such written notice.

2.    **Escrow Funds:** Upon the execution of this Agreement, the Client shall cause the deposit of the sum of Three Million US Dollars ($3,000,000.00 USD) (the "Escrow Funds) into the Escrow Agent's designated non-interest-bearing Escrow account in a bank and with investment terms acceptable to Client. The Escrow Account cannot be moved or modified without the

# GFA Agreement



express prior written approval of Client, and then only in accordance with Client's instructions. All interest earned upon such account shall be payable to Client.

**3.    Client Acknowledgment:** The Parties expressly agree that the Escrow Agent is acting and shall act at all times solely on the executed instructions from the Client and no other party.

**4.    Payment for Escrow Services :** BCFI, LLC, an entity external to this escrow agreement, a Georgia limited liability company, shall be responsible for the timely payment to Escrow Agent of any and all applicable escrow fees, charges, costs or expenses charged or due to Escrow Agent (hereinafter referred to as the "Escrow Fees"), and Escrow Agent agrees to hold Client harmless from and against any payment obligations for the Escrow Fees. No deduction or offset shall be made from or against the Escrow Funds for Escrow Fees or any other liabilities or obligations, fees, charges, costs or expenses of any nature.

**5.    Close of Escrow:** Close of escrow will occur no later than five business days following the expiration of the Term of this Agreement, at which time Escrow Agent will transfer the full balance of the Escrow Account to Client in readily available funds, in accordance with instructions to be provided solely by Client. Escrow Agent shall exclusively rely upon the instructions of Client with respect to the Escrow Account and the Escrow Funds and no other party.

**6.    Reliance:** The Client attests that all funds are non-criminal in origin and do not violate any of the rules and regulations set forth by the U.S. Patriot Act, the U.S. Anti-Money Laundering Statutes, and any other U.S. statute that may apply. The Escrow Agent attests that it shall comply with the Client signed written instructions, and shall safeguard the Escrow Funds while on deposit pursuant to the laws of the State of Illinois. The Escrow Agent shall provide such accounting and fund information and security as Client may reasonably request in writing no more than one request per month.

**7.    Reporting to Government Agencies:** The Parties to this Agreement specifically state that they are independent contractors and reflect services provided by Escrow Agent to Client as an independent contractor. Nothing in this Agreement construes or creates a partnership or employer/employee relationship between or amongst the Parties. All taxes, federal, state or joint venture or other are the independent responsibility of each of the respective Parties and are specifically not the responsibility of the Escrow Agent other than those relating to Escrow Agent's receipt of Escrow Fees.

**8.    Acknowledgment of Parties:** The Escrow Agent and Client specifically acknowledge and agree that Escrow Agent's sole duties and responsibilities and/or liabilities under this Agreement shall be to receive the Escrow Funds from the Client into escrow, deposit the Escrow Funds as described above, safeguard the Escrow Funds and to disburse such Escrow Funds to Client from escrow according to the Client's instructions and authorization in this Agreement.

**9.    Escrow Agent Sole Purpose:** The Escrow Agent shall act solely as a depository and recipient of funds and is not responsible or liable in any manner whatsoever for the sufficiency or correctness as to (1) the form, manner of execution or validity of any documents deposited in this escrow; and (2) the identity, authority, or right of any person executing the same, either as to documents of record or those handled in this escrow. The Escrow Agent's duties shall be limited to the safekeeping and disbursement of the Escrow Funds received in accordance with the terms of this Agreement. Except as otherwise provided in this Agreement, the Escrow Agent shall not be required to take any action regarding the collection, maturity, or apparent outlaw of any obligations deposited with Escrow Agent, unless otherwise instructed and agreed to in writing signed by the Client and agreed by the Escrow Agent.

2

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                                    Escrow Agent's initials ____

# GFA Agreement



**10.     Escrow Agent's Right of Reliance:** In performing its duties hereunder, the Escrow Agent shall have the right to conclusively presume that the Client hereto has full power and authority to execute any written notice.

**11.     Provisions Regarding the Escrow Agent:** In performing any duties under this Agreement, the Escrow Agent shall not be liable to any party for damages, losses, or expenses except that Escrow Agent shall be liable to Client for all damages, losses and expenses that may be incurred or suffered by Client or otherwise due Client on account of breach or failure of any of Escrow Agent's duties and obligations to Client under this Agreement. The Escrow Agent shall not incur any liability for (i) any act or failure to act made or omitted in good faith or (ii) any action taken or omitted in reliance on any instrument, including any written statement or affidavit provided for this Agreement that the Escrow Agent shall, in good faith believe to be genuine, nor will the Escrow Agent be liable or responsible for any forgeries, fraud, impersonations, or determining the scope of any representative authority, provided that the Escrow Agent believed in good faith, that such forgeries, fraud or impersonations were genuine. In addition, the Escrow Agent may consult with legal counsel of its choice in connection with the Escrow Agent's duties under this Agreement, the costs and expense of which shall be borne solely by Client and shall be fully protected by Client in any act taken, suffered, or permitted by it in good faith and in accordance with the advice of counsel.

**12.     General Rights and duties of Escrow Agent:** The Escrow Agent agrees to ensure the security of the escrowed funds and the Escrow Agent agrees to perform its duties hereunder with the same degree of care as that of a prudent fiduciary. The Escrow Agent does not have an interest in the Escrow Funds and has possession thereof only as Escrow Agent in accordance with the terms of this Agreement. Any funds received into escrow shall be deposited in a separate designated trust account of Escrow Agent for the exclusive benefit of Client, unless otherwise instructed in writing by the Client. In performing its duties hereunder, the Escrow Agent shall be entitled to rely upon (i) written authority for payment from the Client, (ii) the service, accuracy, authenticity of any order, judgment, certification, or demand of any court or judicial or administrative notice, and (iii) any written notice or other document delivered to the Escrow Agent in connection herewith believed by it to be genuine and correct and executed and delivered by the appropriate party. The Escrow Agent may conclusively presume that the representative of any entity other than a natural person which is a party hereto has full power and authority to execute any such written notice or other document and to issue instructions to the Escrow Agent on behalf of such party unless written notice to the contrary is delivered to the Escrow Agent.

Client agrees to defend, indemnify and hold harmless the Escrow Agent in its capacity as such for and against any and all liabilities, error in any judgments, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses (including those of its outside counsel) or disbursements of any kind whatsoever which may at any time be imposed upon, incurred by or asserted against Escrow Agent in its capacity as such in any way relating to or arising out of this Agreement other than any of the above arising from Escrow Agent's negligence or misconduct. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, punitive, indirect, or consequential loss or damage of any kind whatsoever (including but not to lost profits) even if the Escrow Agent has been advised of the likelihood of such damages and regardless of the form of action other than any of the above arising from Escrow Agent's gross negligence or willful misconduct. The obligation to indemnify the Escrow Agent under this section shall survive termination of this Agreement.

**13.     Notices:** All notices, written instructions or other documents deliverable to the parties hereto pursuant to the terms and conditions of this Escrow Agreement shall be validly given when hand-delivered or sent by a courier or express service guaranteeing overnight delivery to the Client and the Escrow Agent at the following addresses:

3

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                                         Escrow Agent's initials ____

# GFA Agreement



If to the Client:

Gerald C. Forstner Jr.
JerLib Investors LLC
1433 SW 57th Terrace
Cape Coral FL 33941
Phone:
Fax:

If to the Escrow Agent:

Erwin Cohn
Cohn & Cohn
77 W. Washington St., Suite 1422
Chicago, Illinois 60602
Telephone: 847. 420.1521
Fax: 312.346.9339

If to BCFI, LLC:

2637 Peachtree Rd. NE, Suite 307
Atlanta, Georgia 30326
Telephone: 770.374.3661
Attn: Christopher R. Brown

**14.    Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

**15.    Waiver:** No waiver of any of the obligations or provisions of this Escrow Agreement shall be enforceable against either of the Parties unless such waiver is executed by both of the Parties hereto. Any waiver effected hereby shall not constitute a waiver of any other obligations or Provisions of this Agreement.

**16.    Amendment:** This Escrow Agreement may be amended. modified or terminated only by written instrument or written instruments signed by both Parties hereto. No act. omission or course of dealing shall be deemed to constitute an amendment, modification or termination hereof.

**17.    Heading:** The headings contained in this Agreement are provided for convenience only and form not part of this Agreement and shall not affect the construction or interpretation of this Agreement.

**18.    Successors and Assigns:** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective legal representatives, successors, heirs and assigns. Escrow Agent may not assign this Agreement or any of its duties and obligations without the prior written consent of Client which consent may be withheld in the sole discretion of Client.

4

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                                Escrow Agent's initials ____

# GFA Agreement



**19.   Entire Agreement:** This Agreement sets forth the entire agreement between the Escrow Agent, BCFI. LLC and the Client with respect to the subject matter hereof, and this Agreement supersedes and replaces any agreement or understanding that may have existed between the Parties prior to or contemporaneously with the date hereof in respect of the matter expressly set forth herein.

**20. Additional Provisions:**

    **A.   A FACSIMILE/TELECOPY/ELECTRONIC TRANSMITTALS:** As time is of the essence in this transaction, the Parties hereto agree that these instructions may be executed with signatures and/or initials and then faxed and/or otherwise electronically transmitted to the other party to this Agreement. The Parties hereto further agree that any such signatures and/or initials placed on these instructions by either party shall have the same legal force and binding effect as if all signatures and/or initials were an original signature and/or initial. Further, the Parties hereto agree to re-execute this instruction with an original signature and/or initial as reasonably required by either Party upon request from time-to-time and without delay.

    **B.   SWIFT OR WIRED FUNDS EXCLUSIVELY:** All funds sent to the Escrow Agent shall be sent via SWIFT or Federal wire. No checks or certified funds shall be accepted.

    **C.   SPECIALLY DESIGNATED AND BLOCKED PERSONS.** Should a Party, or anyone with whom they are (or will be) involved with is a person with whom the Escrow Agent is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury of the United States of America (including, but not limited to, those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, the Client hereby agrees to promptly provide Escrow Agent with any additional information that Escrow Agent deems reasonably necessary from time-to-time in order to ensure compliance with all applicable laws concerning money laundering and similar activities. Both Parties expressly acknowledge that they have read and understand the terms and conditions contained in this Paragraph, and holds harmless the other Party from and against any violations of this Paragraph.

    **D.   DUE DILIGENCE.** The Client specifically represents that it is familiar with the use of such services contemplated herein and the terms and structure associated herewith. The Client acknowledges and agrees that the Escrow Agent does not have any responsibility to educate or provide advice to the Client. It shall be the Client's sole responsibility to perform its own due diligence regarding these services. The Client expressly acknowledges that it has read and understands the terms and conditions contained in this Agreement.

    **E.   EFFECTIVE DATE AND TERMINATION.** This Agreement shall become effective at the time the execution of this Agreement by the Parties and the deposit of funds into the Escrow Account pursuant to this Agreement.

    **F.   RELEASE OF ESCROW.** Upon final return of the full balance of Escrow Account to Client, all of the liabilities and obligations of the Escrow Agent in connection with the Escrow Funds and this Agreement shall terminate, except that the indemnity provisions hereof that are for the benefit of the Escrow Agent shall continue in full force and effect for so long as the Escrow Agent may have any liabilities for any amounts for which it has been indemnified pursuant hereto.

5

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                                        Escrow Agent's initials ____

# GFA Agreement



**G. INDEMNIFICATION:** Client shall, to the fullest extent permitted by law, defend, indemnify and hold harmless the Escrow Agent from and against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against Escrow Agent from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any third party person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Agreement or any transactions contemplated herein, irrespective of whether Escrow Agent is a party to any such action, proceeding, suit, or the target of any such inquiry or investigation; provided, however, that Escrow Agent shall not have the right to be indemnified for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of the Escrow Agent.

**H. DISPUTES.** The Escrow Agent shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it. The obligations of Client under this indemnification provision shall survive any termination of the Agreement and the resignation or removal of the Escrow Agent.

**I. NO ATTORNEY/CLIENT RELATIONSHIP.** It is expressly understood and hereby confirmed that no attorney/client relationship exists between the Client and Escrow Agent except and only as it pertains to this specific Agreement and the entrustment of the Escrow Fund as provided herein. Escrow Agent is being engaged solely to provide the escrow services described herein, and is not acting as an attorney or agent of, and shall have no duties or liabilities to the Parties beyond the express scope of this Agreement.

**J. HEADINGS.** The descriptive headings of this Agreement exist for convenience only and do not constitute a substantive part of this Agreement.

**K. MULTIPLE COUNTERPARTS; ELECTRONIC TRANSACTION.** This Agreement may be executed in multiple counterparts, each of which shall be regarded for all purposes as an original, and such counterpart shall constitute but one and the same instrument. In addition, the transaction described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files, and other reproductions of original executed documents shall be deemed authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action, or suit in the appropriate court of law.

**L. ASSIGNMENT.** This Agreement may not be assigned by any Party without the prior written consent of all other parties hereto, which consent shall be in the sole discretion of a Party to give or withhold.

**M. NOTICE TO CLIENT.** During the Term of this Escrow Agreement, Escrow Agent will provide to Client, or his designated agent, upon written request and at least monthly, timely confirmation of the balance of the Escrow Account with earnings thereon, as well as timely notice of any deposit to or withdrawal from such Escrow Account.

6

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____

Escrow Agent's initials ____

# GFA Agreement



**N. MISCELLANEOUS.** The Escrow Agent may execute any of its powers or responsibilities hereunder and exercise any rights hereunder either directly by or through its agents or attorneys. Nothing in this Escrow Agreement shall be deemed to impose upon the Escrow Agent any duty to qualify to do business or to act as fiduciary, or otherwise, in any jurisdiction other than the state in which the Escrow Agent's address for notice purposes is located. The Escrow Agent shall not be responsible for and shall not be under a duty to examine into or pass upon the validity, binding effect, execution, or sufficiency of this Escrow Agreement or of any agreement amendatory or supplemental hereto.

This Agreement shall be governed, construed and interpreted pursuant to the laws of the State of Illinois, United States of America, and any and all disputes shall be brought and resolved within any court of competent jurisdiction in Illinois, without regard to that body of law known as Conflicts of Laws. Disputes in multiple jurisdictions for the same or related cause of action are prohibited. Jurisdiction shall lie exclusively with the Court the first dispute was filed.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns, heirs and legal and personal representatives.

IN WITNESS WHEREOF the parties have executed and delivered this Agreement as of the date first above-written.

**Client:**

_____
By: Gerald C. Forstner, Jr.
Its: Managing Member


**ESCROW AGENT:**
The Law Office of Cohn & Cohn


_____
By: Erwin Cohn


**BCFI, LLC**


By: _Christopher R. Brown_____
    Christopher R. Brown

7

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                                          Escrow Agent's initials ____

# GFA Agreement



| Escrow Agent | The Law Office of Cohn & Cohn |
|---|---|
| Represented by | Erwin Cohn |
| Title | Partner |
| Address | 77 W. Washington St., Suite 1422, Chicago, Illinois 60602 |
| Bank Name | JP Morgan Chase |
| Bank Address | Chase Plaza, Chicago, Illinois 60603 |
| SWIFT Code | ▓▓▓▓▓▓ |
| Bank Routing No. | 071000013 |
| Account No. | ▓▓▓3532 |
| Account Name | Cohn & Cohn, Atty Escrow Account |
| Bank Office Name Bank Phone Bank Officer Email | 888.434.3030 |

8

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                                    Escrow Agent's initials _____

# EXHIBIT B

## ESCROW AGREEMENT AND
## ESCROW INSTRUCTIONS

Date of Deposit: 13 March 2019 (hereinafter referred to as the "Effective Date")

Escrow Agent: COHN& COHN is an Illinois Attorney's office.

Escrow Number: JLB-20190221

This Agreement (hereinafter referred to as this "Agreement") is made and entered as of the above-cited date for the engagement of services from The Law Office of Cohn & Cohn as Escrow Agent having its primary place of business located at 77 W. Washington St., Suite 1422, Chicago, Illinois 60602 (hereinafter referred to as the "Escrow Agent"); and JerLib Investors, LLC, a Florida limited liability company having its primary registered office located at 1433 SW 57th Terrace, Cape Coral, Florida 33941, represented by Gerald C. Forstner Jr. in his representative/provider capacity only with no personal liability or obligation ascribed to JerLib Investors, LLC hereunder, (hereinafter referred to as the "Client"). The Escrow Agent and Client are also hereinafter collectively referred to as the "Parties."

In executing this Agreement, the Parties by their respective authorized signatory represent that the Agreement is understood and agreed to according to the provisions set forth herein.

**Scope of Services and Authority**: The Escrow Agent shall provide all general services required in carrying out the duties of Escrow Agent including safekeeping and the receipt into escrow of funds in the amount of Three Million US Dollars ($3,000,000.00 USD) from Client.

**1.      Term:** The Client in this Agreement specifically instructs the Escrow Agent to comply with the terms and timelines specified herein. This Agreement shall commence on the Effective Date and will remain active for fourteen (14) consecutive months or until written request is receive by the Escrow Agent thereafter except as provided in Section 1.A below (the "Term") after which the escrow will terminate and close as set forth in Section 6 below.

   A.   After 75 days from the Effective Date herein, Client will have the absolute right to remove its funds from the Escrow Account at any time with written notice to Escrow Agent.  Escrow Agent agrees to transfer the full balance of the Escrow Account funds paid into the escrow account to Client in readily available funds within five (5) business days, in accordance with instructions to be provided by Client in such written notice.

**2.      Escrow Funds:** Upon the execution of this Agreement, the Client shall cause the deposit of the sum of Three Million US Dollars ($3,000,000.00 USD) (the "Escrow Funds) into the Escrow Agent's designated non-interest-bearing Escrow account in a bank acceptable to Client. The Escrow Account cannot be moved or modified without the

express prior written approval of Client, and then only in accordance with Client's instructions.

**3.      Client Acknowledgment:** The Parties expressly agree that the Escrow Agent is acting and shall act at all times solely on the executed instructions from the Client and no other party.

**4.      Payment for Escrow Services :** BCFI, LLC, an entity external to this escrow agreement, a Georgia limited liability company, shall be responsible for the timely payment to Escrow Agent of any and all applicable escrow fees, charges, costs or expenses charged or due to Escrow Agent (hereinafter referred to as the "Escrow Fees"), and Escrow Agent agrees to hold Client harmless from and against any payment obligations for the Escrow Fees. No deduction or offset shall be made from or against the Escrow Funds for Escrow Fees or any other liabilities or obligations, fees, charges, costs or expenses of any nature.

**5.      Close of Escrow:** Close of escrow will occur no later than five business days following the expiration of the Term of this Agreement, at which time Escrow Agent will transfer the full balance of the Escrow Account to Client in readily available funds, in accordance with instructions to be provided solely by Client. Escrow Agent shall exclusively rely upon the instructions of Client with respect to the Escrow Account and the Escrow Funds and no other party.

**6.      Reliance:** The Client attests that all funds are non-criminal in origin and do not violate any of the rules and regulations set forth by the U.S. Patriot Act, the U.S. Anti-Money Laundering Statutes, and any other U.S. statute that may apply. The Escrow Agent attests that it shall comply with the Client signed written instructions, and shall safeguard the Escrow Funds while on deposit pursuant to the laws of the State of Illinois. The Escrow Agent shall provide such accounting and fund information and security as Client may reasonably request in writing no more than one request per month.

**7.      Reporting to Government Agencies:** The Parties to this Agreement specifically state that they are independent contractors and reflect services provided by Escrow Agent to Client as an independent contractor. Nothing in this Agreement construes or creates a partnership or employer/employee relationship between or amongst the Parties. All taxes, federal, state or joint venture or other are the independent responsibility of each of the respective Parties and are specifically not the responsibility of the Escrow Agent other than those relating to Escrow Agent's receipt of Escrow Fees.

**8.      Acknowledgment of Parties:** The Escrow Agent and Client specifically acknowledge and agree that Escrow Agent's sole duties and responsibilities and/or liabilities under this Agreement shall be to receive the Escrow Funds from the Client into escrow, deposit the Escrow Funds as described above, safeguard the Escrow Funds and to disburse such Escrow Funds to Client from escrow according to the Client's instructions and authorization in this  Agreement.

**9.      Escrow Agent Sole Purpose:** The Escrow Agent shall act solely as a depository and recipient of funds and is not responsible or liable in any manner whatsoever for the sufficiency or correctness as to (1) the form, manner of execution or validity of any documents deposited in this escrow; and (2) the identity, authority, or right of any person executing the same, either as to documents of  record or those handled in this escrow. The Escrow Agent's duties shall be limited to the safekeeping and disbursement of the Escrow Funds received in accordance with the terms of this Agreement. Except as otherwise provided in this Agreement, the Escrow Agent shall not be required to take any action regarding the collection, maturity, or apparent outlaw of any obligations deposited with Escrow Agent, unless otherwise instructed and agreed to in writing signed by the Client and agreed by the Escrow Agent.

2

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                                              Escrow Agent's initials ____

**10.     Escrow Agent's Right of Reliance:** In performing its duties hereunder, the Escrow Agent shall have the right to conclusively presume that the Client hereto has full power and authority to execute any written notice.

**11.     Provisions Regarding the Escrow Agent:** In performing any duties under this Agreement, the Escrow Agent shall not be liable to any party for damages, losses, or expenses except that Escrow Agent shall be liable to Client for all damages, losses and expenses that may be incurred or suffered by Client or otherwise due Client on account of breach or failure of any of Escrow Agent's duties and obligations to Client under this Agreement. The Escrow Agent shall not incur any liability for (i) any act or failure to act made or omitted in good faith or (ii) any action taken or omitted in reliance on any instrument, including any written statement or affidavit provided for this Agreement that the Escrow Agent shall, in good faith believe to be genuine, nor will the Escrow Agent be liable or responsible for any forgeries, fraud, impersonations, or determining the scope of any representative authority, provided that the Escrow Agent believed in good faith, that such forgeries, fraud or impersonations were genuine. In addition, the Escrow Agent may consult with legal counsel of its choice in connection with the Escrow Agent's duties under this Agreement, the costs and expense of which shall be borne solely by Client and shall be fully protected by Client in any act taken, suffered, or permitted by it in good faith and in accordance with the advice of counsel.

**12.     General Rights and duties of Escrow Agent:** The Escrow Agent agrees to ensure the security of the escrowed funds and the Escrow Agent agrees to perform its duties hereunder with the same degree of care as that of a prudent fiduciary. The Escrow Agent does not have an interest in the Escrow Funds and has possession thereof only as Escrow Agent in accordance with the terms of this Agreement. Any funds received into escrow shall be deposited in a separate designated trust account of Escrow Agent for the exclusive benefit of Client, unless otherwise instructed in writing by the Client. In performing its duties hereunder, the Escrow Agent shall be entitled to rely upon (i) written authority for payment from the Client, (ii) the service, accuracy, authenticity of any order, judgment, certification, or demand of any court or judicial or administrative notice, and (iii) any written notice or other document delivered to the Escrow Agent in connection herewith believed by it to be genuine and correct and executed and delivered by the appropriate party. The Escrow Agent may conclusively presume that the representative of any entity other than a natural person which is a party hereto has full power and authority to execute any such written notice or other document and to issue instructions to the Escrow Agent on behalf of such party unless written notice to the contrary is delivered to the Escrow Agent.

Client agrees to defend, indemnify and hold harmless the Escrow Agent in its capacity as such for and against any and all liabilities, error in any judgments, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses (including those of its outside counsel) or disbursements of any kind whatsoever which may at any time be imposed upon, incurred by or asserted against Escrow Agent in its capacity as such in any way relating to or arising out of this Agreement other than any of the above arising from Escrow Agent's negligence or misconduct. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, punitive, indirect, or consequential loss or damage of any kind whatsoever (including but not to lost profits) even if the Escrow Agent has been advised of the likelihood of such damages and regardless of the form of action other than any of the above arising from Escrow Agent's gross negligence or willful misconduct. The obligation to indemnify the Escrow Agent under this section shall survive termination of this Agreement.

**13.     Notices:** All notices, written instructions or other documents deliverable to the parties hereto pursuant to the terms and conditions of this Escrow Agreement shall be validly given when hand-delivered or sent by a courier or express service guaranteeing overnight delivery to the Client and the Escrow Agent at the following addresses:

3

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                                    Escrow Agent's initials ____

| If to the Client: | Gerald C. Forstner Jr.<br>JerLib Investors LLC<br>1433 SW 57th Terrace<br>Cape Coral FL 33941<br>Phone:<br>Fax: |
|---|---|
| If to the Escrow Agent: | Erwin Cohn<br>Cohn & Cohn<br>77 W. Washington St., Suite 1422<br>Chicago, Illinois 60602<br>Telephone: 847. 420.1521<br>Fax: 312.346.9339 |
| If to BCFI, LLC: | 2637 Peachtree Rd. NE, Suite 307<br>Atlanta, Georgia 30326<br>Telephone: 770.374.3661<br>Attn: Christopher R. Brown |

**14.      Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

**15.      Waiver:** No waiver of any of the obligations or provisions of this Escrow Agreement shall be enforceable against either of the Parties unless such waiver is executed by both of the Parties hereto. Any waiver effected hereby shall not constitute a waiver of any other obligations or Provisions of this Agreement.

**16.      Amendment:** This Escrow Agreement may be amended, modified or terminated only by written instrument or written instruments signed by both Parties hereto. No act, omission or course of dealing shall be deemed to constitute an amendment, modification or termination hereof.

**17.      Heading:** The headings contained in this Agreement are provided for convenience only and form not part of this Agreement and shall not affect the construction or interpretation of this Agreement.

**18.      Successors and Assigns**: This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective legal representatives, successors, heirs and assigns. Escrow Agent may not assign this Agreement or any of its duties and obligations without the prior written consent of Client which consent may be withheld in the sole discretion of Client.

4

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials                                          Escrow Agent's initials ____

19.    **Entire Agreement**: This Agreement sets forth the entire agreement between the Escrow Agent, BCFI, LLC and the Client with respect to the subject matter hereof, and this Agreement supersedes and replaces any agreement or understanding that may have existed between the Parties prior to or contemporaneously with the date hereof in respect of the matter expressly set forth herein.

**20. Additional Provisions:**

**A. A FACSIMILE/TELECOPY/ELECTRONIC TRANSMITTALS:** As time is of the essence in this transaction, the Parties hereto agree that these instructions may be executed with signatures and/or initials and then faxed and/or otherwise electronically transmitted to the other party to this Agreement. The Parties hereto further agree that any such signatures and/or initials placed on these instructions by either party shall have the same legal force and binding effect as if all signatures and/or initials were an original signature and/or initial. Further, the Parties hereto agree to re-execute this instruction with an original signature and/or initial as reasonably required by either Party upon request from time-to-time and without delay.

**B. SWIFT OR WIRED FUNDS EXCLUSIVELY:** All funds sent to the Escrow Agent shall be sent via SWIFT or Federal wire. No checks or certified funds shall be accepted.

**C. SPECIALLY DESIGNATED AND BLOCKED PERSONS.** Should a Party, or anyone with whom they are (or will be) involved with is a person with whom the Escrow Agent is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury of the United States of America (including, but not limited to, those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, the Client hereby agrees to promptly provide Escrow Agent with any additional information that Escrow Agent deems reasonably necessary from time-to-time in order to ensure compliance with all applicable laws concerning money laundering and similar activities. Both Parties expressly acknowledge that they have read and understand the terms and conditions contained in this Paragraph, and holds harmless the other Party from and against any violations of this Paragraph.

**D. DUE DILIGENCE.** The Client specifically represents that it is familiar with the use of such services contemplated herein and the terms and structure associated herewith. The Client acknowledges and agrees that the Escrow Agent does not have any responsibility to educate or provide advice to the Client. It shall be the Client's sole responsibility to perform its own due diligence regarding these services. The Client expressly acknowledges that it has read and understands the terms and conditions contained in this Agreement.

**E. EFFECTIVE DATE AND TERMINATION.** This Agreement shall become effective at the time the execution of this Agreement by the Parties and the deposit of funds into the Escrow Account pursuant to this Agreement.

**F. RELEASE OF ESCROW.** Upon final return of the full balance of Escrow Account to Client, all of the liabilities and obligations of the Escrow Agent in connection with the Escrow Funds and this Agreement shall terminate, except that the indemnity provisions hereof that are for the benefit of the Escrow Agent shall continue in full force and effect for so long as the Escrow Agent may have any liabilities for any amounts for which it has been indemnified pursuant hereto.

5

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                                    Escrow Agent's initials ____

**G.   INDEMNIFICATION:** Client shall, to the fullest extent permitted by law, defend, indemnify and hold harmless the Escrow Agent from and against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against Escrow Agent from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any third party person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Agreement or any transactions contemplated herein, irrespective of whether Escrow Agent is a party to any such action, proceeding, suit, or the target of any such inquiry or investigation; provided, however, that Escrow Agent shall not have the right to be indemnified for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of the Escrow Agent.

**H.   DISPUTES.** The Escrow Agent shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it. The obligations of Client under this indemnification provision shall survive any termination of the Agreement and the resignation or removal of the Escrow Agent.

**I.   NO ATTORNEY/CLIENT RELATIONSHIP.** It is expressly understood and hereby confirmed that no attorney/client relationship exists between the Client and Escrow Agent except and only as it pertains to this specific Agreement and the entrustment of the Escrow Fund as provided herein. Escrow Agent is being engaged solely to provide the escrow services described herein, and is not acting as an attorney or agent of, and shall have no duties or liabilities to the Parties beyond the express scope of this Agreement.

**J.   HEADINGS.** The descriptive headings of this Agreement exist for convenience only and do not constitute a substantive part of this Agreement.

**K. MULTIPLE COUNTERPARTS; ELECTRONIC TRANSACTION.** This Agreement may be executed in multiple counterparts, each of which shall be regarded for all purposes as an original, and such counterpart shall constitute but one and the same instrument. In addition, the transaction described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files, and other reproductions of original executed documents shall be deemed authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action, or suit in the appropriate court of law.

**L.   ASSIGNMENT.** This Agreement may not be assigned by any Party without the prior written consent of all other parties hereto, which consent shall be in the sole discretion of a Party to give or withhold.

**M. NOTICE TO CLIENT.** During the Term of this Escrow Agreement, Escrow Agent will provide to Client, or his designated agent, upon written request and at least monthly, timely confirmation of the balance of the Escrow Account with earnings thereon, as well as timely notice of any deposit to or withdrawal from such Escrow Account.

6

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                                    Escrow Agent's initials ____

**N. MISCELLANEOUS.** The Escrow Agent may execute any of its powers or responsibilities hereunder and exercise any rights hereunder either directly by or through its agents or attorneys. Nothing in this Escrow Agreement shall be deemed to impose upon the Escrow Agent any duty to qualify to do business or to act as fiduciary, or otherwise, in any jurisdiction other than the state in which the Escrow Agent's address for notice purposes is located. The Escrow Agent shall not be responsible for and shall not be under a duty to examine into or pass upon the validity, binding effect, execution, or sufficiency of this Escrow Agreement or of any agreement amendatory or supplemental hereto.

This Agreement shall be governed, construed and interpreted pursuant to the laws of the State of Illinois, United States of America, and any and all disputes shall be brought and resolved within any court of competent jurisdiction in Illinois, without regard to that body of law known as Conflicts of Laws. Disputes in multiple jurisdictions for the same or related cause of action are prohibited. Jurisdiction shall lie exclusively with the Court the first dispute was filed.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns, heirs and legal and personal representatives.

IN WITNESS WHEREOF the parties have executed and delivered this Agreement as of the date first above-written.

**Client:**

By: Gerald C. Forstner, Jr.
Its: Managing Member

**ESCROW AGENT:**
The Law Office of Cohn & Cohn

By: Erwin Cohn

**BCFI, LLC**

By: _____
Christopher R. Brown

7

My initials represent my agreement and acknowledgement of the foregoing.
Client's initials _____                    Escrow Agent's initials _____

| Escrow Agent | The Law Office of Cohn & Cohn |
|---|---|
| Represented by | Erwin Cohn |
| Title | Partner |
| Address | 77 W. Washington St., Suite 1422, Chicago, Illinois 60602 |
| Bank Name | JP Morgan Chase |
| Bank Address | Chase Plaza, Chicago, Illinois 60603 |
| SWIFT Code | ████████ |
| Bank Routing No. | 071000013 |
| Account No. | ████3532 |
| Account Name | Cohn & Cohn, Atty Escrow Account |
| Bank Office Name Bank Phone Bank Officer Email | 888.434.3030 |

8

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                    Escrow Agent's initials ____

9

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                    Escrow Agent's initials ____

## ESCROW AGREEMENT AND
## ESCROW INSTRUCTIONS

Date of Deposit: 13 March 2019 (hereinafter referred to as the "Effective Date")

Escrow Agent: COHN & COHN is an Illinois Attorney's office.

Escrow Number: JLB-20190221

This Agreement (hereinafter referred to as this "Agreement") is made and entered as of the above-cited date for the engagement of services from The Law Office of Cohn & Cohn as Escrow Agent having its primary place of business located at 77 W. Washington St., Suite 1422, Chicago, Illinois 60602 (hereinafter referred to as the "Escrow Agent"); and JerLib Investors, LLC, a Florida limited liability company having its primary registered office located at 1433 SW 57th Terrace, Cape Coral, Florida 33941, represented by Gerald C. Forstner Jr. in his representative/provider capacity only with no personal liability or obligation ascribed to JerLib Investors, LLC hereunder, (hereinafter referred to as the "Client"). The Escrow Agent and Client are also hereinafter collectively referred to as the "Parties.

In executing this Agreement, the Parties by their respective authorized signatory represent that the Agreement is understood and agreed to according to the provisions set forth herein.

Scope of Services and Authority: The Escrow Agent shall provide all general services required in carrying out the duties of Escrow Agent including safekeeping and the receipt into escrow of funds in the amount of Three Million US Dollars ($3,000,000.00 USD) from Client.

1.      Term: The Client in this Agreement specifically instructs the Escrow Agent to comply with the terms and timelines specified herein. This Agreement shall commence on the Effective Date and will remain active for fourteen (14) consecutive months or until written request is receive by the Escrow Agent thereafter except as provided in Section 1.A below (the "Term") after which the escrow will terminate and close as set forth in Section 6 below.

    A.  After 75 days from the Effective Date herein. Client will have the absolute right to remove its funds from the Escrow Account at any time with written notice to Escrow Agent. Escrow Agent agrees to transfer the full balance of the Escrow Account funds paid into the escrow account to Client in readily available funds within five (5) business days, in accordance with instructions to be provided by Client in such written notice.

2.      Escrow Funds: Upon the execution of this Agreement, the Client shall cause the deposit of the sum of Three Million US Dollars ($3,000,000.00 USD) (the "Escrow Funds) into the Escrow Agent's designated non-interest-bearing Escrow account in a bank acceptable to Client. The Escrow Account cannot be moved or modified without the

From:
03/13/2019 12:51 FAX                                    03/13/2019 13:00      #449 P.003/009
                                                                              ☏003

express prior written approval of Client, and then only in accordance with Client's instructions.

3.      **Client Acknowledgment:** The Parties expressly agree that the Escrow Agent is acting and shall act at all times solely on the executed instructions from the Client and no other party.

4.      **Payment for Escrow Services :** BCFl, LLC, an entity external to this escrow agreement, a Georgia limited liability company, shall be responsible for the timely payment to Escrow Agent of any and all applicable escrow fees, charges, costs or expenses charged or due to Escrow Agent (hereinafter referred to as the "Escrow Fees"), and Escrow Agent agrees to hold Client harmless from and against any payment obligations for the Escrow Fees. No deduction or offset shall be made from or against the Escrow Funds for Escrow Fees or any other liabilities or obligations, fees, charges, costs or expenses of any nature.

5.      **Close of Escrow:** Close of escrow will occur no later than five business days following the expiration of the Term of this Agreement, at which time Escrow Agent will transfer the full balance of the Escrow Account to Client in readily available funds, in accordance with instructions to be provided solely by Client. Escrow Agent shall exclusively rely upon the instructions of Client with respect to the Escrow Account and the Escrow Funds and no other party.

6.      **Reliance:** The Client attests that all funds are non-criminal in origin and do not violate any of the rules and regulations set forth by the U.S. Patriot Act, the U.S. Anti-Money Laundering Statutes, and any other U.S. statute that may apply. The Escrow Agent attests that it shall comply with the Client signed written instructions, and shall safeguard the Escrow Funds while on deposit pursuant to the laws of the State of Illinois. The Escrow Agent shall provide such accounting and fund information and security as Client may reasonably request in writing no more than one request per month.

7.      **Reporting to Government Agencies:** The Parties to this Agreement specifically state that they are independent contractors and reflect services provided by Escrow Agent to Client as an independent contractor. Nothing in this Agreement construes or creates a partnership or employer/employee relationship between or amongst the Parties. All taxes, federal, state or joint venture or other are the independent responsibility of each of the respective Parties and are specifically not the responsibility of the Escrow Agent other than those relating to Escrow Agent's receipt of Escrow Fees.

8.      **Acknowledgment of Parties:** The Escrow Agent and Client specifically acknowledge and agree that Escrow Agent's sole duties and responsibilities and/or liabilities under this Agreement shall be to receive the Escrow Funds from the Client into escrow, deposit the Escrow Funds as described above, safeguard the Escrow Funds and to disburse such Escrow Funds to Client from escrow according to the Client's instructions and authorization in this Agreement.

9.      **Escrow Agent Sole Purpose:** The Escrow Agent shall act solely as a depository and recipient of funds and is not responsible or liable in any manner whatsoever for the sufficiency or correctness as to (1) the form, manner of execution or validity of any documents deposited in this escrow; and (2) the identity, authority, or right of any person executing the same, either as to documents of record or those handled in this escrow. The Escrow Agent's duties shall be limited to the safekeeping and disbursement of the Escrow Funds received in accordance with the terms of this Agreement. Except as otherwise provided in this Agreement, the Escrow Agent shall not be required to take any action regarding the collection, maturity, or apparent outlaw of any obligations deposited with Escrow Agent, unless otherwise instructed and agreed to in writing signed by the Client and agreed by the Escrow Agent.

2

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                                  Escrow Agent's initials _ec_

10.    **Escrow Agent's Right of Reliance**: In performing its duties hereunder, the Escrow Agent shall have the right to conclusively presume that the Client hereto has full power and authority to execute any written notice.

11.    **Provisions Regarding the Escrow Agent**: In performing any duties under this Agreement, the Escrow Agent shall not be liable to any party for damages, losses, or expenses except that Escrow Agent shall be liable to Client for all damages, losses and expenses that may be incurred or suffered by Client or otherwise due Client on account of breach or failure of any of Escrow Agent's duties and obligations to Client under this Agreement. The Escrow Agent shall not incur any liability for (i) any act or failure to act made or omitted in good faith or (ii) any action taken or omitted in reliance on any instrument, including any written statement or affidavit provided for this Agreement that the Escrow Agent shall, in good faith believe to be genuine, nor will the Escrow Agent be liable or responsible for any forgeries, fraud, impersonations, or determining the scope of any representative authority, provided that the Escrow Agent believed in good faith, that such forgeries, fraud or impersonations were genuine. In addition, the Escrow Agent may consult with legal counsel of its choice in connection with the Escrow Agent's duties under this Agreement, the costs and expense of which shall be borne solely by Client and shall be fully protected by Client in any act taken, suffered, or permitted by it in good faith and in accordance with the advice of counsel.

12.    **General Rights and duties of Escrow Agent**: The Escrow Agent agrees to ensure the security of the escrowed funds and the Escrow Agent agrees to perform its duties hereunder with the same degree of care as that of a prudent fiduciary. The Escrow Agent does not have an interest in the Escrow Funds and has possession thereof only as Escrow Agent in accordance with the terms of this Agreement. Any funds received into escrow shall be deposited in a separate designated trust account of Escrow Agent for the exclusive benefit of Client, unless otherwise instructed in writing by the Client. In performing its duties hereunder, the Escrow Agent shall be entitled to rely upon (i) written authority for payment from the Client, (ii) the service, accuracy, authenticity of any order, judgment, certification, or demand of any court or judicial or administrative notice, and (iii) any written notice or other document delivered to the Escrow Agent in connection herewith believed by it to be genuine and correct and executed and delivered by the appropriate party. The Escrow Agent may conclusively presume that the representative of any entity other than a natural person which is a party hereto has full power and authority to execute any such written notice or other document and to issue instructions to the Escrow Agent on behalf of such party unless written notice to the contrary is delivered to the Escrow Agent.

Client agrees to defend, indemnify and hold harmless the Escrow Agent in its capacity as such for and against any and all liabilities, error in any judgments, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses (including those of its outside counsel) or disbursements of any kind whatsoever which may at any time be imposed upon, incurred by or asserted against Escrow Agent in its capacity as such in any way relating to or arising out of this Agreement other than any of the above arising from Escrow Agent's negligence or misconduct. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, punitive, indirect, or consequential loss or damage of any kind whatsoever (including but not to lost profits) even if the Escrow Agent has been advised of the likelihood of such damages and regardless of the form of action other than any of the above arising from Escrow Agent's gross negligence or willful misconduct. The obligation to indemnify the Escrow Agent under this section shall survive termination of this Agreement.

13.    **Notices**: All notices, written instructions or other documents deliverable to the parties hereto pursuant to the terms and conditions of this Escrow Agreement shall be validly given when hand-delivered or sent by a courier or express service guaranteeing overnight delivery to the Client and the Escrow Agent at the following addresses:

3

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                    Escrow Agent's initials _Or_

If to the Client:              Gerald C. Forstner Jr.
                               JerLib Investors LLC
                               1433 SW 57th Terrace
                               Cape Coral FL 33941
                               Phone:
                               Fax:


If to the Escrow Agent:        Erwin Cohn
                               Cohn & Cohn
                               77 W. Washington St., Suite 1422
                               Chicago, Illinois 60602
                               Telephone: 847. 420.1521
                               Fax: 312.346.9339


If to BCFI, LLC:               2637 Peachtree Rd. NE, Suite 307
                               Atlanta, Georgia 30326
                               Telephone: 770.374.3661
                               Attn: Christopher R. Brown

**14.    Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

**15.    Waiver:** No waiver of any of the obligations or provisions of this Escrow Agreement shall be enforceable against either of the Parties unless such waiver is executed by both of the Parties hereto. Any waiver effected hereby shall not constitute a waiver of any other obligations or Provisions of this Agreement.

**16.    Amendment:** This Escrow Agreement may be amended, modified or terminated only by written instrument or written instruments signed by both Parties hereto. No act, omission or course of dealing shall be deemed to constitute an amendment, modification or termination hereof.

**17.    Heading:** The headings contained in this Agreement are provided for convenience only and form not part of this Agreement and shall not affect the construction or interpretation of this Agreement.

**18.    Successors and Assigns:** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective legal representatives, successors, heirs and assigns. Escrow Agent may not assign this Agreement or any of its duties and obligations without the prior written consent of Client which consent may be withheld in the sole discretion of Client.

4

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                               Escrow Agent's initials ____

**19. Entire Agreement:** This Agreement sets forth the entire agreement between the Escrow Agent, BCFI, LLC and the Client with respect to the subject matter hereof, and this Agreement supersedes and replaces any agreement or understanding that may have existed between the Parties prior to or contemporaneously with the date hereof in respect of the matter expressly set forth herein.

**20. Additional Provisions:**

**A. A FACSIMILE/TELECOPY/ELECTRONIC TRANSMITTALS:** As time is of the essence in this transaction, the Parties hereto agree that these instructions may be executed with signatures and/or initials and then faxed and/or otherwise electronically transmitted to the other party to this Agreement. The Parties hereto further agree that any such signatures and/or initials placed on these instructions by either party shall have the same legal force and binding effect as if all signatures and/or initials were an original signature and/or initial. Further, the Parties hereto agree to re-execute this instruction with an original signature and/or initial as reasonably required by either Party upon request from time-to-time and without delay.

**B. SWIFT OR WIRED FUNDS EXCLUSIVELY:** All funds sent to the Escrow Agent shall be sent via SWIFT or Federal wire. No checks or certified funds shall be accepted.

**C. SPECIALLY DESIGNATED AND BLOCKED PERSONS.** Should a Party, or anyone with whom they are (or will be) involved with is a person with whom the Escrow Agent is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury of the United States of America (including, but not limited to, those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, the Client hereby agrees to promptly provide Escrow Agent with any additional information that Escrow Agent deems reasonably necessary from time-to-time in order to ensure compliance with all applicable laws concerning money laundering and similar activities. Both Parties expressly acknowledge that they have read and understand the terms and conditions contained in this Paragraph, and holds harmless the other Party from and against any violations of this Paragraph.

**D. DUE DILIGENCE.** The Client specifically represents that it is familiar with the use of such services contemplated herein and the terms and structure associated herewith. The Client acknowledges and agrees that the Escrow Agent does not have any responsibility to educate or provide advice to the Client. It shall be the Client's sole responsibility to perform its own due diligence regarding these services. The Client expressly acknowledges that it has read and understands the terms and conditions contained in this Agreement.

**E. EFFECTIVE DATE AND TERMINATION.** This Agreement shall become effective at the time the execution of this Agreement by the Parties and the deposit of funds into the Escrow Account pursuant to this Agreement.

**F. RELEASE OF ESCROW.** Upon final return of the full balance of Escrow Account to Client, all of the liabilities and obligations of the Escrow Agent in connection with the Escrow Funds and this Agreement shall terminate, except that the indemnity provisions hereof that are for the benefit of the Escrow Agent shall continue in full force and effect for so long as the Escrow Agent may have any liabilities for any amounts for which it has been indemnified pursuant hereto.

5

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                        Escrow Agent's initials _SC_

From:
03/13/2019 12:53 FAX

03/13/2019 13:03    #449 P.007/009
@007

**G.   INDEMNIFICATION:** Client shall, to the fullest extent permitted by law, defend, indemnify and hold harmless the Escrow Agent from and against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against Escrow Agent from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any third party person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Agreement or any transactions contemplated herein, irrespective of whether Escrow Agent is a party to any such action, proceeding, suit, or the target of any such inquiry or investigation; provided, however, that Escrow Agent shall not have the right to be indemnified for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of the Escrow Agent.

**H.   DISPUTES.** The Escrow Agent shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it. The obligations of Client under this indemnification provision shall survive any termination of the Agreement and the resignation or removal of the Escrow Agent.

**I.   NO ATTORNEY/CLIENT RELATIONSHIP.** It is expressly understood and hereby confirmed that no attorney/client relationship exists between the Client and Escrow Agent except and only as it pertains to this specific Agreement and the entrustment of the Escrow Fund as provided herein. Escrow Agent is being engaged solely to provide the escrow services described herein, and is not acting as an attorney or agent of, and shall have no duties or liabilities to the Parties beyond the express scope of this Agreement.

**J.   HEADINGS.** The descriptive headings of this Agreement exist for convenience only and do not constitute a substantive part of this Agreement.

**K.   MULTIPLE COUNTERPARTS; ELECTRONIC TRANSACTION.** This Agreement may be executed in multiple counterparts, each of which shall be regarded for all purposes as an original, and such counterpart shall constitute but one and the same instrument. In addition, the transaction described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files, and other reproductions of original executed documents shall be deemed authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action, or suit in the appropriate court of law.

**L.   ASSIGNMENT.** This Agreement may not be assigned by any Party without the prior written consent of all other parties hereto, which consent shall be in the sole discretion of a Party to give or withhold.

**M. NOTICE TO CLIENT.** During the Term of this Escrow Agreement, Escrow Agent will provide to Client, or his designated agent, upon written request and at least monthly, timely confirmation of the balance of the Escrow Account with earnings thereon, as well as timely notice of any deposit to or withdrawal from such Escrow Account.

6

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials _____                              Escrow Agent's initials _QC_/

N. MISCELLANEOUS. The Escrow Agent may execute any of its powers or responsibilities hereunder and exercise any rights hereunder either directly by or through its agents or attorneys. Nothing in this Escrow Agreement shall be deemed to impose upon the Escrow Agent any duty to qualify to do business or to act as fiduciary, or otherwise, in any jurisdiction other than the state in which the Escrow Agent's address for notice purposes is located. The Escrow Agent shall not be responsible for and shall not be under a duty to examine into or pass upon the validity, binding effect, execution, or sufficiency of this Escrow Agreement or of any agreement amendatory or supplemental hereto.

This Agreement shall be governed, construed and interpreted pursuant to the laws of the State of Illinois, United States of America, and any and all disputes shall be brought and resolved within any court of competent jurisdiction in Illinois, without regard to that body of law known as Conflicts of Laws. Disputes in multiple jurisdictions for the same or related cause of action are prohibited. Jurisdiction shall lie exclusively with the Court the first dispute was filed.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns, heirs and legal and personal representatives.

IN WITNESS WHEREOF the parties have executed and delivered this Agreement as of the date first above-written.

Client:


_____

By: Gerald C. Forstner, Jr.
Its: Managing Member


ESCROW AGENT:
The Law Office of Cohn & Cohn

_____

By: Erwin Cohn


BCFI, LLC

By: _____
       Christopher R. Brown


                                 7

          My initials represent my agreement and acknowledgement of the foregoing.
       Client's initials _____                              Escrow Agent's initials _____

| Escrow Agent | The Law Office of Cohn & Cohn |
|---|---|
| Represented by | Erwin Cohn |
| Title | Partner |
| Address | 77 W. Washington St., Suite 1422, Chicago, Illinois 60602 |
| Bank Name | JP Morgan Chase |
| Bank Address | Chase Plaza, Chicago, Illinois  60603 |
| SWIFT Code | ████████████ |
| Bank Routing No. | 071000013 |
| Account No. | █████3532 |
| Account Name | Cohn & Cohn, Atty Escrow Account |
| Bank Office Name Bank Phone Bank Officer Email | 888.434.3030 |

8

My initials represent my agreement and acknowledgement of the foregoing.

Client's initials ____                    Escrow Agent's initials _RC_/



# EXHIBIT C

# JERLIB INVESTORS, LLC

July 12, 2019

Erwin Cohn
Cohn & Cohn
77 W. Washington St., Suite 1422
Chicago, Illinois 60602

Re:    Escrow Agreement between Cohn & Cohn (Escrow Agent)
and Jerlib Investors, LLC (Client) dated March 13, 2019

Mr. Rose:

Pursuant to the terms of the above-referenced Escrow Agreement, please be advised that SynSel Energy, Inc. has breached its obligations under the GFA Agreement (as defined in the Escrow Agreement), and as such, JerLib Investors is exercising its right to immediately remove all its funds from the Escrow Account totaling Three Million Dollars ($3,000,000.00), plus any interest earned or accrued on such account.

Accordingly, and as per the terms of the Escrow Agreement, please transfer the full balance of the Escrow Account in readily available funds within five business days to Jerlib Investors, LLC, in accordance with the following wire transfer instructions:

Wire Transfer Instructions:

| | |
|---|---|
| Bank ABA Routing Number | 044000037 |
| Bank Name | JPMorgan Chase Bank, N.A. |
| Bank Account Number | 269318785 |
| Account Name | JERLIB INVESTORS, LLC |

As per the Escrow Agreement, the full balance of the account is to be transferred without any deduction for any escrow fees, costs or expenses.

If you have any questions, please contact Scott A. Yaecker at scott@ssmini.com or 440-239-7767 ext. 160.

Sincerely,

Gerald C. Forstner, Jr.
Manager

C:     Timothy D. Tawoda, SynSel Energy, Inc.
Christopher R. Brown, BCFI, LLC



# EXHIBIT D

**FALLS LAW FIRM, PLLC**

**DAVID C. BOGGS**
Attorney at Law

**1712 Euclid Avenue
Charlotte, NC 28203**

T  704-314-4847
F  704-519-2522

E  dboggs@fallslawfirm.com

August 5, 2019

**VIA EMAIL ONLY: cceclaw@aol.com**

Charles Cohn, Esquire
Erwin Cohn, Esquire
Cohn & Cohn
77 W. Washington Street, Suite 1422
Chicago, IL  60602

Re:   Release from Escrow Agreement between Cohn & Cohn (Escrow Agreement)
          and Jerlib Investors, LLC (Client) dated March 13, 2019

Dear Messrs. Cohn:

We represent Jerlib Investors, LLC.

Enclosed is Mr. Forstner's July 12, 2019 letter to you as Escrow Agent demanding release of the $3 Million funds per the Escrow Agreement terms.  The $3 Million escrowed funds are immediately due and payable to Jerlib Investors, LLC via wire transfer as set forth in the aforesaid July 12 letter.

If the funds in full are not in Jerlib's stated account by 5:00 PM EDT Monday, August 5, 2019, legal action as well as reporting action to appropriate governing bodies will be made immediately.

Christopher R. Brown of BCFI, LLC will be held responsible as well as the escrow agent, as he required the services of your firm as escrow agent.

Your immediate attention to and fulfillment of your legal and contractual duties under the agreement are demanded.

Very truly yours,

**Falls Law Firm, PLLC**

David C. Boggs

blo/encl.
cc:    Mr. Scott A. Yaecker (via email: scott@ssmini.com)
        Mr. Chris Brown (via email: cbrown@browncapital.biz)



# EXHIBIT E

**FALLS LAW FIRM, PLLC**

**DAVID C. BOGGS**
Attorney at Law

August 13, 2019

**1712 Euclid Avenue**
**Charlotte, NC 28203**

**T** 704-314-4847
**F** 704-519-2522

**E** dboggs@fallslawfirm.com

<u>**VIA FACSIMILE: 866-701-9886**</u>

J.P. Morgan Chase Bank, N.A.
Springfield Main
1 E Old State Capital Plz.
Springfield, IL 62701

**Re: Cohn and Cohn Attorneys at Law Trust Account at Chase No. 791533532**

Dear Sir or Madam:

      This firm represents JerLib Investors, LLC ("JerLib"). Pursuant to an escrow agreement dated March 18, 2019, JerLib made a USD 3 million wire transfer to the above referenced law firm trust account. A true copy of the escrow agreement and the wire transfer notice and agreement are attached to this letter.

      In accordance with the terms of the escrow agreement, JerLib duly terminated the escrow agreement and demanded refund of its USD 3 million, as set forth in its July 12, 2019 letter, a true copy of which is attached. Despite numerous communications to the Escrow Agent, he has failed to provide either a satisfactory explanation for due retention of those funds or to refund the escrowed funds.

      Please confirm the availability of USD 3 Million in this trust account and that the Bank will preserve a balance within said account to satisfy in full the refund of the escrowed funds currently due JerLib.

      Please contact the undersigned with any questions or concerns.

      Regards.

      Falls Law Firm, PLLC

      David C. Boggs

:lob
Enclosure



# EXHIBIT F



# JOHNSON&BELL
## TRIAL LAWYERS

Victor J. Pioli

WRITER'S DIRECT DIAL (312) 984-0226
E-MAIL: pioliv@jbltd.com

August 29, 2019

**VIA EMAIL and HAND DELIVERY**
Mr. Erwin Cohn
Cohn & Cohn
77 W. Washington Street
Suite 1422
Chicago, Illinois 60602
(ccelaw@aol.com)

RE:    *Jerlib Investors, LLC and Cohn & Cohn Escrow Agreement*

Dear Mr. Cohn:

Please be advised that we have been retained by Jerlib Investors, LLC ("Jerlib") with regard to the above referenced matter. As you are aware, Cohn & Cohn ("C&C") serves as Escrow Agent under the Escrow Agreement incorporated into the GFA Agreement between Jerlib and Synsel Energy, Inc. Jerlib deposited $3,000,000 in to the Escrow Account. Pursuant to the Escrow Agreement, Jerlib has the "absolute right to remove its funds from the Escrow Account at any with written notice to [C&C]." *See* Escrow Agreement, at ¶ 1A.

Jerlib has repeatedly demanded that you release its $3,000,000 in funds from the Escrow Account, including *inter alia* Gerald Forstner's July 12, 2019 letter to you. You have inexplicably and without justification refused Jerlib's requests and demands. Your conduct is inexcusable and violates your ethical obligations including *inter alia* those pursuant to ILL. R. PROF'L CONDUCT 1.15. Your obligations also include preserving all funds and ensuring they remain intact for proper distribution. You have thus far failed to ensure that you have fulfilled this obligation and we direct that you do so.

Jerlib hereby makes one last demand that you immediately release and return its funds from the Escrow Account in compliance with your obligations as Escrow Agent. If the funds are not released by **5:00 p.m. on Tuesday, September 4, 2019**, we file suit on behalf of Jerlib against C&C and you for *inter alia* breach of contract, breach of fiduciary duty, constructive trust, and injunctive relief.

Very truly yours,

JOHNSON & BELL, LTD.

Victor J. Pioli

cc:    Lee Rose (leerose17@gmail.com)
Charles Cohn (ccelaw@aol.com; via hand delivery)

---

**CHICAGO OFFICE**  PH (312) 372-0770  /  FAX (312) 372-9818
SUITE 2700  /  33 WEST MONROE ST  /  CHICAGO, IL 60603-5404

**INDIANA OFFICE**  PH (219) 791-1900  /  FAX (219) 791-1901
SUITE B  /  11051 BROADWAY ST  /  CROWN POINT, IN 46307

**WWW.JOHNSONANDBELL.COM**

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JERLIB INVESTORS, LLC, | ) | |
| a Florida limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-06203 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| COHN & COHN, an Illinois partnership, | ) | Mag. J. Sheila M. Finnegan |
| ERWIN COHN, CHARLES A. COHN, | ) | |
| LEE S. ROSE, JOHN KRCIL, BLACK | ) | |
| LION INVESTMENT PARTNERS, INC., | ) | |
| BROWN CAPITAL FUNDING | ) | |
| INTERNATIONAL, LLC, | ) | |
| CHRISTOPHER R. BROWN | ) | |
| and STEPHEN HAY, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RULE 41 MOTION TO DISMISS
## COUNTS I, II, AND III OF THE SECOND AMENDED COMPLAINT

Plaintiff, JERLIB INVESTORS, LLC ("JerLib"), by and through its attorneys, moves this Honorable Court pursuant to FED. R. CIV. P. 41(a)(2) to voluntarily dismiss Counts I, II, and III of the Second Amended Complaint [ECF No. 111]. In support of its motion, JerLib states as follows:

1.    Plaintiff previously filed its Rule 54(b) motion for entry of final judgment against Erwin Cohn and Charles Cohn on the claims for which the Court had granted summary judgment in JerLib's favor. [ECF No. 394]. These were JerLib's claims for breach of contract (Count IV), breach of fiduciary duty (Count V), and conversion (Count VI) as stated in its Second Amended Complaint. [ECF No. 111].

2.    On August 8, 2024, the Court issued its ruling denying JerLib's Rule 54(b) motion finding, *inter alia*, that Cohn & Cohn's bankruptcy and JerLib's pursuit of its fraud and consumer fraud claims precluded the Court from entering a final judgment. [ECF No. 409, at 3-4]. The Court

also ruled that it could not enter default judgments against the other defendants in the case because of JerLib's outstanding fraud and consumer fraud claims against the Cohn Defendants. [*Id*., at 4].

3.      A status hearing was held in this case on August 9, 2024. At that hearing, counsel for JerLib orally moved to dismiss its fraud (Count VII) and consumer fraud (Count VIII) claims against the Cohn Defendants *only* in an effort to address the concerns expressed in the Court's August 8, 2024 ruling and to obtain a final judgment against the Cohn Defendants on the counts for which the Court has already granted summary judgment in JerLib's favor. The Court stated that it would take the oral motion under advisement.

4.      Following the August 9, 2024 hearing, JerLib had an opportunity to review its Second Amended Complaint and discovered that there are three counts that have essentially been rendered moot at this point – Count I (injunctive relief), Count II (declaratory judgment), and Count III (accounting). Nevertheless, these counts technically remain pending.

5.      To eliminate any doubt and to ensure that all claims against all parties will be fully adjudicated, JerLib brings this present motion to voluntarily dismiss Counts I, II, and III of the Second Amended Complaint.

6.      This should effectively conclude this matter and eliminate any obstacle to the Court's entry of a default judgment against all non-Cohn Defendants and entry of a Rule 54(b) judgment against Erwin Cohn and Charles Cohn on the counts for which the Court has already entered summary judgment.

WHEREFORE, for all of these reasons, Plaintiff, JERLIB INVESTORS, LLC, respectfully request that this Honorable Court enter an order pursuant to Fed. R. Civ. P. 41(a) that Plaintiff has voluntarily dismissed Counts I, II, and III of the Second Amended Complaint [ECF No. 111] and granting such other relief as the Court deems just and proper.

Respectfully submitted,

JERLIB INVESTORS, LLC

By:___/s/ *Victor J. Pioli*_____
            One of Its Attorneys

Joseph R. Marconi (marconij@jbltd.com)
Victor J. Pioli (pioliv@jbltd.com)
Ramses Jalalpour (jalalpourr@jbltd.com)
JOHNSON & BELL, LTD.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
312.372.0770 (T)

*Attorneys for Plaintiff,*
  *Jer-Lib, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

/s/ Victor J. Pioli

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JERLIB INVESTORS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-06203 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| COHN & COHN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In connection with what was represented to be a lucrative investment opportunity, Plaintiff JerLib Investors, LLC ("JerLib") deposited $3 million in an escrow account held by Defendant Cohn & Cohn, a law firm consisting of two partners, Defendants Charles Cohn ("Charles") and Erwin Cohn ("Erwin"). When the investment fell through, JerLib requested that Cohn & Cohn return its deposit. JerLib brought the present action after Cohn & Cohn failed to comply with JerLib's request. JerLib's Second Amended Complaint asserts claims against Cohn & Cohn, Charles, and Erwin for breach of contract, breach of fiduciary duty, conversion, and fraud. (Dkt. No. 111.) Now before the Court are JerLib's motion for partial summary judgment (Dkt. No. 221), Charles and Cohn & Cohn's (collectively, "Firm Defendants") motion for summary judgment as to all claims (Dkt. No. 224), and Erwin's motion for judgment on the pleadings and for partial summary judgment (Dkt. No. 228). For the reasons that follow, JerLib's motion is granted, and Firm Defendants' and Erwin's motions are granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

JerLib is a Florida-based company whose single member, Gerald Forstner, formed it in connection with an investment opportunity offered by SynSel Energy, Inc. ("SynSel"), a biofuel company. (Defs. Charles Cohn and Cohn & Cohn's Response to Pl.'s Statement of Material Facts in Supp. of Mot. for Summ. J. ("CCRPSF") ¶¶ 1, 5, Dkt. No. 248; Pl.'s Resp. to Defs. Charles Cohn and Cohn & Cohn's Statement of Material Facts in Supp. of Mot. for Summ. J. ("PRCCSF") ¶¶ 9, 21.) In particular, SynSel was looking to undertake a transaction in which it would receive financing to construct biofuel plants from Defendant Brown Capital Funding International, LLC ("BCFI"), a direct-lending company with a single member, Defendant Christopher Brown. (CCRPSF ¶ 5; PRCCSF ¶¶ 7, 18, 19.) BCFI proposed using a "good faith" account form of financing for SynSel's business, whereby SynSel, as the party seeking the loan, was required to make a good faith showing that it had access to capital representing 25% of its loan. (PRCCSF ¶¶ 18–20.)

A third-party company approached Forstner about providing financial support for SynSel's transaction with BCFI. (CCPRSF ¶ 5; PRCCSF ¶ 18.) Forstner had no previous relationship with either SynSel or BCFI, but he nonetheless proceeded to form JerLib for the purpose of doing business with SynSel. (PRCCSF ¶¶ 18, 20–21.) While JerLib had no employees, Forstner's accountant and business manager, Scott Yaecker, served as JerLib's agent in the dealings relevant here. (*Id.* ¶ 22.) In addition, David Boggs, a North Carolina attorney, served as JerLib's outside counsel. (*Id.*) After working with BCFI and SynSel, JerLib entered into its first Good Faith Agreement with SynSel on May 25, 2018. (CCRPSF ¶ 7; PRCCSF ¶¶ 23–24.) Under that agreement, JerLib was to deposit $3 million in a specially held account under its own name, which would allow BCFI to obtain $12 million in financing for SynSel.

(CCRPSF ¶ 7; PRCCSF ¶ 24.) In exchange, SynSel agreed to pay JerLib a return consisting of a

$1 million transaction fee, paid after 90 days, and $240,000 in legal fees and contingencies, paid

in four installments over a year. (PRCCSF ¶ 24.) JerLib subsequently deposited the $3 million as

agreed, but BCFI was unable to obtain financing for SynSel and SynSel was unable to timely pay

JerLib the promised return. (CCRPSF ¶ 8; PRCCSF ¶¶ 25–27.) As a result, the Good Faith

Agreement was amended to extend SynSel's time to pay JerLib while also increasing the amount

of JerLib's return. (PRCCSF ¶ 26.) When SynSel again failed to pay JerLib, the process

repeated. (*Id.*) Altogether, the original Good Faith Agreement was amended six times and the

amount due to JerLib was increased to $1,550,000, but SynSel remained unable meet its payment

obligations. (CCRPSF ¶ 8; PRCCSF ¶¶ 26–27.)

Despite SynSel's failure to obtain financing from BCFI and pay JerLib pursuant to the

initial Good Faith Agreement, it nonetheless sought to enter into a new Good Faith Agreement

with JerLib. (CCRPSF ¶ 9; PRCCSF ¶ 28.) To that end, Defendant Lee Rose was brought into

the deal. (PRCCSF ¶ 28.) Rose was a principal in Defendant Black Lion Investment Partners,

Inc. ("Black Lion"), along with Defendant John Krcil and Edward Wooten. (CCRPSF ¶ 46;

PRCCSF ¶¶ 3–6.) Rose suggested that JerLib and SynSel enter a new Good Faith Agreement in

which the $3 million would be deposited in a cash escrow account, and he recommended using

Cohn & Cohn as the escrow agent. (CCRPSF ¶¶ 11–12; PRCCSF ¶ 28.) Cohn & Cohn was an

Illinois personal-injury law firm organized as a general partnership under Illinois law. (PRCCSF

¶¶ 2, 13–14; Pl.'s Statement of Material Facts, Ex. 3, Partnership Agreement, Dkt. No. 231-3.)

The firm's two partners were Erwin, and his son, Charles, and they both represented clients in

personal injury, Social Security Disability, worker's compensation, and securities arbitration

matters. (PRCCSF ¶¶ 2, 12–14.) Rose was a long-time friend of the 94-year-old Erwin and had previously served as an expert witness for Cohn & Cohn. (*Id.* ¶ 3.)

On February 21, 2019, BCFI provided SynSel with an initial draft of an escrow agreement between JerLib and Cohn & Cohn, which listed Cohn & Cohn as the escrow agent and identified Rose as the Cohn & Cohn partner representing the firm. (CCRPSF ¶ 15; PRCCSF ¶ 30.) After JerLib received a copy of the draft escrow agreement, both Yaecker and Boggs questioned why a small personal-injury law firm that had no previous relationship with JerLib or Forstner was chosen to serve as the escrow agent. (CCRPSF ¶¶ 13, 16; PRCCSF ¶¶ 31–33.) In a February 27, 2019 email, Yaecker wrote to BCFI's Brown explaining that he had asked "Tim Tawoda [CEO of SynSel] how Cohn & Cohn was selected to act as the escrow agent, how they had been vetted, and what prior experience [Tawoda] had with them. Tim said he hadn't been involved in the selection" and directed Yaecker to refer those questions to Brown. (CCRPSF ¶ 16.) In response, Brown stated that he selected Cohn & Cohn as escrow agent because the firm had "proven themselves to serve our needs for well over a decade." (CCRPSF ¶ 17; PRCCSF ¶ 33.) Yet Brown later admitted that neither he nor BCFI had previously worked with Cohn & Cohn. (*Id.*)

To investigate the chosen escrow agent further, JerLib asked Tawoda to reach out directly to Cohn & Cohn. (CCRPSF ¶ 18.) On March 6, 2019, Tawoda sent an email to Yaecker in which he stated that he had personally spoken with Erwin and that Erwin "verified that [Rose] is the escrow agent—NOT a partner at Cohn & Cohn" and that "Rose and Erwin have known each other for 40 years and [Rose] does a lot of these with Cohn & Cohn." (*Id.* ¶ 20.) Tawoda later testified that the conversation described in the email was consistent with a five-minute phone call he had with Erwin. (CCRPSF ¶ 21; PRCCSF ¶ 34.) That same day, another agent of SynSel,

Brian Buckta, emailed Yaecker to inform him that Tawoda "was able to verify [Rose's] 41-year association with Cohn & Cohn by speaking directly with Erwin." (CCRPSF ¶ 22.) Buckta further explained that "Lee Rose is a financial specialist who manages Escrow services for Cohn & Cohn, working under the full authority of the firm" and that "BCFI erroneously listed Lee as a Partner when they completed the template, as they assumed he was an attorney due to his role and tenure with the firm." (*Id.*) Though disputed, Buckta later testified that his email was consistent with a discussion he had with Erwin by phone. (*Id.* ¶ 24.)

After SynSel's representatives spoke with Erwin, the draft Good Faith Agreement was revised to remove Rose as the signatory for Cohn & Cohn and replace him with Erwin. (CCRPSF ¶ 25; PRCCSF ¶ 36.) At no point was either Erwin or Charles involved in drafting or revising the Good Faith Agreement, and instead, Rose claimed to work on behalf of Cohn & Cohn during the process. (PRCCSF ¶¶ 37–38, 41–43.) Moreover, SynSel was the primary conduit for the exchange of documents and communications between JerLib and Rose. (*Id.* ¶ 43.)

On March 2, 2019, Rose accompanied Erwin to a Chase Bank branch and had himself added as a signatory to an existing but little-used Cohn & Cohn checking account ending 3532 ("Escrow Account"). (CCRPSF ¶¶ 37–39; PRCCSF ¶¶ 15, 44; Defs. Charles Cohn and Cohn & Cohn's Resp. to Pl.'s Statement of Additional Facts ("CCRPSAF") ¶¶ 7–8, Dkt. No. 267.) At the same time, Rose removed Charles as a signatory to the Escrow Account and changed the delivery format of the account's statements and notifications to have the documents sent electronically to the general Cohn & Cohn email address, cceclaw@aol.com, whereas they were previously sent in paper form to Cohn & Cohn's office. (PRCCSF ¶ 44.) Erwin did not regularly monitor the cceclaw@aol.com account, and Rose was aware that Erwin had difficulties using that email account. (*Id.* ¶ 17.) During the visit, a new Chase Bank account ending 8928 was

opened under Erwin's name ("8928 Account"), with Rose given signatory access. (CCRPSF ¶¶ 58–59; PRCCSF ¶ 44.) As with the Escrow Account, statements and notifications regarding the 8928 Account would be sent in electronic form to Cohn & Cohn's email account. (*Id.*)

Several days later, SynSel and JerLib executed a new Good Faith Agreement with an effective date of March 13, 2019 ("March 2019 GFA"), under which JerLib would deposit the $3 million it previously held in its own bank account into the Escrow Account with Cohn & Cohn serving as the escrow agent. (CCRPSF ¶¶ 26, 44; PRCCSF ¶¶ 45–46.) In exchange for its deposit, SynSel promised to pay JerLib over the course of 14 months an amount equal to the unpaid $1,550,000 from the first Good Faith Agreement along with additional fees and interest. (PRCCSF ¶ 47.) JerLib contemporaneously executed an escrow agreement with Cohn & Cohn ("Escrow Agreement"), which was attached to the March 2019 GFA. (CCRPSF ¶ 27; PRCCSF ¶ 49.) The Escrow Agreement listed Cohn & Cohn as the escrow agent and Erwin signed the agreement on behalf of Cohn & Cohn.[1] (CCRPSF ¶ 31.) Under the Escrow Agreement, JerLib agreed to deposit $3 million into the Escrow Account, where that sum would be held separately from any other funds and for JerLib's exclusive benefit. (*Id.* ¶¶ 32–34.) As the escrow agent, Cohn & Cohn could act solely upon instructions from JerLib and could not move or transfer the funds without JerLib's express written consent and instruction. (*Id.* ¶¶ 33–35.) Finally, the Escrow Agreement provided that, after 75 days, JerLib would have an absolute right to the return of the $3 million upon written notice to Cohn & Cohn. (*Id.* ¶ 33.)

On March 18, 2019, JerLib deposited $3 million into the Escrow Account. (CCRPSF ¶ 36; PRCCSF ¶ 53.) Prior to making the deposit, none of JerLib's agents (*i.e.*, Forstner,

---

[1] Rose presented the Escrow Agreement to Erwin and asked him to sign it. (CCRPSF ¶ 28.) Neither Erwin nor Firm Defendants dispute that Erwin signed the Escrow Agreement. (*Id.* ¶¶ 29–30.)

Yaecker, and Boggs) had any direct communications with Erwin or Charles. (PRCCSF ¶ 54.) That same day, $175,000 of JerLib's funds were transferred out of the Escrow Account and into the 8928 Account, then later from the 8928 Account to Rose. (CCRPSF ¶¶ 47, 60; PRCCSF ¶ 56; CCRPSAF ¶ 15.) Four days later, Rose made a cash withdrawal of $20,000 from the Escrow Account, converted it into a cashier's check, and paid that cashier's check to Erwin as a "fee for handling paperwork." (PRCCSF ¶ 56; CCRPSAF ¶ 14.) Erwin signed the cashier's check and deposited the $20,000 in his personal bank account. (*Id.*) Within 22 days of the deposit, JerLib's remaining funds were transferred out of the Escrow Account and directed to Rose, Black Lion, or one of Black Lion's other principals. (CCRPSF ¶¶ 47–48; PRCCSF ¶ 56.) Meanwhile, Rose had used the Escrow Account to deposit funds obtained pursuant to similar escrow agreements with other investors.[2] (CCRPSF ¶¶ 39, 54–57; CCRPSAF ¶ 36.)

Ultimately, BCFI was unable to obtain the promised financing for SynSel, which left SynSel unable perform its obligations to JerLib pursuant to the March 2019 GFA. (CCRPSF ¶ 40.) Consequently, JerLib attempted to exercise its right to the immediate return of its $3 million deposit. (CCRPSF ¶ 42.) JerLib's first attempt came by way of a July 12, 2019 letter to Erwin that went unanswered. (*Id.*) JerLib followed up on its request twice in August 2019 but received no response. (*Id.* ¶ 43.) When Yaecker reached out to Rose seeking the return of JerLib's funds, Rose told Yaecker that "the Treasury Department had to authorize the release of the funds." (PRCCSF ¶ 58.) In late July or early August 2019, JerLib's counsel, Boggs, was able to contact Charles regarding JerLib's request for the return of its $3 million and advised him that "there seems to be something going on" that Charles needed to look into. (*Id.* ¶ 59.) Charles

---

[2] Like the Escrow Agreement, those other escrow agreements listed Cohn & Cohn as the escrow agent. But unlike here, Rose signed them purportedly on Cohn & Cohn's behalf. (CCRPSF ¶ 54; Pl.'s Statement of Material Facts, Ex. 27, Dkt. No. 231-26.)

claims that it was only after Boggs's call that he first learned about the situation with Rose and Erwin. (*Id.*)

Having still not obtained the return of its funds, JerLib initiated the present lawsuit on September 17, 2019. (Dkt. No. 1.) Erwin appeared at multiple in-person hearings before this Court. (CCRPSF ¶ 63.) During a hearing on September 20, 2019, Erwin acknowledged that he was the escrow agent for the Escrow Account but claimed that he could not return JerLib's funds "without the approval of the Treasury Department." (*Id.* ¶ 64.) Erwin later explained to the Court at subsequent hearings that government authorities would only allow him to return JerLib's $3 million if Forstner personally appeared to verify his identity and collect the funds. (*Id.* ¶¶ 65–66.) Those statements were inaccurate, but Charles, Erwin, and Cohn & Cohn all contend that Erwin did not make them with an intent to mislead, as Erwin himself had been deceived by his longtime friend Rose. (*Id.* ¶¶ 63–67.) Similarly, Rose gave testimony in connection with the present action during which he stated that JerLib would receive its $3 million when Forstner showed up in Court to claim it. (PRCCSF ¶ 61.) Yet Rose incongruously insisted that he was free to do "whatever he wanted" with JerLib's $3 million and did not need to repay it, characterizing the money as a "perfect $3 million gift." (CCRPSF ¶ 49; PRCCSF ¶ 61.)

On July 30, 2021, the United States Securities and Exchange Commission filed a complaint against Rose, Black Lion, Krcil, and Wooten, alleging that they defrauded three investors out of $3,340,000, in a scheme resembling the allegations here. (PRCCSF ¶ 63.) Default judgment was entered as to Rose, Black Lion, Krcil, and Wooten in that action on November 2, 2021. (*Id.*) In addition, JerLib obtained a default judgment against Wooten in North Carolina state court for a sum that included $2,760,000 in compensatory damages and $5,520,000 in punitive damages. (*Id.* ¶ 65.)

JerLib's ten-count Second Amended Complaint in this case alleges the following claims against Erwin, Charles, and Cohn & Cohn: requests for injunctive relief, declaratory judgment, and an accounting, each relating to the return of JerLib's $3 million deposit (Counts I–III); breach of contract (Count IV); breach of fiduciary duty (Count V); conversion (Count VI); fraud (Count VII); consumer fraud (Count VIII); civil conspiracy (Count IX); and, in the alternative to Count VI's conversion claim, unjust enrichment (Count X). (Second Am. Compl., Dkt. No. 111.) Further, Rose is named as a Defendant with respect to all Counts except for Count IV. Krcil and Black Lion are included as Defendants for purposes of Counts VI through X. And BCFI, its owner, Brown, and another BCFI agent, Stephen Hay, are named as Defendants in Counts VII through X. The Court has since entered default judgment as to liability with respect to Krcil, Black Lion, BCFI, Brown, and Hay, and entered default as to Rose.[3] (Dkt. No. 205.) Thus, only Erwin, Charles, and Cohn & Cohn are actively litigating JerLib's claims.

Now before the Court are motions for summary judgment brought by JerLib, Firm Defendants, and Erwin. JerLib requests that summary judgment be entered against Firm Defendants and Erwin as to its claims for breach of contract, breach of fiduciary duty, and conversion (Counts IV–VI). Firm Defendants seek summary judgment as to all Counts against them. And Erwin seeks summary judgment in his favor as to the claims for conversion, fraud,

---

[3] Firm Defendants have asserted a counterclaim against JerLib, crossclaims against Rose, and third-party claims against Black Lion, Krcil, BCFI, Brown, Hay, and Wooten. (Dkt. No. 110.) Similarly, Erwin has asserted crossclaims against Rose and third-party claims as to Black Lion, Krcil, BCFI, Brown, Hay, and Wooten. (Dkt. No. 120.) Charles, Cohn & Cohn, and Erwin moved for default judgment as to their crossclaims and third-party claims (Dkt. Nos. 155, 173, 201), but this Court denied those motions without prejudice. (Dkt. No. 205.)

consumer fraud, and civil conspiracy (Counts VI–IX),[4] and with respect to certain damages issues.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, JerLib and Firm Defendants move for summary judgment as to the claims for breach of contract, breach of fiduciary duty, and conversion, with Erwin also moving for summary judgment as to conversion. In the case of cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

Broadly, Firm Defendants contend they are entitled to summary judgment as to all Counts because Erwin was not authorized to execute the Escrow Agreement on behalf of Cohn & Cohn. Firm Defendants also argue that summary judgment should be entered in their favor because Erwin acted in good faith and therefore the Escrow Agreement protects them from liability. At minimum, Firm Defendants assert that both contentions are sufficient to defeat JerLib's motion for summary judgment. Thus, the Court will begin with those two issues since they are applicable to all claims. The Court will then turn to the parties' various individual

---

[4] While Erwin characterizes his motion as to Counts VI through IX as one for either judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or partial summary judgment, his arguments regarding those counts often refer to matters outside the pleadings, and for that reason, JerLib's opposition treated the entire motion as one for summary judgment. The Court agrees that Erwin's motion is best evaluated as arising solely under Federal Rule of Civil Procedure 56.

Case: 24-1957 Document: 24 Filed: 09/04/24 Page: 12 of 27 Case: 1:20-cv-02208 Document #: 103 Filed: 08/06/24 Page 12 of 27 PageID #:3074

3    Page 12 of 27

contentions regarding the claims asserted at Counts IV through X.[5] To conclude, the Court will address any remaining contentions as to damages.

I.      **Firm Defendants' Liability for Erwin's Acts**

According to Firm Defendants, all JerLib's claims fail because Erwin acted outside the ordinary course of Cohn & Cohn's business as a personal-injury law firm by executing the Escrow Agreement. At minimum, Firm Defendants assert that there are genuine issues of fact regarding Erwin's ability to execute the Escrow Agreement on Cohn & Cohn's behalf that defeat JerLib's motion for summary judgment.

Cohn & Cohn is a general partnership, and under Illinois law, partners "are agents of the partnership and of one another for purposes of the businesses." *Ioerger v. Halverson Constr. Co.*, 902 N.E.2d 645, 648 (Ill. 2008). Thus, Illinois's Uniform Partnership Act ("UPA") provides that "[a] partnership is liable for loss or injury caused to a person . . . as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with the authority of the partnership." 805 ILCS 206/305(a). The UPA further states that "[a]n act of a partner which is not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners." 805 ILCS 206/301(2). Firm Defendants claim that Erwin acted outside the scope of Cohn & Cohn's business as a personal-injury law firm when he executed the Escrow Agreement to assist parties with which the firm had no previous relationship in obtaining financing for a biofuel plant construction project.

The Court begins by addressing certain preliminary issues that may impact or dispose of multiple claims. The Court agrees that Firm Defendants have a strong argument that the Escrow

---

[5] Neither Firm Defendants nor Erwin make any arguments specific to Counts I through III.

Agreement was outside Cohn & Cohn's ordinary course of business given that Erwin was not

acting as an attorney with respect to the Escrow Agreement, nor was there any history of an

attorney-client relationship between the firm and either JerLib or SynSel. Nonetheless, section

305(a) of the UPA also makes the partnership liable where a partner acts "with the authority of

the partnership." 805 ILCS 206/305(a). Similarly, section 301's rules as to a single partner's

ability to bind the partnership is "[s]ubject to the effect of a statement of partnership authority."

805 ILCS 206/301.

> Relevant here, section 12 of Cohn & Cohn's partnership agreement provides that:
>
> Each partner shall have equal voice in the management of the Partnership and shall
> have authority to bind the Partnership in making contracts and incurring obligations
> in the name and on the credit of the firm. However, no Partner shall incur any
> obligations in the name or on the credit of the firm exceeding $10,000.00 without
> the consent of the other partner.

(Partnership Agreement § 12; *see also* CCRPSF ¶ 14; PRCCSF ¶ 14.) By its express terms, the

partnership agreement gives a single partner the ability to execute any contract so long as he does

not incur an obligation greater than $10,000. Firm Defendants do not contend that Cohn & Cohn

incurred an obligation exceeding $10,000 with respect to the Escrow Agreement, and they could

not, since Cohn & Cohn's job as escrow agent was simply to "ensure the security of the

escrowed funds" but otherwise it had no interest in them. (Pl.'s Statement of Material Facts, Ex.

14, Escrow Agreement § 12, Dkt. No. 231-14.)

Yet Firm Defendants claim that the otherwise plain language of section 12 of Cohn &

Cohn's partnership agreement must be read in conjunction with section 1 of the agreement.

There, the partnership agreement states that Cohn & Cohn was formed as "a Partnership for the

purpose of conducting the business of the practice of law, and such other business as may be

agreed upon by the Partners." (Partnership Agreement § 1; *see also* PRCCSF ¶ 14.) Essentially,

Firm Defendants argue that section 1 modifies section 12 so as to add another, unenumerated exception to a single partner's ability to execute a contract on behalf of the firm—not only must the contract incur no obligation of greater than $10,000, but it also must relate to the practice of law. The Court rejects such an interpretation, however, as it conflicts with the plain language of section 12. *See, e.g.*, *Guarantee Tr. Life Ins. Co. v. Platinum Supplemental Ins., Inc.*, 68 N.E.3d 481, 489 (Ill. App. Ct. 2016) ("The contractual language must be given its plain and ordinary meaning."). Had Cohn & Cohn intended to limit a single partner's ability to bind the firm as Firm Defendants now propose, it could have expressly done so in section 12, just as it did with respect to obligations in excess of $10,000. *See, e.g.*, *Gallagher v. Lenart*, 854 N.E.2d 800, 807 (Ill. App. Ct. 2006) ("A presumption exists against provisions that easily could have been included in the contract but were not.").

While Firm Defendants correctly observe that "[a] contract must be construed as a whole, viewing each provision in light of the other provisions," *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011), the Court disagrees that section 1 impliedly modifies section 12. Section 1 simply states Cohn & Cohn was formed to conduct a particular type of business—the practice of law. But it does not necessarily follow that the fundamental nature of a law firm's business can be changed by a small number of transactions not directly related to the practice of law. That being the case, the Court declines to modify section 12 "in a way that is contrary to the plain and obvious meaning of the language used." *Id.*; *see also Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021) ("A court will not rewrite a contract to suit one of the parties." (quoting *Wright v. Chi. Title Ins. Co.*, 554 N.E.2d 511, 514 (Ill. App. Ct. 1990))).

Section 12's clear and unambiguous language gave Erwin the right to bind Cohn & Cohn to the Escrow Agreement, even though that contract may not have been related to the practice of

law. Consequently, Firm Defendants can neither obtain summary judgment as to JerLib's claims

against them nor defeat JerLib's motion for summary judgment by arguing that the Escrow

Agreement was outside the ordinary course of Cohn & Cohn's business.

## II.     Good Faith

Next, Firm Defendants note that there is an applicable exculpatory clause in the Escrow

Agreement that absolves Cohn & Cohn from liability for acts or omissions made in good faith.

They argue that the exculpatory clause applies here because Erwin honestly believed his

longtime friend Rose's representations regarding the Escrow Agreement, only to learn that Rose

had taken advantage of his trust.

Section 11 of the Escrow Agreement provides, in relevant part, as follows:

> In performing any duties under this Agreement, the Escrow Agent shall not be
> liable to any party for damages, losses, or expenses except that Escrow Agent shall
> be liable to Client for all damages, losses and expenses that may be incurred or
> suffered by Client or otherwise due Client on account of breach or failure of any of
> Escrow Agent's duties and obligations to Client under this Agreement. The Escrow
> Agent shall not incur any liability for (i) any act or failure to act made or omitted
> in good faith or (ii) any action taken or omitted in reliance on any instrument,
> including any written statement or affidavit provided for this Agreement that the
> Escrow Agent shall, in good faith believe to be genuine, nor will the Escrow Agent
> be liable or responsible for any forgeries, fraud, impersonations, or determining the
> scope of any representative authority, provided that the Escrow Agent believed in
> good faith, that such forgeries, fraud or impersonations were genuine.

(Escrow Agreement § 11; *see also* PRCCSF ¶ 49.) By limiting Cohn & Cohn's liability in certain

circumstances, section 11 acts as an exculpatory clause. *See Hawkins v. Cap. Fitness, Inc.*, 29

N.E.3d 442, 446–47 (Ill. App. Ct. 2015). Although disfavored, exculpatory clauses are generally

enforceable in Illinois. *Johnson v. Salvation Army*, 957 N.E.2d 485, 491 (Ill. App. Ct. 2011).

Nonetheless, "courts closely scrutinize them and they are strictly construed against the party

seeking to rely on them." *Hawkins*, 29 N.E.3d at 447. Here, JerLib does not challenge section

11's enforceability and instead dismisses as "laughable" Cohn & Cohn's assertion that it acted in good faith.

It is entirely plausible, however, that the nonagenarian Erwin was an innocent victim of his longtime friend's deception. Indeed, Rose was the person who got Cohn & Cohn involved in JerLib's transaction with SynSel in the first place. Rose was the sole intermediary between Cohn & Cohn and JerLib, handling all negotiations as to the Escrow Agreement and presenting it to Erwin for his signature. Indeed, the extent of Erwin's involvement was one or two brief phone calls he had with representatives of SynSel in which he vouched for his friend, Rose. Moreover, Rose was with Erwin at the Chase Bank branch on the day he was added as a signatory to the Escrow Account[6] and the 8928 Account was opened. And nearly all of JerLib's deposited funds were diverted to Rose or his associates, which Rose brazenly described as a $3 million gift. Meanwhile, the $20,000 that went to Erwin was provided in a form that disguised its provenance. That Rose had statements and notifications regarding the Escrow Account and 8928 Account sent to an email address that Erwin did not regularly use also suggests that Rose sought to conceal his misconduct from Erwin. Finally, a district court entered judgment against Rose in connection with his participation in similar fraudulent schemes. Thus, there is ample evidence to support Firm Defendants' contention that Erwin was taken advantage of by Rose.

Yet the evidence suggesting that Rose was solely responsible for the alleged misconduct does not create even a question of fact as to the applicability of section 11. As an initial matter, section 11 expressly states that Cohn & Cohn remained liable for any breaches of its duties under the Escrow Agreement. And the claims here relate to Cohn & Cohn's failure to safeguard

---

[6] Notably, Erwin opened the Escrow Account back in 2008 as a favor to Rose, after Rose claimed he needed the account to deposit some money that, ultimately, never materialized. (CCRPSAF ¶¶ 7–8.) Rose testified that he was aware that Erwin was not using the account (PRCCSF ¶ 15.)

JerLib's funds. Further, while the Escrow Agreement shields Cohn & Cohn from liability for "frauds" that it "believed in good faith" to be "genuine," that language is best construed as relating to frauds perpetrated by third parties—*i.e.*, a third party making a fraudulent claim to the funds. But here, while there is certainly strong evidence that Rose's conduct was fraudulent, the evidence also establishes that he was not a third party. Instead, Erwin allowed Rose to become a signatory to the Escrow Account, which at all times was registered as a Cohn & Cohn business account.[7] By doing so, Erwin expressly certified that Rose was "authorized to act for and on behalf of the Business in any matter involving any of the Business' depository accounts at the Bank." (Pioli Aff., Ex. B at JPMC/C&C000001, Chase Bank Business Depository Resolution, Dkt. No. 32; *id.* at JPMC/C&C000006, Chase Bank Business Account Add Signers Form; *see also* CCRPSF ¶¶ 37 & n.1, 45.) Consequently, Rose acted as Cohn & Cohn's agent in moving JerLib's money out of the Escrow Account. *E.g.*, *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. App. Ct. 1999) ("An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act.").

Especially since section 11 must be strictly construed against Cohn & Cohn (the party seeking its protection), the Court cannot conclude that it protects Cohn & Cohn from liability for the acts of someone expressly granted authority to act on its behalf—*i.e.*, that Cohn & Cohn is shielded from responsibility for its own fraud. *See, e.g.*, *Zimmerman v. Northfield Real Est., Inc.*, 510 N.E.2d 409, 415 (Ill. App. Ct. 1986) ("Defendants argue that the contract's exculpatory clause . . . protects them from liability for fraud. An exculpatory clause cannot protect persons

---

[7] Although Firm Defendants employ passive voice to describe how Rose was added as a signatory to the Escrow Account (*see* PRCCSF ¶ 44 ("Rose was added as a signatory to the Account . . . .")), at least at the summary judgment stage, they do not contend that Rose gained signatory access without Erwin's knowing authorization.

Case: 24-1565 Document: 24 Filed: 07/24/24 Pages: 128  Case: 1:23-cv-06003 Document: 46 Filed: 03/06/24 Page: 18 of 27 PageID #:3010

3   Page 18 of 27

from the results of their willful and wanton misconduct."); *see also Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1211 (7th Cir. 1993) ("[A] principal who arms his agent to deceive . . . ought to be answerable for the consequences of that deceit.").

In short, by signing the Escrow Agreement, Erwin obligated Cohn & Cohn to safeguard the $3 million JerLib deposited into the Escrow Account. Further, Erwin authorized Rose to act on behalf of the firm with respect to the Escrow Account, thus making Rose's fraud Cohn & Cohn's fraud. For that reason, Firm Defendants cannot now use section 11's exculpatory clause to claim that Cohn & Cohn acted in good faith such that it cannot be liable for Rose's misconduct.

### III.    Breach of Contract

Turning next to the individual claims, JerLib first contends that there is no genuine dispute of fact that Cohn & Cohn breached the Escrow Agreement. In Illinois, a breach of contract claim requires a plaintiff to prove: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). Neither Firm Defendants nor Erwin challenges the Escrow Agreement's validity or enforceability—they admit Erwin signed it and they do not claim that he did so unknowingly or involuntarily. They also do not deny that JerLib performed its obligations under the agreement.

JerLib argues that Cohn & Cohn breached at least three of its obligations as escrow agent. In particular, JerLib contends that Cohn & Cohn breached its obligation to deposit JerLib's $3 million "in a separate designated trust account of [Cohn & Cohn] for [JerLib's] exclusive benefit" by allowing its funds to be commingled with other parties' funds. (Escrow Agreement § 12; CCRPSF ¶¶ 33, 39.) Cohn & Cohn also failed to honor JerLib's absolute right to the return

17

of its funds after 75 days by, to this day, failing to return JerLib's $3 million. And Cohn & Cohn allowed JerLib's funds to be transferred out of the Escrow Account without first receiving JerLib's express written approval. There is no genuine dispute that each of these breaches occurred.

Both Firm Defendants and Erwin nonetheless argue that they cannot be held liable for breaching the Escrow Agreement because they never took any action with respect to the funds. Rather, it was Rose who was responsible for commingling and transferring JerLib's money in violation of the Escrow Agreement. Moreover, Firm Defendants and Erwin claim that JerLib's damages were not caused by them but by Rose's intervening criminal acts. In response, JerLib argues that because Rose was vested with authority to act on Cohn & Cohn's behalf when he was added as signatory to the Escrow Account, Firm Defendants and Erwin cannot now disavow Rose as a third party and intervening cause of JerLib's damages. As discussed above, the Court agrees that Rose's acts taken within the authority granted to him as signatory of the Escrow Account are properly treated as Cohn & Cohn's acts. Because Firm Defendants and Erwin raise no other arguments in opposition to the breach of contract claim, JerLib is entitled to summary judgment on Count IV.

## IV.     Breach of Fiduciary Duty

JerLib asserts that Cohn & Cohn was a fiduciary to the escrowed funds and therefore owed a fiduciary duty to JerLib that it breached by allowing Rose to abscond with the $3 million. A breach of fiduciary duty claim requires that the plaintiff establish (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately caused by that breach. *Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 829 N.E.2d 818, 829 (Ill. App. Ct. 2005).

As an escrow agent, Cohn & Cohn owed a fiduciary duty to JerLib that required Cohn & Cohn "to act only in accordance with the escrow instructions." *231 W. Scott, LLC v. Lakeside*

*Bank*, 80 N.E.2d 753, 760 (Ill. App. Ct. 2017) (internal quotation marks omitted). Cohn & Cohn breached that duty by allowing JerLib's funds to be transferred out of the Escrow Account without JerLib's written consent and by failing to return the money upon JerLib's demand. And, as a result, JerLib has been damaged because it remains without the $3 million it deposited into the Escrow Account.

Erwin makes a brief, underdeveloped argument that JerLib's breach of fiduciary duty claim runs afoul of the Illinois rule that prohibits breach of contract claims from being converted into tort claims. That argument fails because Illinois does not treat a breach of fiduciary duty claim as a tort. *Kinzer v. City of Chicago*, 539 N.E.2d 1216, 1220 (Ill. 1989). Otherwise, both Firm Defendants and Erwin rely on the same Rose-as-intervening-cause argument that they asserted in opposition to the breach of contract claim. That argument is equally unavailing to defeat the breach of fiduciary duty claim. Consequently, JerLib is granted summary judgment as to Count V.

### V.   Conversion

The last claim on which JerLib seeks summary judgment is its conversion claim. "The essence of an action for conversion is the wrongful deprivation of property from the person entitled to possession." *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985) (internal quotation marks omitted). *Id.* A conversion claim must involve "an identifiable object of property of which the plaintiff was wrongfully deprived," which can include money, so long as the money is "capable of being described as a specific chattel." *Id.* To prevail on a conversion claim, a plaintiff "must show a tortious conversion of the chattel, a right to property in it, and a right to immediate possession which is absolute." The plaintiff must also show that it made a demand for the return of the property. *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008).

Here, JerLib has shown that it was deprived of a specific sum of money that was deposited into the Escrow Account, it had a right to that money, and it had a right to immediate possession of that money upon demand. In response, Firm Defendants and Erwin claim that it was Rose who converted the funds not them. As the Court has discussed above, Rose was authorized by Erwin to make the transfers on behalf of Cohn & Cohn, such that Rose's conversion was effectively Cohn & Cohn's conversion. *See, e.g.*, *Phipps v. Cohn*, 487 N.E.2d 428, 430 (Ill. App. Ct. 1985) ("A principal is liable for acts committed within the scope of authority by an agent . . . .").[8] As a result, summary judgment is granted in JerLib's favor as to Count VI.

## VI.     Fraud and Consumer Fraud

Firm Defendants and Erwin both seek summary judgment as to JerLib's common law fraud and consumer fraud claims. The two fraud claims are predicated on Erwin's statements to SynSel vouching for Rose as Cohn & Cohn's escrow specialist. According to JerLib, it relied on those statements to its detriment in deciding to proceed with the Escrow Agreement.

As an initial matter, the Court must address Firm Defendants' contention that the statements Erwin made to SynSel's agents, Tawoda and Buckta, are inadmissible hearsay. Erwin's statements to Tawoda and Buckta are properly regarded as non-hearsay statements under Federal Rule of Evidence 801(d)(2), since they are Erwin's own statements and offered by JerLib against him as an opposing party. Moreover, there is no hearsay issue based on the fact that the statements are recounted in emails because both Tawoda and Buckta testified that the

---

[8] Erwin contends that JerLib's damages with respect to the conversion claim should be limited to the sum remaining in the Escrow Account at the time JerLib demanded the return of its funds. The Court is aware of no authority suggesting that a plaintiff's conversion damages should be limited in such a way and Erwin cites none. *See, e.g.*, *United States v. Morales*, 572 F. Supp. 3d 502, 508 (N.D. Ill. 2021) ("[U]nderdeveloped and merely perfunctory arguments . . . are waived.").

emails accurately reflected their own direct conversations with Erwin. (CCRPSF ¶¶ 21, 24); *see, e.g.*, *United States v. Hunter*, 932 F.3d 610, 621 (7th Cir. 2019) ("[The witness's] testimony centered on her personal knowledge of what she heard [the defendant say], and those things are admissible as non-hearsay statements by a party opponent."). Erwin's statements are therefore properly considered in connection with summary judgment.

Turning to the substantive claims, in Illinois, a common law fraud claim requires a plaintiff to prove:

> (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 198 (Ill. 1992). Meanwhile, a consumer fraud claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, requires a plaintiff to establish the following elements: "(1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Firm Defendants and Erwin contend that they are entitled to summary judgment on both fraud claims because the evidence shows that Erwin made the allegedly false statements to SynSel, not JerLib, and because JerLib's fraud claims rest on the same factual foundation as its breach of contract claims.

It is undisputed that Erwin did not make the challenged statements directly to JerLib; his alleged misrepresentations were made only to representatives of SynSel. Nonetheless, for purposes of the fraud claims, it is not necessary that Erwin made the statements directly to JerLib. *E.g.*, *People ex rel. Peters v. Murphy-Knight*, 618 N.E.2d 459, 466 (Ill. App. Ct. 1993)

("[T]he fact that the representations were not made directly to the plaintiff in the first instance does not preclude an action for fraud . . . ."). "[F]alse representations need not be made directly to the party claiming to have relied on them, but may instead be indirect, 'where a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving him.'" *Amerigas Propane, LP v. BP Am., Inc.*, 691 F. Supp. 2d 844, 853 (N.D. Ill. 2010) (quoting *St. Joseph Hosp. v. Corbetta Constr. Co.*, 316 N.E.2d 51, 72 (Ill. App. Ct. 2010)). Viewing the evidence in the light most favorable to JerLib, a jury could reasonably conclude that Erwin made statements to SynSel about Rose intending or knowing that SynSel would convey his statements to JerLib, the other party to the contract Rose was seeking to execute on Cohn & Cohn's behalf and that Erwin ultimately signed.

Next, Firm Defendants and Erwin argue that JerLib's fraud claims are improper reformulations of its breach of contract claim. The Illinois Supreme Court has held that "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005). However, Firm Defendants and Erwin are incorrect that JerLib alleges only that the Escrow Agreement is the misrepresentation at issue in the fraud claims. As already discussed, the fraud claims arise out of Erwin's statements regarding Rose's escrow work for Cohn & Cohn. Thus, neither Firm Defendants nor Erwin have demonstrated any grounds for summary judgment on the fraud and consumer fraud claims. Accordingly, the Court denies their motions for summary judgment as to Counts VII and VIII.

### VII.   Civil Conspiracy

JerLib claims that Firm Defendants and Erwin conspired with Rose and the other Defendants named in this action to defraud JerLib of its $3 million. "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted

action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). A civil conspiracy claim "requires proof that a defendant knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (internal quotation marks omitted). To be liable as a coconspirator, a defendant must "understand[] the general objectives of the conspiratorial scheme, accept[] them, and agree[], either explicitly or implicitly to do its part to further those objectives." *Adcock*, 645 N.E.2d at 894. However, "[a]ccidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy." *McClure*, 720 N.E.2d at 258.

Rarely is a conspiracy susceptible to direct proof. *Id.* "Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id.* (internal quotation marks omitted). Where a plaintiff seeks to show a conspiracy only by circumstantial evidence, "that evidence must be clear and convincing." *Id.* Here, Firm Defendants and Erwin contend that JerLib's civil conspiracy claim fails because it lacks clear and convincing evidence that proves a conspiratorial agreement.

Although JerLib argues that there is direct proof of the conspiracy, the Court disagrees. The supposed direct proof consists of Rose's testimony that Erwin agreed to allow Rose to use the Escrow Account and that he vaguely recalled discussing with Charles at some indeterminate "time in the past" having himself added as a signatory to the Escrow Account. (CCRPSAF ¶ 13; Pl.'s Statement of Material Facts, Ex. 24, Rose Dep. Tr. 74:8–21.) None of this evidence demonstrates that Erwin or Charles ***knowingly*** agreed to join the conspiracy. And "a defendant

who innocently performs an act which happens to fortuitously further the tortious purpose of
another is not liable under the theory of civil conspiracy." *Id.* (internal quotation marks omitted).

Because all JerLib's evidence of the purported civil conspiracy is circumstantial, it is
subject to the clear and convincing evidence standard. Yet Illinois courts have recognized that
"no reasonable trier of fact could find, by clear and convincing evidence, that the defendants
entered into a conspiratorial agreement if a nonconspiratorial explanation could reasonably be
postulated." *Gillenwater v. Honeywell Int'l, Inc.*, 996 N.E.2d 1179, 1202 (Ill. App. Ct. 2013).
The Court has discussed above how the evidence plausibly suggests that Erwin was taken
advantage of by his friend Rose and had no idea that his involvement with respect to the Escrow
Agreement and the Escrow Account was in furtherance of Rose's misconduct.

There is even less evidence as to Charles's involvement in a conspiracy. Indeed, nothing
in the record shows that Charles was actively involved in any discussions regarding the Escrow
Agreement or Escrow Account prior to JerLib contacting him to request the return of its $3
million. At best, JerLib's evidence shows that Charles regularly monitored the email account that
received emails regarding JerLib's dealings with Rose and the electronic statements for the
Escrow Account and the 8928 Account. (CCRPSF ¶¶ 50–53, 55–57.) There is no evidence that
the Cohn & Cohn account ever responded to any of those emails, and Charles claims he only
reviewed emails regarding his own clients and cases. (PRCCSF ¶ 17.) Even if Charles saw the
relevant emails, "[m]ere knowledge of the fraudulent or illegal actions of another is also not
enough to show a conspiracy." *McClure*, 720 N.E.2d at 258; *see also Powell v. City of Berwyn*,
68 F. Supp. 3d 929, 950 (N.D. Ill. 2014) ("[M]erely failing to prevent the unlawful conduct of
one party or assisting an unlawful actor does not necessarily constitute a conspiracy." (internal

quotation marks omitted)). Finally, none of JerLib's $3 million was transferred to either Charles or Cohn & Cohn. (PRCCSF ¶ 57.)

On the present record, the Court concludes that the facts concerning Erwin's and Charles's respective roles in Rose's misconduct "are as consistent with innocent conduct as they are with guilty conduct," and therefore "the evidence is neither clear nor convincing." *Lozman v. Putnam*, 884 N.E.2d 756, 774 (Ill. App. Ct. 2008). For that reason, JerLib's civil conspiracy claim cannot survive summary judgment. *Id.* ("If a party relies solely on circumstantial evidence to prove a conspiracy claim, the heightened 'clear and convincing' standard is implicated by the summary judgment motion."). Summary judgment is granted in favor of Firm Defendants and Erwin as to Count IX.

### VIII.   Unjust Enrichment

As to Firm Defendants and Erwin, JerLib's unjust enrichment claim is pleaded in the alternative to the breach of contract claim. That is because "a party may not seek a quasi-contractual remedy such as unjust enrichment where an actual contract governs their relationship." *Gagnon v. Schickel*, 983 N.E.2d 1044, 1053 (Ill. App. Ct. 2012). Since the Court has granted JerLib summary judgment as to the breach of contract claim, its unjust enrichment claim is not viable. Therefore, the Court grants Firm Defendants and Erwin summary judgment as to Count X.

### IX.   Punitive Damages

Finally, Firm Defendants and Erwin seek summary judgment as to punitive damages. They assert that JerLib cannot seek punitive damages because section 12 of the Escrow Agreement makes clear that the escrow agent shall not "be liable for special, punitive, indirect, or consequential loss or damage of any kind whatsoever" except in the case of the agent's "gross negligence or willful misconduct." (Escrow Agreement § 12; PRCCSF ¶ 51.) The Court declines

to rule as a matter of law that section 12 bars any of JerLib's damages claims. Rather, the Court believes that a reasonable jury could conclude that Erwin was grossly negligent in failing to exercise any oversight over Rose, despite allowing him to represent himself as Cohn & Cohn's escrow specialist and granting him signatory access to a Cohn & Cohn bank account.

### CONCLUSION

For the foregoing reasons, JerLib's motion for summary judgment (Dkt. No. 221) is granted, and Firm Defendants' and Erwin's motions for summary judgment (Dkt. Nos. 224, 228) are granted in part and denied in part. Summary judgment is entered in favor of JerLib with respect to Counts IV, V, and VI of the Second Amended Complaint. Summary judgment is entered in favor of Firm Defendants and Erwin as to Counts IX and X.

ENTERED:

Dated:  March 31, 2023

_____
Andrea R. Wood
United States District Judge

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1
### Eastern Division

Jerlib Investers, LLC

                         Plaintiff,

v.                                                    Case No.: 1:19−cv−06203
                                                      Honorable Andrea R. Wood

Cohn & Cohn, et al.

                         Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, April 9, 2024:

        MINUTE entry before the Honorable Andrea R. Wood: Telephonic status hearing
held on 4/9/2024. For the reasons stated on the record, Cohn Defendants' renewed motion
for a stay of proceedings [378] is denied. Jury trial set for 4/15/2024 is stricken and reset
for 4/19/2024 at 9:00 AM for jury selection. Counsel are to appear at 8:45 AM on
4/19/2024 to facilitate commencement of voir dire at 9:00 AM. Written rulings on the
pending motions in limine to follow in short order. Mailed notice (lma, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JERLIB INVESTORS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-06203 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| COHN & COHN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff's motions for entry of judgment under Rule 54(b) [394] and renewed motion for default judgment [395] are denied. See the accompanying Statement for details.

## STATEMENT

In connection with what was represented to be a lucrative investment opportunity, Plaintiff JerLib Investors, LLC ("JerLib") deposited $3 million in an escrow account held by Defendant Cohn & Cohn, a law firm consisting of two partners, Defendants Charles Cohn ("Charles") and Erwin Cohn ("Erwin"). When its investment fell through, JerLib requested that Cohn & Cohn return its deposit. JerLib brought the present action after Cohn & Cohn failed to comply with that request. Now before the Court are JerLib's motion for entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b) as to the claims against Charles and Erwin for which JerLib obtained summary judgment (Dkt. No. 394), as well as JerLib's renewed motion for a default judgment as to damages against Defendants Lee Rose, John Krcil, Black Lion Investment Partners, Inc. ("Black Lion"), Brown Capital Funding International, LLC ("BCFI"), Christopher Brown, and Stephen Hay (collectively, "Defaulting Defendants"), all of whom are named as defendants in the Second Amended Complaint but have not actively defended against this action. (Dkt. No. 395.)

## I.

The following briefly summarizes the facts relevant to the instant motions.

JerLib is a single-member limited liability company formed in connection with an investment opportunity offered by SynSel Energy, Inc. ("SynSel"). SynSel approached JerLib for financial support in connection with a transaction between SynSel and BCFI, a direct-lending company with a single member, Christopher Brown. According to JerLib, SynSel promised that, if JerLib deposited $3 million into a specially-held account, JerLib would earn astronomical returns.

Eventually, Rose was brought into the deal. Rose was a principal in Black Lion, along with Krcil and Wooten. Rose proposed that JerLib and SynSel enter into an agreement whereby JerLib's $3 million would be deposited in a cash escrow account, with Cohn & Cohn as the escrow agent. Cohn & Cohn is a small personal injury law firm with two partners: Erwin, who was Rose's longtime friend, and Charles. Because it was skeptical about using as the escrow agent a small personal-injury law firm with which it had no previous relationship, JerLib asked SynSel's Chief Executive Officer, Tim Tawoda, to reach out directly to Cohn & Cohn. Tawoda subsequently reported back to JerLib that he had spoken with Erwin and that he verified that Rose had long performed escrow work for Cohn & Cohn. This was apparently enough for JerLib to proceed with the transaction.

Before JerLib deposited the $3 million, Rose accompanied Erwin to a bank and was added as a signatory to an existing Cohn & Cohn checking account. Shortly thereafter, JerLib deposited $3 million into that account pursuant to an escrow agreement with Cohn & Cohn ("Escrow Agreement") under which the sum was to be separately held for JerLib's exclusive benefit with Cohn & Cohn serving as the escrow agent. Erwin signed the Escrow Agreement on Cohn & Cohn's behalf. Almost immediately, large amounts of JerLib's funds began to be transferred out of the escrow account to Rose and his associates. Ultimately, JerLib's supposed investment opportunity fell through, and it demanded the return of its $3 million deposit. When its requests went unanswered, JerLib brought the present action.

The Court previously granted summary judgment in JerLib's favor on its claims against Charles, Erwin, and Cohn & Cohn (collectively, "Cohn Defendants") for breach of contract, breach of fiduciary duty, and conversion. The Court also denied Cohn Defendants' motions for summary judgment on JerLib's claims for common-law fraud and consumer fraud under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* The case was set for trial as to JerLib's fraud claims but, shortly before the trial was scheduled to begin, Cohn & Cohn filed for bankruptcy. As a result, the claims against Cohn & Cohn were subject to an automatic stay and the trial date was vacated.

JerLib's operative Second Amended Complaint also names as Defendants Rose, Black Lion, Krcil, BCFI, Brown, and Hay, another BCFI agent. None of those Defaulting Defendants have actively defended this case, and the Court already has entered default judgment as to liability with respect to JerLib's claims against Krcil, Black Lion, BCFI, Brown, and Hay. (Rose has been defaulted but no judgment of liability has been entered.) The Court declined to enter default judgment as to damages, however, finding that it was precluded from making any determination as to JerLib's damages against Defaulting Defendants until all Defendants' liability had been resolved as to any claims for which they may be jointly and severally liable with other Defendants.

## II.

Given the uncertainty as to when Cohn & Cohn's bankruptcy will be resolved so that a trial on the fraud claims can be held as to all Cohn Defendants, JerLib has filed a motion for entry of a final judgment against Charles and Erwin pursuant to Rule 54(b) on the claims for which it was awarded summary judgment. Rule 54(b) provides, in relevant part, that

[w]hen an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

In other words, "Rule 54(b) authorizes the district court to make immediately appealable a judgment that disposes, with finality, of one or more claims, even though other claims remain pending in the district court so that the suit as a whole has not been finally disposed of by that court." *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1366 (7th Cir. 1990). A court's decision to grant a Rule 54(b) motion is left largely to the court's discretion. *See U.S. Gen., Inc. v. Albert*, 792 F.2d 678, 681–82 (7th Cir. 1986).

Under Rule 54(b), entry of a partial final judgment is permitted "only when all of one party's claims or rights have been fully adjudicated, or when a distinct claim has been fully resolved with respect to all parties." *Factory Mut. Ins. Co. v. Bobst Grp. USA, Inc.*, 392 F.3d 922, 924 (7th Cir. 2004). This requirement poses an obstacle that JerLib cannot surmount given the present procedural posture of this case. First, the automatic bankruptcy stay precludes this Court from entering a final judgment as to Cohn & Cohn. That means any Rule 54(b) judgment would fail to fully adjudicate the breach of contract, breach of fiduciary duty, and conversion claims for which JerLib was awarded summary judgment because each of those claims is also asserted against Cohn & Cohn. Nor would a Rule 54(b) judgment resolve all claims against Charles and Erwin, since the two fraud claims remain unadjudicated as to them.

Moreover, even if Cohn & Cohn were not in bankruptcy such that a Rule 54(b) judgment could fully resolve the breach of contract, breach of fiduciary, and conversion claims, JerLib's continued pursuit of the fraud claims as to Cohn Defendants would still make it improper to enter a Rule 54(b) judgment. The Seventh Circuit has "insisted that Rule 54(b) be employed only when the subjects of the partial judgment do not overlap with those remaining in the district court." *Lottie v. W. Am. Ins. Co.*, 408 F.3d 935, 938–39 (7th Cir. 2005). Put differently, "the retained and the appealed claims must be factually distinct, for otherwise the court of appeals may be forced to analyze the same facts in successive appeals, a form of piecemeal appealing not authorized by the rule." *Olympia Hotels*, 908 F.2d at 1366.

Here, JerLib's fraud claims arise out of the same facts as the claims for which it was awarded summary judgment. Specifically, both fraud claims arise out of Erwin's alleged misrepresentations that were supposedly made to induce JerLib to make the deposit and assert that JerLib's reliance on those misrepresentation resulted in its loss of the $3 million. Similarly, the breach of contract, breach of fiduciary duty, and conversion claims focus on Cohn Defendants' role in accepting JerLib's $3 million deposit and its failure to fulfill its obligations under the Escrow Agreement. All claims concern the same transaction and plead the same harm: JerLib's loss of $3 million. That JerLib pleads "different theories of relief or different legal characterizations of the same facts" does not render those claims separate for Rule 54(b) purposes. *Lottie*, 408 F.3d at 939. Rather, it is evident to the Court that an appeal of any judgment entered on the fraud claims would require the Seventh Circuit to revisit the same facts that it would have

3

heard from an earlier appeal of the claims on which a Rule 54(b) judgment was entered. It necessarily follows that the Court cannot enter a Rule 54(b) judgment.

So long as the fraud claims remain in this case, the Court cannot enter a partial judgment that would fully adjudicate all the claims against Charles and Erwin. And so long as Cohn & Cohn remains in bankruptcy, the Court cannot enter a judgment that would fully adjudicate any individual claim against Charles and Erwin. The presence of the fraud claims therefore precludes entry of a Rule 54(b) judgment and JerLib's motion is denied.

### III.

JerLib also seeks to obtain a damages award against Defaulting Defendants. When this Court considered JerLib's earlier motion for default judgment, it concluded that, while it could enter default judgment as to Defaulting Defendants' liability, it could not enter a default judgment as to damages because all Defendants' liability had not been resolved for claims for which Defendants may be jointly and severally liable. *See Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1324 (7th Cir. 1983) ("[W]here liability is joint and several, the entry of default judgment against fewer than all defendants in an action is proper [but] a damages hearing may not be held until the liability of each defendant has been resolved."); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1262 (7th Cir. 1980) ("Just as the several or independent nature of [the] plaintiff's claim permits different findings as to liability of individual defendants, the joint nature of [the plaintiff's] claim prohibits different findings as to damages against all defendants."). Since the earlier default judgment motion preceded the resolution of any of the claims against Cohn Defendants, the Court held that it was unable to enter default judgment as to damages against Defaulting Defendants until Cohn Defendants' liability had been determined.

With summary judgment having been entered finding Cohn Defendants' liable for certain claims, JerLib now renews its motion for default judgment as to Defaulting Defendants. But once again, the continued presence of the unadjudicated fraud claims against Cohn Defendants preclude JerLib's requested relief. JerLib seeks to hold all Defendants jointly and severally liable on the fraud claims, and therefore the unresolved liability of Cohn Defendants as to those claims precludes entry of a damages award. Moreover, holding a damages hearing solely as to the claims on which all Defendants' liability has been determined would not serve judicial economy. Accordingly, the Court again denies JerLib's motion for default judgment without prejudice to renewal once all Defendants' liability is ascertained.

### IV.

For the foregoing reasons, JerLib's motion for judgment under Rule 54(b) against Cohn Defendants (Dkt. No. 394) and its motion for default judgment as to damages against Defaulting Defendants (Dkt. No. 395) are both denied.

Dated:  August 8, 2024

_____
Andrea R. Wood
United States District Judge

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1
### Eastern Division

Jerlib Investers, LLC

Plaintiff,

v.                                                    Case No.: 1:19–cv–06203
                                                      Honorable Andrea R. Wood

Cohn & Cohn, et al.

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, August 9, 2024:

      MINUTE entry before the Honorable Andrea R. Wood: In Court status hearing held on 8/9/2024. As discussed on the record, Plaintiff's oral motion to voluntarily dismiss the fraud and consumer fraud claims against Erwin Cohn and Charles Cohn is taken under advisement. Telephonic status hearing set for 9/5/2024 at 10:30 AM. To ensure public access to court proceedings, members of the public and media may call in to listen to telephonic hearings. The call–in number is (888) 557–8511 and the access code is 3547847. Counsel of record will receive an email 30 minutes prior to the start of the telephonic hearing with instructions to join the call. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Mailed notice (lma, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.